BENJAMIN SADUN (287533)
benjamin.sadun@dechert.com
DECHERT LLP
US Bank Tower, 633 West 5th Street,
Suite 4900
Los Angeles, CA 90071-2013
Phone: (213) 808-5721; Fax: (213) 808-5760

KATHLEEN N. MASSEY (admitted *pro hac vice*)
Kathleen.massey@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Phone: (212) 698-3500; Fax: (212) 698 3599

Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE on behalf of herself and all other similarly situated,<br>          Plaintiffs,<br><br>          v.<br><br>MINDGEEK USA INCORPORATED, MINDGEEK S.A.R.L., MG FREESITES, LTD (D/B/A PORNHUB), MG FREESITES II, LTD, MG CONTENT RT LIMITED, AND 9219- 1568 QUEBEC, INC. (D/B/A MINDGEEK),<br>          Defendants. | CASE NO. 8:21-CV-00338-CJC-ADS<br><br>*Assigned to Hon. Cormac J. Carney*<br>Courtroom: 9B<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE DECLARATION OF BRIAN N. LEVINE**<br><br>Hearing: November 13, 2023 1:30 P.M. |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................. 1

LEGAL STANDARD ........................................................................................... 3

ARGUMENT ........................................................................................................ 4

I.    Federal Rule of Evidence 702 Must Be Satisfied as Part of the Class Certification "Rigorous Analysis." ............................................................. 4

II.   Levine Is Admittedly Unqualified to Proffer Testimony on Appropriate Content Moderation Policies. .................................................................... 5

III.  Levine's Declaration Is Unreliable under F.R.E. 702. .............................. 7

    A.    Levine Has No Methodology and His Opinions Are Unconnected to Any Standard of Care ................................................................... 8

    B.    Levine's Opinions Are Not Supported by Reliable Evidence. ......... 13

IV.   The Levine Declaration Is Lay Opinion That Does Nothing More than Sponsor Plaintiff's Arguments. ............................................................... 16

V.    Levine's Opinions Regarding MindGeek's States of Mind Are Inadmissible .............................................................................................. 19

CONCLUSION .................................................................................................. 21

CASE NO. 8:21-CV-00338

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
   2013 WL 5955666 (N.D. Cal. Nov. 6, 2013) ........................................ 5

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
   613 F. Supp. 3d 1308 (S.D. Cal. 2020) ...................................... 16, 19

*Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*,
   923 F. Supp. 2d 1245 (S.D. Cal. 2013) .......................................... 8

*Cabrera v. Cordis Corp.*,
   134 F.3d 1418 (9th Cir. 1998) .................................................. 13

*Clarr v. Burlington N. R.R. Co.*,
   29 F.3d 499 (9th Cir. 1994) ...................................................... 8

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ........................................................*passim*

*Dennis v. Pertec Computer Corp.*,
   927 F. Supp. 156 (D.N.J. 1996) ................................................. 9

*Diabolic Video Prods., Inc. v. Does 1-2099*,
   2011 WL 3100404 (N.D. Cal. May 31, 2011) ................................... 2

*Diviero v. Uniroyal Goodrich Tire Co.*,
   114 F.3d 851 (9th Cir. 1997) ..................................................... 8

*E.E.O.C. v. Freeman*,
   778 F.3d 463 (4th Cir. 2015) ................................................... 15

*Georges v. Novartis Pharms. Corp.*,
   2012 WL 9064768 (C.D. Cal. Nov. 2, 2012) ..........................5, 12, 20

*Grodzitsky v. Am. Honda Motor Co.*,
   957 F.3d 979 (9th Cir. 2020) ..................................................... 4

*Lanard Toys Ltd. v. Anker Play Prods., LLC*,
   2020 WL 6873647 (C.D. Cal. Nov. 12, 2020) ................................. 20

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
892 F.3d 624 (4th Cir. 2018) .................................................................. 13

*Lopez v. I-Flow Inc.*,
2011 WL 1897548 (D. Ariz. Jan. 26, 2011) ................................... 9, 20

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008) ................................................................. 15

*Medoff v. Minka Lighting, LLC*,
2023 WL 4291973 (C.D. Cal. May 8, 2023) ........................................ 1

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ................................................... 9

*Morin v. United States*,
534 F. Supp. 2d 1179 (D. Nev. 2005) ................................................... 7

*Nelson v. Matrixx Initiatives*,
2012 WL 3627399 (N.D. Cal. Aug. 21, 2012) ..................................... 14

*Owens v. Auxilium Pharms., Inc.*,
895 F.3d 971 (7th Cir. 2018) ............................................................... 15

*Pascal v. Nissan N. Am., Inc.*,
2022 WL 19076763 (C.D. Cal. Dec. 21, 2022) ..................................... 4

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................................. 16, 20

*Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*,
927 F. Supp. 2d 1069 (D. Or. 2013) .................................................... 20

*Snyder v. Bank of Am., N.A.*,
2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) ........................................ 5

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Stambolian v. Novartis Pharms. Corp.*,
  2013 WL 6345566 (C.D. Cal. Dec. 6, 2013)..............................................5, 7, 16

*Stanley v. Novartis Pharms. Corp.*,
  2014 WL 12573393 (C.D. Cal. May 6, 2014)......................................................19

*Stone Brewing Co., LLC v. MillerCoors LLC*,
  2020 WL 907060 (S.D. Cal. Feb. 25, 2020) ......................................................19

*In re Trasylol Prods. Liab. Litig.*,
  709 F. Supp. 2d 1323 (S.D. Fla. 2010)..........................................................16, 18

*United States v. Valencia-Lopez*,
  971 F.3d 891 (9th Cir. 2020) ..........................................................................3, 8

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000) ............................................................................................8

*White v. Ford Motor Co.*,
  312 F.3d 998 (9th Cir. 2002) .......................................................................5, 16

*Whiting v. Bos. Edison Co.*,
  891 F. Supp. 12 (D. Mass. 1995)........................................................................5

*Yi v. BMW of N. Am., LLC*,
  2018 WL 6071397 (C.D. Cal. May 24, 2018)......................................................3

**Federal Rules**

Fed. R. Civ. P. 23...........................................................................................5, 21

Fed. R. Evid. 702 ........................................................................................*passim*

**Other Authorities**

7AA Fed. Prac. & Proc. Civ. § 1785 (3d ed.).....................................................4

National Center for Missing and Exploited Children,
  https://www.missingkids.org/cybertiplinedata...................................................15

# **INTRODUCTION**

In support of her motion for class certification, Plaintiff submits a declaration of Professor Brian N. Levine ("Levine"), a computer scientist, who specializes in digital forensics and computer networks.    The Court should exclude Levine's declaration from consideration on class certification for several reasons.  First, Levine is not qualified to offer opinions on MindGeek's "content moderation policies and practices."  Declaration of Brian Levine ¶ 1 (Ex. 1) ("Levine Decl.").  These policies and practices include, but are not limited to, MindGeek's use of human moderation and automated tools for detecting and removing content, MindGeek's mechanisms for receiving and responding to complaints about potential CSAM, MindGeek's age verification practices, its use and allowance of certain keywords in categories, titles and tags, and MindGeek's offering of software that allows users to keep their browsing data private.  Levine Decl. ¶¶ 1-7.  He offers these opinions despite acknowledging that he has never worked in content moderation, has never designed a content moderation system, has never drafted a content moderation policy, has no training in content moderation, cannot defend legal assertions contained in his declaration, is aware of no industry standards that apply, conducted no review of the facts of Plaintiff Jane Doe's case, and has no idea whether the alleged deficiencies in MindGeek's content moderation policies led to the posting of Plaintiff's content.  Transcript of Deposition of Brian N. Levine (Sept. 29, 2023) (Ex. 2) ("Levine Dep.") at 35:6-36:18; 66:23-67:23; 81:21-82:18; 83:25-84:12; 146:25-14; 155:8-156:157:3; 165:5-166:5.  To the contrary, the only tenuous connection Levine has to the issues involved in this case are that he has developed algorithms and forensic tools to assist law enforcement in locating individuals who possess and distribute CSAM on Freenet, a "dark net,"[1] designed to help keep users anonymous, and the BitTorrent

---

[1] "Darknet" and "dark web" are "general term[s] that describes hidden Internet sites that users cannot access without using special software."  *Medoff v. Minka Lighting, LLC*, 2023 WL 4291973, at *3 n.5 (C.D. Cal. May 8, 2023).

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE LEVINE**

Network.[2] Levine Decl. ¶ 13; Levine Dep. at 49:7-51:2.  In connection with that work, he has proffered expert testimony in criminal motion-to-suppress hearings, in which he testified to the reliability of his tools for identifying individuals who possessed and distributed CSAM on Freenet or BitTorrent.  Levine Dep. at 70:5-73:24. While Levine may be qualified to testify in those fields, the opinions he offers on the above "content moderation policies and practices" are far afield from his training, academic research, prior testimony, and technical experience.

Second, Levine's proposed testimony is unreliable under Federal Rule of Evidence 702.  Levine elucidates no methodology through which he reached his opinions (let alone a reliable one), and his opinions about the "adequacy" of MindGeek's practices are divorced from any recognized standard of care.  Nor are Levine's opinions premised on reliable evidence.  Rather than rely on scholarly articles and other materials normally relied on in his profession, Levine relies primarily on a hodgepodge of out-of-context snippets of MindGeek documents, Twitter posts, online sources, and media articles, none of which he has properly vetted.

Third, the vast majority of Levine's sprawling declaration, which spans over 73 single-spaced pages and 28,000 words, is simply a recitation of facts from cherry-picked documents provided to him by Plaintiff's attorneys.  Levine presents a misleading (at best), one-sided recitation of certain facts he claims demonstrate that MindGeek's content moderation system was inadequate, while repeatedly making clear that he is "not here to present solutions."  *Id.* at 235:15-236:3. Throughout his deposition, he repeatedly stated that he sees his role in the case as being not to state his own opinions but rather to "evaluate the materials" Plaintiff's counsel gave him

---

[2] BitTorrent is "a decentralized method of distributing data" online that "allow[s] users to share files anonymously with other users."  *Diabolic Video Prods., Inc. v. Does 1-2099*, 2011 WL 3100404, at *1 (N.D. Cal. May 31, 2011).

and "present[] them in a coherent manner."  Levine Dep. at 156:12-20.  This is not bona fide expert testimony; this is cheerleading for the Plaintiff's counsel.

Finally, Levine's declaration is littered with improper "state of mind" opinions. Levine's statements regarding MindGeek's "intent" and "knowledge" are inadmissible because there is no methodology by which a person can know what another thought, they usurp the role of the fact finder, and they amount to little more than legal advocacy for Plaintiff's position.

For each of the foregoing reasons, and those contained herein, his declaration must be excluded.

## **LEGAL STANDARD**

Plaintiff bears the burden of showing Levine's testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592 n.10 (1993).  Before admitting expert testimony, "the district court must perform a 'gatekeeping role' to ensure that the testimony is both relevant and reliable."  *United States v. Valencia-Lopez*, 971 F.3d 891, 897-98 (9th Cir. 2020) (cleaned up).

*Daubert* and its progeny are codified by Federal Rule of Evidence 702, which provides that if "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," a "witness qualified as an expert" may testify thereto only if "the testimony is based upon sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

"Courts addressing a motion to exclude expert testimony must 'assess whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.'"  *Yi v. BMW of N. Am., LLC*, 2018 WL 6071397, at *2 (C.D. Cal. May 24, 2018) (quoting *Ollier v. Sweetwater Union High Sch. Dist.,* 768 F.3d 843, 860 (9th Cir. 2014)).

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE LEVINE**

In conducting a *Daubert* analysis, courts consider the following nonexclusive factors: (1) whether a scientific technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication," (3) "the known or potential rate of error" of a particular scientific technique," and (4) "general acceptance" in the relevant scientific community. *Daubert,* 509 U.S. at 592-96.

Levine has no methodology to speak of. All he does is sponsor Plaintiff's case by reading and reciting the cherry-picked documents that Plaintiff's counsel provided to him to reach the legal conclusion that all of the issues in this case can be determined through common evidence. This is both wrong and a gross abuse of the expert process.

## **ARGUMENT**

### **I.    Federal Rule of Evidence 702 Must Be Satisfied as Part of the Class Certification Rigorous Analysis**

"In evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*" to "ensure that all admitted expert testimony is both relevant and reliable." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (internal quotations and citation omitted). The proffered opinions must be admissible; a possibility that "the testimony could evolve into something admissible by the time of trial" is insufficient. 7AA Fed. Prac. & Proc. Civ. § 1785 (3d ed.).

Because Levine's proffered opinion is the centerpiece of Plaintiff's motion for class certification, the Court "should first apply *Daubert* 'to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination'" of whether "the expert's testimony is reliable." *Pascal v. Nissan N. Am., Inc.,* 2022 WL 19076763, at *4-5 (C.D. Cal. Dec. 21, 2022), *reconsid. denied*, 2023 WL 2558786 (C.D. Cal. Feb. 21, 2023). If, and only if, the Court determines that Levine's opinions are "admissible under *Daubert*," it should

then "conduct the rigorous analysis mandated by *Dukes* to determine whether the strictures of Rule 23 have been satisfied." *Id.* (cleaned up).

## II.    Levine Is Admittedly Unqualified to Proffer Testimony on Appropriate Content Moderation Policies.

"Under Federal Rule of Evidence 702, experts may not make expert conclusions about areas outside their expertise." *Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013). "This means that a witness must be qualified in the ***specific*** subject for which his testimony is offered." *Whiting v. Bos. Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) (emphasis in original). Even a well credentialed expert in one field may not be an expert in every related field. *See id.*; *Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020) (expert in real estate and the preparation of residential loans was not qualified to opine on the specifics of loan servicing or credit reporting); *Georges v. Novartis Pharms. Corp.*, 2012 WL 9064768, at *13 (C.D. Cal. Nov. 2, 2012) (expert in FDA labeling requirements not qualified as an expert in ethical standards that may apply to pharmaceutical labeling).

Relevant considerations to assess whether someone is qualified as an expert in a particular field include whether he has "published any articles" on the topic, "done any research" on it, and is familiar enough with the literature to identify publications that support his conclusions when questioned. *See Stambolian v. Novartis Pharms. Corp.*, 2013 WL 6345566, at *6 (C.D. Cal. Dec. 6, 2013).

The Ninth Circuit has emphasized why it is so important for courts to preclude testimony by experts outside their fields. "When testifying outside his area of expertise," an expert witness is nothing more than "[a] layman." *White v. Ford Motor Co.*, 312 F.3d 998, 1008–09 (9th Cir. 2002). He "ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion." *Id.*

Here, the entire purpose of Levine's report is to opine that MindGeek's content moderation policies are inadequate and that can be determined for every member of

the class using "common evidence."  Yet he admits that he has *zero* training or experience in content moderation:

> Q. Have you evaluated the content moderation policies for user-generated content for any adult website, other than PornHub?
>
> A. I have not.

Levine Dep. at 158:2-6.  Likewise, he has never even *thought about* whether it is "possible for any pornographic website to create a system [he] believe[s] would be satisfactory" because he "only sat down to think about what was presented to [him] for MindGeek."  *Id.* at 246:25-248:15.

Levine also has no training, experience, or knowledge relating to website content moderation more broadly.  He is a professor of computer science specializing in digital forensics, meaning the finding and tracking of data.  *Id.* at 22:7-24.  He has never authored a peer-reviewed article regarding content moderation.  *Id.* at 234:17-22.  He has not researched many of the practices he claims MindGeek should have adopted, such as age verification.  *E.g.*, *id.* at 241:12-28.  He has no formal or other training regarding content moderation and has never taught a course or done research on content moderation.  *Id.* at 165:5-18; 234:23-24.  Although he claims there is academic literature in the field, he is not familiar with it.  Tellingly, his declaration does not cite a single academic or industry source regarding content moderation.  At his deposition, he was able to identify only a single textbook in the field, which he claims to have read only once "a couple of months ago" and "not carefully."  *Id.* 163:11-164:4.

Levine also does not have any practical or industry experience in the field of content moderation:

> Q. Have you ever designed a content moderation system for a website?
>
> A. I have not.
>
> Q. Have you ever drafted a content moderation policy?

1    A. I have not.

2    Q. Have you ever created content moderation practices or procedures?

3    A. No.

4  *Id.* at 36:10-18.  In fact, he has never worked for any company in the business of

5  operating websites or platforms hosting user-generated content.  *Id.* 27:18-28:7,

6  28:13-29:5, 29:6-30:7.

7    When asked why he believed he was an expert on content moderation, Levine

8  stated only that he "think[s] about it all the time" and that he has seen the "end result

9  of moderation, which anyone can do" through using websites like Facebook and

10  Instagram. *Id.* at 35:6-36:9. Thinking hard and using Facebook and Instagram do not

11  constitute the specialized "knowledge, skill, experience, training, or education"

12  contemplated by Rule 702.

13    Levine's declaration touts his experience developing tools to help law

14  enforcement find or track CSAM.  Levine Decl. ¶¶ 13, 16.  But none of that experience

15  "involved the dissemination of CSAM on an adult website like PornHub."  Levine

16  Dep. at 61:21-62:4. Moreover, investigating the distribution of CSAM by specific

17  individuals is worlds apart from designing websites and moderation protocols.

18  Analogously, courts have held that medical doctors who are experts in treating a

19  condition are not necessarily experts in assessing the causes of that condition.  *E.g.*,

20  *Morin v. United States*, 534 F. Supp. 2d 1179, 1185 (D. Nev. 2005), *aff'd*, 244 F.

21  App'x 142 (9th Cir. 2007); *Stambolian*, 2013 WL 6345566, at *6.  The same is true

22  here.  While Levine might have expertise in designing algorithms to help law

23  enforcement catch people who share CSAM on the dark net, that does not make him

24  an expert on the content moderation practices of legitimate public facing websites that

25  permit user-generated content.

26  **III.    Levine's Declaration Is Unreliable under F.R.E. 702.**

27    To the extent Levine's testimony contains any analysis at all, it is unreliable

28  under *Daubert* and inadmissible because it is based entirely on his own subjective

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE LEVINE**

belief and inuendo.  "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997).  "[T]he Court has a duty to ensure that [the expert's] methodology is sound and that his testimony is supported by the underlying facts." *Brighton Collectibles, Inc. v. RK Texas Leather Mfg.*, 923 F. Supp. 2d 1245, 1255 (S.D. Cal. 2013).  The Court must exclude expert testimony that is not "the product of reliable principles and methods," is not "based on sufficient facts or data," or has not "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702. These are "exacting standards of reliability."  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000).

### A.    Levine Has No Methodology and His Opinions Are Unconnected to Any Standard of Care.

Rule 702 requires that experts employ a valid "methodology." *Valencia-Lopez*, 971 F.3d at 900.  This requires the expert to have one in the first place.  Thus, as a "prerequisite" to applying *Daubert*, the Court must first "assure that the methods are adequately explained." *Id.* (citation omitted).  Expert testimony that does not identify a reliable methodology is inadmissible. *Id.*

Here, Levine admittedly did not employ any known methodology.  He concedes that "[t]he scope of [his] report was focused on an analysis, an evaluation, and a rendering of an opinion of the policies and practices of MindGeek as it relates to child sexual abuse material." Levine Dep. at 64:24-65:7. Rather than apply any recognized methodology, his preferred method "was to just look through the evidence and point out why [MindGeek's content moderation] might be inadequate, and I found that it was inadequate." *Id.* at 219:18-25.  But "[c]oming to a firm conclusion first and then doing research to support it is the antithesis of the scientific method." *Clarr v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) (emendation omitted). The fact that that is precisely what Levine did is underscored by Levine's testimony

1    that even if the factual assumptions undergirding his opinions turned out to be wrong,
2    he would still not change his opinions.  *E.g.*, Levine Dep. at 17:13-22, 67:24-68:21,
3    203:3-10.

4    　　　Levine testified that he did not use any objective standards in evaluating
5    MindGeek's moderation process:

> Q. Okay.  Is there something similar that can be applied to a website's
> content moderation practices where you can judge whether it is passing
> that standard or failing those standards?
>
> A. I didn't set out to pass or fail MindGeek.  I evaluated the materials
> that were before me and presented them in a coherent manner.

11    *Id.* at 154:3-11; *see also id.* at 148:9-24 ("Q. Is there a way to measure whether …
12    one company's content moderation policies and practices are adequate as opposed to
13    another company's[?] …. A. I don't think that was the goal of my -- scope of my
14    report.  I evaluated MindGeek based upon the evidence or the discovery materials that
15    were provided to me").

16    　　　To the extent Levine purports to have a "method," it consists merely of
17    selectively describing various things MindGeek did or did not do to detect and remove
18    CSAM and offering a conclusory assessment of whether these policies were adequate.
19    But presenting a "narrative of selected [facts]… and quotations and then leap[ing] to
20    a conclusion without sufficient explanation" is not a reliable methodology.  *Lopez v.*
21    *I-Flow Inc.*, 2011 WL 1897548, at *10 (D. Ariz. Jan. 26, 2011). "[U]nrecorded mental
22    methodology amounts to nothing more than unsupported speculation."  *Dennis v.*
23    *Pertec Computer Corp.*, 927 F. Supp. 156, 161 (D.N.J. 1996), *aff'd sub nom.*, *Dennis*
24    *v. Commc'n Mach. Corp.*,135 F.3d 764 (3d Cir. 1997); *see also In re Mirena Ius*
25    *Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 247 (S.D.N.Y. 2018)
26    (noting that an expert's "malleable and vague approach" "is in tension with first
27    principles under *Daubert*"), *aff'd,* 982 F.3d 113 (2d Cir. 2020).  Levine's musings are
28    not testable, they have not been published or peer reviewed, they have no known error

rate, and they have not been accepted by the scientific community. *Daubert*, 509 U.S. at 593-94.

Nevertheless, Levine repeatedly opines that various MindGeek policies were "inadequate" and that MindGeek "failed" to adopt certain other policies. *See, e.g.*, Levine Decl. ¶¶ 1-7. But these opinions are simply lay speculation sponsoring Plaintiff's argument because he admits that he has no yardstick by which to measure what "adequate" content moderation looks like:

> Q. You didn't evaluate MindGeek's conduct against any sort of external standard?
>
> A. Not explicitly.
>
> Q. Implicitly?
>
> A. I think that's up to the reader.

Levine Dep. at 156:9-15; *see also id.* at 155:8-13 ("[M]y goal was to present my analysis. My goal wasn't to present it against some standard."), 149:8-24 ("I wasn't asked to speculate or evaluate whether it was adequate by one person's measure or another. I was just asked to evaluate it."), 112:23-114:9 (similar)

Likewise, Levine admitted that he was not aware of "any industry standards on how to moderate user-generated content." *Id.* at 147:10-14. Nor did he compare MindGeek's policies and practices to those of any other adult website, in part because he is not familiar with any other website's moderation processes. *Id.* at 215:14-216:15. And while he makes numerous unfavorable comparisons between MindGeek's practices and those of other companies like Google and Facebook, *e.g.*, Levine Decl. ¶¶ 35, 110, 140, 213, he admits that he has no real knowledge of those companies' practices. For example, he has no independent knowledge of how many moderators Facebook or Google use, how they train their moderators, or "how effective their systems are." Levine Dep. at 224:2-21. At the same time, he concedes that those websites also struggle with CSAM posted by third parties. *Id.* at 123:25-

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE LEVINE**

1 125:2 (acknowledging the presence of CSAM on email systems and every social

2 media website, including Twitter, Reddit, Facebook, Instagram, and TikTok); 158:7-

3 159:5 (claiming tens of thousands of users are exchanging CSAM on Instagram).

4      Because he does not employ any objective standard, Levine cannot say what

5 "adequate" moderation would look like or even whether it is possible at all. *See, e.g.*,

6 Levine Dep. at 83:25-84:5 ("Q. So you're not offering any opinion as to what would

7 have made MindGeek's policies and practices adequate? A. That's not within the

8 scope of what I was asked to do."); *id.* at 246:5-247:7 ("Q. Do you think it's possible

9 for any pornographic website to create a system that you believe would be

10 satisfactory? A. I haven't been asked to evaluate that…."). Indeed, he suggests no

11 objective criteria even *exist* for determining the adequacy of content moderation. On

12 that point, he testified that: "there is a variety of standards" and that "advocacy

13 groups" and "individual people" may all have their own opinions of what constitutes

14 adequate moderation and those may have nothing to do with "standards that are

15 written into law." Levine Dep. at 155:8-24.

16      In the absence of any objective standard, Levine simply opines *ipse dixit* that

17 the mere fact that *any* CSAM was posted to MindGeek's sites is *per se* proof that its

18 policies were inadequate. Levine Decl. ¶ 81. Perversely, he basis this on the fact that

19 MindGeek's *own goal* was to have "zero tolerance" for CSAM. *See* Levine Dep. at

20 88:8-20, 104:19-105:4, 106:17-108:11. But it makes no sense to say that a different

21 standard should govern companies that take a strong stance against CSAM than those

22 that do not.

23      Levine's lack of any coherent methodology permeates his declaration. Absent

24 any standard or framework for evaluating moderation policies, Levine has no basis to

25 compare the systems MindGeek had or has in place with those on his "wish list." For

26 example, Levine opines that MindGeek should have hired more moderators. Levine

27 Decl. ¶ 32. But he has no way to determine when a website has enough moderators.

28 Levine Dep. at 219:2-17 ("Q. So, what's the appropriate number? A. It depends. …

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE LEVINE**

1  Q. Sure. How many moderators do you think MindGeek should have had? A. I think

2  they should have had enough to prevent, detect, and remove CSAM that was on their

3  system….").  Similarly, Levine opines that MindGeek's moderators should have

4  received better training.  Levine Decl. ¶ 41. But he does not know what types of

5  training programs are available for moderators and has no opinion about "what would

6  make a content moderation training program adequate."  Levine Dep. at 228:9-25.

7      The declaration also repeatedly criticizes MindGeek for not "verifying" the

8  ages of performers.  *E.g.* Levine Decl. ¶ 4.  When questioned, however, he could not

9  name an adequate method to verify performers' ages and was not even sure one exists.

10  Levine Dep. at 236:14-19 ("Q. What would a workable [age verification] system look

11  like? A. … I didn't come here today with a prepared solution for MindGeek that solves

12  all their problems."); *id.* at 238:2-8 (similar).  And while his report mentions requiring

13  government ID as one solution, Levine Decl. ¶ 146, he admits that he is not aware of

14  any literature or study on the effectiveness of requiring government IDs, especially in

15  light of the fact that they are easily faked.  Levine Dep. at 241:21-242:25.

16     Levine's declaration also lists several technologies that he thinks MindGeek

17  should have adopted earlier to detect CSAM.  Levine Decl. ¶¶ 101-33.  At the same

18  time, however, he opines that these technologies are "insufficient" and fail to catch

19  *80%* of the CSAM caught by humans.  *Id.* ¶¶ 134-35.  Thus, it is hard to see how the

20  failure to use such unreliable programs was "inadequate."

21     In short, Levine offers nothing more than subjective feelings and beliefs, under

22  the thin guise of "expert" testimony, about how, in hindsight, he thinks MindGeek

23  should have been run.  Such beliefs must be excluded under Federal Rule of Evidence

24  702 and *Daubert*.  *See, e.g.*, *Georges*, 2012 WL 9064768, at *12 (excluding expert's

25  speculative testimony as to whether the defendant's practices were "adequate").

26

27

28

## B.    Levine's Opinions Are Not Supported by Reliable Evidence.

Levine's declaration should also be excluded because his opinions are not based on reliable evidence.  "Result-driven analysis, or cherry-picking, undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion."  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018).  In lieu of reliable information, Levine's report relies on select unverified media articles and online sources, and on mischaracterizations of internal MindGeek documents to support his opinions.  He freely admits that his report does not cite to any scholarly articles about content moderation or research papers discussing proper third-party content moderation techniques.  Levine Dep. at 164:8-15; 167:13-21.  He is also clear that he does not believe an expert witness has responsibility to vet the quality of his sources, instead stating that "I think I have a duty to gather materials and present those sources and include the source so that you, for example, could report on those biases."  *See, e.g.*, *id.* at 261:3-264:7.  He also believes that the nature of a source "seems irrelevant" to its reliability.  *Id.* at 261:3-17.  Levine is wrong.  "An opinion based on … unsubstantiated and undocumented information is the antithesis of the scientifically reliable expert opinion admissible under *Daubert* and Rule 702."  *Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1423 (9th Cir. 1998).  As the facts on which Levine relies are unreliable, his declaration should be excluded.

As just one example, the primary evidence on which Levine bases his opinion that MindGeek was indifferent to the age of performers on its platforms is a 2018 tweet from a notorious anti-pornography activist.  Levine Decl. ¶151; AgeID Tweet (Ex. 3).  The tweet, which appears to be lifted directly from Plaintiff's Third Amended Complaint, ECF No. 107 ¶ 3, claims to include posts made on the website, Reddit, by an unnamed MindGeek employee.  Ex. 3.  Levine did not look at the actual Reddit.com posts, did no independent investigation to verify the tweet's accuracy,

acknowledged the text appeared to be excerpted from larger posts, and does not know who the original Reddit poster is. Levine Dep. at 258:4-259:7; 267:8-268:15. Given this lack of rigor, it is unsurprising that Levine's analysis of the tweet was completely wrong. Levine Decl. ¶ 151. The Reddit post had ***nothing*** to do with verifying the age of performers; it concerned a law being discussed in the United Kingdom that would require age verification for ***users*** of adult websites. The poster was not discussing the age of performers at all but rather responding to accusations that MindGeek would be profiting from a law making it harder for minors to *view* pornography because it had developed proprietary software to comply with it. Levine Dep. at 270:5-272:12. Levine's implication based on this post that MindGeek was against verifying the age of individuals appearing in videos on their website was thus entirely unsupported. "Where an expert bases his conclusion upon assumptions which are not supported by the record … or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value." *Nelson v. Matrixx Initiatives*, 2012 WL 3627399, at *10 (N.D. Cal. Aug. 21, 2012) (citation omitted), *aff'd*, 592 F. App'x 591 (9th Cir. 2015). That is exactly the case here.

The quality of other evidence relied on by Levine is also lacking and not of the type that can support serious academic analysis. For example, Levine extensively cites to unverified news and online articles. In Paragraph 192 of his declaration, he cites to a *New Yorker* article that purports to be quoting an anonymous former MindGeek employee as though the statements were verified fact, while ignoring that MindGeek directly denied the allegations. Levine Decl. ¶ 192. Levine has not even attempted to confirm their veracity. His declaration is loaded with other similar examples too numerous to list where he simply reprints excerpts of news articles absent context and treats them as scientific fact. *See, e.g. id.* ¶¶ 52-61; 173, 184.

Levine's declaration is also rife with unsubstantiated speculation. For example, Levine claims that MindGeek used Virtual Private Network (VPN) services and "Onion" services to "thwart" law enforcement efforts, Levine Decl. ¶¶ 188-201, but

he could not provide a single example of a law enforcement investigation hampered by MindGeek's practices.  Levine Dep. at 378:24-379:9. Admitting expert testimony based on such "speculative assumptions is an abuse of discretion."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008); *see also Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) ("[A]n expert's opinion on hypothetical circumstances, rather than the facts at issue, shows a lack of familiarity with the case that affects both the certainty of his conclusion and whether it fit[s] the facts of the case.").

Levine also repeatedly gets facts wrong even when relying on his own sources. For example, his report completely misstates how the Tor "mirror" site set up by MindGeek operated, even though it was clearly described in the very source he cited. Levine Dep. at 365:2-23 ("So, I apologize, I missed that, and my presumption was incorrect.").   Other examples include misstating the date on which at least one electronic tool became commercially available by two years, *id.* at 324:14-325:9, and conflating MindGeek's e-mail address with its entirely separate Content Removal Request system.  Levine Decl. ¶ 69.

Many of Levine's opinions are also informed by his erroneous assumption that MindGeek was legally required to report CSAM to NCMEC.  Levine Decl. ¶ 208-18. While MindGeek voluntarily reports apparent CSAM to NCMEC, it is ***not*** legally required to do so.  Among other issues, the websites are operated by MG Freesites Ltd, a Cypriot entity located outside the United States.  NCMEC's own website says that only "U.S. based [companies] are legally required to report child sexual abuse material (CSAM) or 'apparent child pornography'" and that reporting by "non U.S. based companies" is "voluntary."  https://www.missingkids.org/cybertiplinedata.

In sum, Levine's analysis contains many obvious errors fed to him by Plaintiff's counsel; these legal and "factual deficiencies further evidence his faulty methods and lack of investigation."  *E.E.O.C. v. Freeman*, 778 F.3d 463, 470 (4th Cir. 2015) (Agee, J., concurring) (internal quotations and citation omitted).

**IV.    The Levine Declaration Is Lay Opinion That Does Nothing More than Sponsor Plaintiff's Arguments.**

As the Supreme Court has observed, "expert evidence can be both powerful and quite misleading." *Daubert*, 509 U.S. at 595 (citation omitted). Accordingly, courts must be careful not to allow parties to present lay evidence under an imprimatur of expertise. *See White*, 312 F.3d at 1008-09. That, however, is precisely what Levine's declaration does. Although he purports to opine on MindGeek's moderation practices, his declaration consists overwhelmingly of a selective presentation of facts he thinks are helpful to Plaintiff's case and cursory conclusions about what those facts purport to show regarding the adequacy of MindGeek's systems or MindGeek's state of mind. Huge swathes of Levine's declaration consist of little more than recitations of selective facts he has gleaned from cherry-picked documents provided by Plaintiff's counsel. Such testimony is inadmissible. "[E]xpert testimony cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021); *Stambolian*, 2013 WL 6345566, at *10 (holding that expert is "not permitted to read, selectively quote from, or 'regurgitate' the evidence" (cleaned up)); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (same). Nor does such testimony become admissible merely because the expert "reaches conclusory opinions that are purportedly based on these facts." *In re Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1345–46 (S.D. Fla. 2010).

If Plaintiff wishes to present this material, the documents and deposition transcripts speak for themselves. *Aya Healthcare*, 613 F. Supp. 3d at 1322-23. A would-be expert's subjective narration of these facts consists of nothing more than "secondhand knowledge unnecessary for the edification of the jury." *Id.* at 1323 (quoting *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *1-2 (S.D.N.Y. July 16, 2002)).

Yet, according to Levine himself, the ***entire purpose of his declaration*** is to present a factual narrative. In his own words:

> A. So ***I'm offering facts that are relevant to the question of evaluating and rendering opinion about MindGeek's policies*** and practices as it relates to CSAM. So there's a lot of facts both through discovery and, you know, from the world that are relevant and I'm putting them all in one place in a coherent form.

Levine Dep. at 176:12-20 (emphasis added).

> Q. So, you didn't judge the policies and practices against any objective standard?
>
> …
>
> A. No, I disagree. At the start you asked me what forensics is and I said it's the preparation of materials or evidence. In this case, materials that were provided to me to present them in a forum. So ***I am presenting these materials in a coherent way that the rest of you in the room can carry on with the legal process***. And so to me the question was, which of their -- which things did I see was relevant to CSAM?

*Id.* at 113:7-114:9 (emphasis added); *see also id.* at 154:3-11 ("I didn't set out to pass or fail MindGeek. I evaluated the materials that were before me and presented them in a coherent manner.").

Levine also admits that several of the "opinions" in his report are not his opinions at all but merely things other people have said. For example, he states in his report that "Electronic service providers, such as MindGeek, are … required to report all apparent violations involving child sex crimes to NCMEC." Levine Decl. ¶ 208. When asked to explain the basis for that statement, however, he stated: "I think that since that's a question about U.S. federal law, I'm not here to offer a legal conclusion." Levine Dep. at 175:6-11. Instead, he explained that his report is just stating that "the Canadian Center for Child Protection stated that" U.S. law requires websites to report to NCMEC. *Id.* at 178:5-8. Similarly, when questioned about his

17

reliance on tweets by strangers, Levine Decl. ¶¶ 85, 95, 151, Levine said that he is just collecting information "that allows you to come to your own conclusions." Levine Dep. at 261:18-262:11.

Consistent with Levine's stated purpose to merely "present" selected facts, nearly his entire declaration consists of inadmissible factual narratives and "conclusory opinions that are purportedly based on these facts." *In re Trasylol*, 709 F. Supp. 2d at 1345-46. As just some examples, Paragraphs 18-24 summarize documents regarding MindGeek's business model, content moderation practices, and Levine's spin on statements by MindGeek employees. Paragraphs 27-30 collect statements from documents produced in discovery supposedly showing that MindGeek failed to detect some CSAM. Next, Paragraphs 32-51 and 64-80 merely summarize documents about MindGeek's training and use of moderators, other moderation tools, and tools for reporting CSAM sprinkled with Levine's conclusory opinions that these procedures were "inadequate" and/or implemented in bad faith. Paragraphs 81-88 collect and regurgitate various statistics from documents produced in discovery about how many times CSAM was uploaded or viewed to MindGeek's sites. Paragraphs 97-100 and 150-207 summarize documents describing various features of MindGeek's sites, such as search tools, keywords, VPNs, and "Onion" sites. These contain almost no analysis or extrinsic information beyond brief descriptions of what these technologies are, Levine's opinions that MindGeek should have designed its sites differently, and his speculation about why MindGeek used certain features.

Paragraphs 101-36 present a narrative about what detection technologies MindGeek uses, when it began using them, and publicly available information about what those technologies do and when they became available. Levine performs no analysis other than characterizing the time before MindGeek adopted certain technologies as a "failure to implement" them and offering conclusory opinions that the technologies adopted were "insufficient." Finally, Paragraphs 208-218

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE LEVINE**

summarize MindGeek documents about its reporting to NCMEC and publicly available documents about what NCMEC is and how content reporting works. As discussed above, Levine expressly disclaims that his statements about NCMEC reporting requirements are his opinions but merely summaries of things people in Canada have said.

In short, Levine admits that the purpose of his declaration is not to *analyze* facts but to collect facts supporting Plaintiff's position and present them "in a coherent manner." Because his declaration does precisely that—and only that—it is inadmissible and should be stricken.

## V. Levine's Opinions Regarding MindGeek's States of Mind Are Inadmissible.

Throughout his declaration, Levine repeatedly opines on MindGeek's state of mind, including what MindGeek "intended," *e.g.*, Levine Decl. ¶¶ 4, 172, & p. 53, what MindGeek "knew" or could have known, *e.g.*, *id.* ¶¶ 5, 6, 25, 111, & pp. 36-37, 40, 54, or what MindGeek "understood" certain terms to mean. *E.g.*, *id.* ¶ 156. Such testimony is inadmissible for at least three reasons.

First, it lacks reliable methodology. "[T]he opinions of [expert] witnesses on the intent, motives, or states of mind of corporations … and others have no basis in any relevant body of knowledge or expertise." *Stone Brewing Co., LLC v. MillerCoors LLC*, 2020 WL 907060, at *4 (S.D. Cal. Feb. 25, 2020) (quotation omitted); *accord, e.g.*, *Aya Healthcare*, 613 F. Supp. 3d at 1320-21; *Stanley v. Novartis Pharms. Corp.*, 2014 WL 12573393, at *6 (C.D. Cal. May 6, 2014).

Levine admits that many of his inferences do not draw on any expertise. For example, his opinion about what MindGeek employees thought of MindGeek's moderation practices is based on "just reading" what they wrote in a chat and says "I think it's obvious from the text" what they thought. Levine Dep. at 115:17-117:14. If, in fact, his inference is "obvious from the text," it is not the proper subject of expert testimony under FRE 702.

Second, such testimony invades the province of the fact finder. The court "is sufficiently capable of drawing its own inferences regarding intent, motive, or state of mind from the evidence, and permitting expert testimony on this subject would be merely substituting the expert's judgment for the [fact finder]'s…." *Lanard Toys Ltd. v. Anker Play Prods., LLC*, 2020 WL 6873647, at *7 (C.D. Cal. Nov. 12, 2020) (cleaned up); *see also In re Rezulin*, 309 F. Supp. 2d at 547 ("[T]he question of intent is a classic jury question and not one for the experts.").

Third, such opinions are legal advocacy, not expert opinions. Experts who make arguments regarding the "intent or motives underlying the [defendant's] conduct" "improperly … assume the role of advocates for the plaintiff['s] case." *Id.* at 546. Such "musings as to defendants' motivations … would not be admissible if given by any witness—lay or expert." *Id.* (cleaned up).

For all these reasons, "[c]ourts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind." *Siring v. Or. State Bd. of Higher Educ. ex rel. E. Or. Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) (collecting cases); *accord, e.g.*, *Georges*, 2012 WL 9064768, at *16 (excluding expert testimony on "Defendant's alleged 'bad faith' conduct, intent, or motives"); *Lopez*, 2011 WL 1897548, at *11 (excluding expert who "opine[d] as to the knowledge, state of mind, intent or motivations of" the defendants).

Levine's declaration is littered with similarly impermissible subjective inferences about MindGeek's state of mind. These include opinions that "MindGeek was aware of significant amounts of [CSAM]," Levine Decl. at ¶ 7, and did not care about detecting CSAM, *id.* at ¶ 49; opinions about MindGeek's intent behind how it designed various site features, *id.*; and things Levine believes MindGeek "knew" or should have known about the kinds of content being posted to the site using various keywords. *Id.* ¶¶ 174-180. These are not admissible expert opinions; they are the subjective conclusions of a layman whose explicit task was to find reasons MindGeek's policies were inadequate. To the extent his inferences are correct (which

they are not), the Court is just as capable of drawing them as part of its Rule 23 analysis as Levine is.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Declaration of Professor Brian N. Levine should be excluded from the Court's consideration of Plaintiff's motion for class certification.

DATED: October 16, 2023                 Respectfully submitted,

                                             /s/    *Kathleen N. Massey*

KATHLEEN N. MASSEY (*pro hac vice*)
Kathleen.massey@dechert.com
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Phone: (212) 698-3500; Fax: (212) 698 3599

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Michael T. Zeller (CA Bar No. 196417)
michaelzeller@quinnemanuel.com
Michael E. Williams (CA Bar No. 181299)
michaelwilliams@quinnemanuel.com
Diane Cafferata (CA Bar No. 190081)
dianecafferata@quinnemanuel.com
Robert Becher (CA Bar No. 193431)
robertbecher@quinnemanuel.com
Thomas Nolan (CA Bar No. 238213)
thomasnolan@quinnemanuel.com
Mari F. Henderson (CA Bar No. 307693)
marihenderson@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,570 words, which complies with the word limit of L.R. 11-6-1.

/s/ *Christopher R Boisvert*
Christopher R Boisvert