DAVIDA BROOK (275370)
dbrook@susmangodfrey.com
KRYSTA KAUBLE PACHMAN (280951)
kpachman@susmangodfrey.com
HALLEY W. JOSEPHS (338391)
hjosephs@susmangodfrey.com
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA  90067
Phone:  (310) 789-3100; Fax: (310) 789-3150

AMY B. GREGORY (Pro Hac Vice)
agregory@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl.
New York, NY 10019-6023
Phone: (212) 336-8330; Fax: (212) 336-8340

(*See additional counsel on signature page*)

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JANE DOE on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MINDGEEK USA INCORPORATED, MINDGEEK S.A.R.L., MG FREESITES, LTD (D/B/A PORNHUB), MG FREESITES II, LTD, MG CONTENT RT LIMITED, AND 9219-1568 QUEBEC, INC. (D/B/A MINDGEEK),<br><br>Defendants. | Case No. 8:21-cv-00338-CJC-ADS<br><br>*Hon. Cormac J. Carney*<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE THE DECLARATION OF BRIAN N. LEVINE**<br><br>Judge:    Hon. Cormac J. Carney<br>Date:     November 13, 2023<br>Time:     1:00 p.m.<br>Location: Courtroom 9 B<br>411 West Fourth Street<br>Santa Ana, CA 92701 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    I.    Case Background ................................................................................ 3

    II.    Dr. Levine's Report and Qualifications .............................................. 4

    III.    MindGeek's Motion to Exclude ......................................................... 6

LEGAL STANDARD .......................................................................................... 6

ARGUMENT ....................................................................................................... 8

    I.    Dr. Levine Is Qualified to Offer His Opinions .................................. 8

    II.    Dr. Levine's Opinions are Reliably Based on His Experience
        and on Scientific Literature .............................................................. 11

    III.    Dr. Levine's Opinions Are Supported by Evidence .......................... 14

    IV.    Dr. Levine Does Not Offer State of Mind Opinions ......................... 16

    V.    Dr. Levine Does Not Offer a Factual Narrative and His
        Testimony Assists the Court in Assessing Rule 23
        Requirements ................................................................................... 18

CONCLUSION .................................................................................................. 20

1

2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**Cases**

5

*Apple, Inc. v. Samsung Elecs. Co.*,
6      2013 WL 5955666 (N.D. Cal. Nov. 6, 2013) ..................................................... 10

7

*Arista Recs. LLC v. Lime Grp. LLC*,
8      784 F. Supp. 2d 398 (S.D.N.Y. 2011) ............................................................... 16

9

*Cap Export, LLC v. Zinus, Inc.*,
10     2019 WL 982883 (C.D. Cal. Jan. 24, 2019) ..................................................... 7, 9

11

*Capri Sun GmbH v. Am. Beverage Corp.*,
12     595 F. Supp. 3d 83 (S.D.N.Y. 2022) ................................................................. 15

13

*City of Pomona v. SQM North Am. Corp.*,
14     750 F.3d 1036 (9th Cir. 2014) ............................................................................. 8

15

*Cooper-Harris v. United States*,
      2013 WL 12125527 (C.D. Cal. Feb. 8, 2013) ................................................... 19

16

*D.F. by and through Amador v. Sikorsky Aircraft Corp.*,
17     2017 WL 4922814 (S.D. Cal. Oct. 30, 2017) ...................................................... 7

18

*Dennis v. Pertec Computer Corp.*,
19     927 F. Supp. 156 (D.N.J. 1996), *aff'd sub nom. Dennis v. Commc'n
       Mach. Corp.*, 135 F.3d 764 (3d Cir. 1997) ...................................................... 13

20

*Doe v. Rose*,
21     2016 WL 9023602 (C.D. Cal. Aug. 31, 2016) .................................................. 7, 9

22

*Hangarter v. Provident Life and Acc. Ins. Co.*,
23     373 F.3d 998 (9th Cir. 2004) ............................................................................... 7

24

*In re AXA Equitable Life Ins. Co. COI Litig.*,
25     595 F. Supp. 3d 196 (S.D.N.Y. 2022) ............................................................... 17

26

*In re ConAgra Foods, Inc.*,
27     302 F.R.D. 537 (C.D. Cal. 2014) ...................................................................... 19

28

*In re HIV Antitrust Litig.*,
    2023 WL 3089820 (N.D. Cal. Mar. 7, 2023) ....................................... 17

*In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig.*,
    341 F. Supp. 3d 213 (S.D.N.Y. 2018) ................................................. 13

*In re Rezulin Prod. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004) ................................................. 19

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
    318 F. Supp. 2d 879 (C.D. Cal. 2004) ................................................... 7

*In re Term Commodities Cotton Futures Litig.*,
    2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ................................... 17

*In re Trasylol Products Liability Litigation*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) ............................................... 19

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
    2006 WL 2128785 (S.D.N.Y. July 28, 2006) ....................................... 7

*Kane v. PaCap Aviation Fin., LLC*,
    2022 WL 3446314 (D. Haw. Aug. 17, 2022) ..................................... 16

*Kaupelis v. Harbor Freight Tools USA, Inc.*,
    2020 WL 5901116 (C.D. Cal. Sept. 23, 2020) ..................................... 6

*Kumho Tire Co. v. Carmichael*,
    119 S. Ct. 1167 (1999) ....................................................................... 13

*Lopez v. I-Flow Inc.*,
    2011 WL 1897548 (D. Ariz. Jan. 26, 2011) ....................................... 13

*Lytle v. Nutramax Labs.*, Inc.,
    2022 WL 1600047 (C.D. Cal. May 6, 2022) ......................................... 6

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ............................................................... 15

*Munoz v. PHH Mortg. Corp.*,
    2022 WL 138670 (E.D. Cal. Jan. 14, 2022) ....................................... 16

*Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc*,
    2023 WL 6194385 (C.D. Cal. Sept. 7, 2023) .............................. 13, 15

iii

*Nelson v. Matrixx Initiatives*,
    2012 WL 3627399 (N.D. Cal. Aug. 21, 2012) .................................................. 15

*Owens v. Auxilium Pharms., Inc.*,
    895 F.3d 971 (7th Cir. 2018) ............................................................................. 15

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) .................................................................... 6, 7, 17

*Stambolian v. Novartis Pharms. Corp.*,
    2013 WL 6345566 (C.D. Cal. Dec. 6, 2013) ..................................................... 11

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. 2012) ......................................................................... 6

*Taylor v. Union Pac. R. Co.*,
    2010 WL 3724287 (S.D. Ill. Sept. 16, 2010) ................................................... 10

*U.S.A v. Torres*,
    2021 WL 2017290 (C.D. Cal. May 20, 2021) ................................................... 13

*United States v. Brooks*,
    610 F.3d 1186 (9th Cir. 2010) ........................................................................... 10

*United States v. Brown*,
    2023 WL 5424293 (W.D. La. Aug. 7, 2023) .............................................. 1, 9, 12

*United States v. Pac. Health Corp.*,
    2018 WL 1026361 (C.D. Cal. Feb. 20, 2018) ................................................... 10

*United States v. Sullivan*,
    2022 WL 3716594 (N.D. Cal Aug. 28, 2022) ................................................... 13

*Whiting v. Bos. Edison Co.*,
    891 F. Supp. 12 (D. Mass. 1995) ....................................................................... 11

**Rules**

Fed. R. Civ. P. 23 .......................................................................................... 6, 17, 18

Fed. R. Evid. 702 ...................................................................................... 7, 10, 13, 19

**Other Authorities**

Wigmore: Expert Evidence § 3.1 (3d ed. 2022) ...................................................... 7

iv

## INTRODUCTION

Plaintiff's expert in Internet-based crimes against children, Dr. Brian Levine, has more than 24 years of experience researching and writing about preventing the online distribution of child sex abuse material (CSAM). Mot. Ex. 1 (Dkt. 176-3, filed under seal) (Levine Decl.) ¶¶ 12-17. He regularly consults with governments, including the United States government, on technology used in "crimes against children" online, and was the sole author of a recent, 2022 Report to Congress submitted on behalf of the United States National Institute of Justice regarding "lax" online "platforms" that foster "crimes against children." *Id.* ¶¶ 13, 15. Dr. Levine's academic work includes "research[ing], design[ing], buil[ding], evaluat[ing], and deploy[ing] many tools" to stop "Internet-based crimes against children," many of which have been adopted by "state and federal law enforcement in the US and investigators internationally," *id.* ¶ 16, as well as researching and writing publicly about "child exploitation in mobile apps," *id.* ¶ 13. His work in this area has been featured in multiple, major news publications like the *New York Times* and the *Wall Street Journal*. *Id.* ¶¶ 13, 15. He has been lauded by the Association for Computing Machinery for his contributions to "thwarting [online] crimes against children." *Id.* ¶ 12.

In short, it is hard to imagine someone more qualified than Dr. Levine to offer opinions in this case about the disputed classwide issue of MindGeek's use (or the lack thereof) of well-known, readily available technologies, tools, and practices to prevent its online distribution of CSAM. Indeed, just a few months ago Dr. Levine was "accepted as an expert in the field of networking and digital forensics" by another court, which relied on his testimony regarding specific technologies relevant to tracking "CSAM files" that are distributed online. *See United States v. Brown*, 2023 WL 5424293, at *1 (W.D. La. Aug. 7, 2023), *report and recommendation adopted*, 2023 WL 5411034 (W.D. La. Aug. 22, 2023).

Even so, MindGeek moves to exclude ***all of*** Dr. Levine's proffered opinions, claiming that despite his deep and recognized expertise in exactly this area, he is somehow unqualified to offer testimony on MindGeek's non-use of readily available anti-CSAM technologies. MindGeek also claims his opinions are unreliable.

MindGeek's principal argument is that Dr. Levine is not "qualified" to offer opinions on "MindGeek's content moderation policies and practices" because he has "never worked in content moderation." Mot. at 1, 5-7 (cleaned up). This argument is a red herring. It does not even address the opinions that Dr. Levine offers, which are tied directly to his decades of experience in CSAM-combatting technologies and tools. MindGeek is free to raise to the jury its flimsy argument that only a "content moderation expert"—a field that MindGeek does not even establish exists—should testify in this case.

MindGeek slings myriad other complaints at Dr. Levine, none of which pass muster or show that his opinions are "unreliable." *Id.* at 7-8. MindGeek criticizes Dr. Levine for offering testimony based on his deep expertise and decades of experience, rather than employing an "industry standard" or "standard of care" which MindGeek admits does not exist. *See id.* at 8-12. MindGeek nitpicks at and mischaracterizes Dr. Levine's interpretation of the record, *see id.* at 13-15, 19-20, issues it is free to explore during cross examination. MindGeek is incorrect that Dr. Levine is forbidden from discussing the record in the context of offering his reasonable, well-qualified opinions about matters within his expertise. *See id.* at 16-19.

At best, MindGeek raises issues that may affect the jury's assessment of Dr. Levine's credibility. But, as discussed further below, nothing in MindGeek's motion goes to the threshold issue of Dr. Levine's qualifications to offer the testimony he proposes to, for which courts employ a liberal standard, and the Court's ability to consider this testimony in determining class certification.

# BACKGROUND

## I.    Case Background

This case is about MindGeek's knowing receipt and distribution of CSAM for its own financial benefit. Despite claiming to have a "zero tolerance" policy for CSAM, MindGeek failed to implement even the most basic protections, like age verification and requiring government-issued ID for each person appearing in content uploaded to its websites; refused to review content flagged as CSAM **repeatedly**; and repudiated cooperation with the National Center for Missing & Exploited Children (NCMEC). Dkt. 123-1 (Plaintiff's Memorandum of Law in Support of Motion for Class Certification, filed under seal) at 6-8.  MindGeek's knowing participation in computer crimes against children is not even disputed. ***MindGeek itself*** documented its extensive participation in child sex trafficking, such as greenlighting videos to distribute (with advertisements) bearing titles like "███████████████" and "███████████████." *Id.* at 1-2.

In its defense, MindGeek will argue (among other things) that its largely manual, understaffed processes were the best it could do to combat the avalanche of CSAM on its popular websites, and it is not responsible for the illegal materials it nonetheless knowingly received and distributed. *See, e.g.*, Ex. A (█████ 30(b)(6) Tr.) at 206:20-207:4; Ex. B (█████ Tr.) at 39:8-44:5, 146:22-149:9. Whether MindGeek is right or wrong is indisputably a class-wide issue; as Dr. Levine's declaration explains, contrary to MindGeek's suggestion, there are a host of techniques and available technologies to prevent the online distribution of CSAM. *See, e.g.*, Levine Decl. ¶¶ 101-132 (opining on a variety of "technological tools readily available and designed to aid Internet platforms" in "detecting, removing, and preventing the upload or download" of CSAM). MindGeek failed to deploy, delayed in deploying, or deployed ineffectively each of these tools. *See id.* ¶¶ 133-140. Moreover, MindGeek's age verification practices were well out of line with peer-reviewed "[s]cientific studies" regarding "error rate[s]" for age verification. *See id.*

¶¶ 141-154. Indeed, instead of using well-known and accepted technologies and strategies, and cooperating with trusted organizations, to prevent the distribution of CSAM on its websites, MindGeek instead used and permitted technologies well known to protect traffickers and to aid in the distribution of CSAM. *See id.* ¶¶ 155-218.

A layperson will not be knowledgeable about the various technologies, strategies, tools, and organizations designed to aid Internet platforms like MindGeek in detecting, removing, and preventing the upload or download of CSAM. Thus, testimony from an expert with specialized knowledge of computer crimes against children (and the prevention thereof) would assist the trier-of-fact in helping resolve the factual issues in dispute. MindGeek's motion never argues that such information will not be relevant or helpful for the jury or the Court in deciding whether Rule 23's requirements are satisfied.

## II. Dr. Levine's Report and Qualifications

Plaintiff's expert, Dr. Levine, offers opinions about MindGeek's use (or lack thereof) of known and available tools, strategies, and technologies to prevent the upload, download, and distribution of child sex trafficking materials on its websites. After explaining his assignment and providing his (extensive) qualifications and some brief background remarks, Dr. Levine's declaration covers the following topics:

- Background on MindGeek's actual, ***manual*** practices to purportedly combat CSAM on its websites, such as MindGeek's use of a minimal number of poorly trained employees visually inspected potential CSAM as its primary strategy, *see id.* ¶¶ 25-63;

- Dr. Levine's opinion that these practices were largely ineffectual, *see id.* ¶¶ 64-100;

- Specialized, technical information about the operation and availability of a variety of technologies that can be used "to combat the uploading and distribution of CSAM" online,

4

such as "Vobile Media Wise," "Google CSAI Match," "Microsoft Photo DNA," "Google Content Safety API," and others, *see id.* ¶¶ 101-132;

- Dr. Levine's opinion that MindGeek did not use these technologies, delayed using them, or used them ineffectively, despite their availability, *see id.* ¶¶ 133-40;

- Dr. Levine's opinion that MindGeek's age verification practices were out of line with peer-reviewed, scientific studies regarding age verification in the context of CSAM, *see id.* ¶¶ 141-154;

- Specialized, technical information regarding MindGeek's use of and/or permissions for alternative internet technologies, tools, and strategies that, in contrast, are well known by experts in the field to enable consumers of CSAM and child sex traffickers to connect online anonymously, including via keywords in titles, tags, and categories, recommended and related videos, VPN and Onion services, and private messaging and cryptocurrencies, *see id.* ¶¶ 155-207; and

- Specialized knowledge regarding the "important role" NCMEC plays in preventing the dissemination of CSAM online, and critical differences between MindGeek's cooperation with that organization in contrast to its peers such as Facebook and Twitter, *see id.* ¶¶ 208-218.

Dr. Levine is more than qualified to opine on these matters. He is a tenured Professor of Information and Computer Sciences and a recognized expert in computer-based approaches "for thwarting crimes against children." *Id.* ¶ 12. He has been working in this field for 24 years, *id.*, including consulting with various governments "in areas related to crimes against children" online, *id.* ¶ 15, as well as his decade and a half long effort with various agencies of the United States Government to "build and deploy tools for forensic investigation of crimes against children." *Id.* ¶¶ 12-13. Dr. Levine has repeatedly been qualified as an expert in this

field, and testified in courts all over the country regarding "Internet-based crimes against children." *Id.* ¶ 16.

### III.    MindGeek's Motion to Exclude

MindGeek moves to exclude Dr. Levine's testimony, claiming that—despite his decades of experience as a nationally regarded expert in online CSAM prevention—he is unqualified to offer testimony because he has "never worked in content moderation." Mot. at 1. MindGeek also claims his opinions are unreliable because he does not apply a nonexistent standard of care, and because MindGeek disagrees with Dr. Levine's view of the record.

MindGeek's complaints go to the weight, not the admissibility of Dr. Levine's testimony. Its motion should be denied.

### LEGAL STANDARD

At class certification "robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 493 (C.D. Cal. 2012) (citation omitted).

When a motion to exclude is raised together with a motion for class certification, "district courts must conduct an analysis tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance." *Id.* at 495. "This type of analysis is expressly contrasted with a full-fledged *Daubert* analysis." *Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at *4 (C.D. Cal. Sept. 23, 2020). The court's ruling on a motion to exclude at this stage does not address the admissibility of the expert testimony at trial, but instead considers whether "expert reports and testimony are admissible to the extent the court relies on them in determining class certification." *Lytle v. Nutramax Labs.*, Inc., 2022 WL 1600047, at *6 (C.D. Cal. May 6, 2022); *see also Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). (At the class certification stage the court should "evaluate

6

admissibility [of expert testimony] under the standard set forth in Daubert," but the "admissibility must not be dispositive" and instead "an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage."); *id.* at 1004 ("Inadmissibility alone is not a proper basis to reject evidence submitted in support of class certification.").

Under Federal Rule of Evidence 702, a witness can qualify as an expert on the basis of his her or "knowledge, skill, experience, training, or education." The rule "contemplates a *broad conception* of expert qualifications," and an expert is qualified if he meets "the *minimal foundation* of knowledge, skill, and experience." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1015–16 (9th Cir. 2004) (citations omitted; emphasis in original). Accordingly, an expert's "qualifications are construed broadly" and proffered testimony is admissible if "the witness is generally qualified." *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 889 (C.D. Cal. 2004); *see also Doe v. Rose*, 2016 WL 9023602, at *3 (C.D. Cal. Aug. 31, 2016) (holding that Rule 702 requires only that an expert testify on matters "within the reasonable confines of his subject area" (citation omitted)).

"Generally, standards for qualifying experts are liberal and a witness need have only minimal qualifications to express his expert opinion." *Cap Export, LLC v. Zinus, Inc.*, 2019 WL 982883, at *3 (C.D. Cal. Jan. 24, 2019) (cleaned up). "Once a witness has met the minimal requirements for expert testimony, limitations in his credentials go to the weight the trier of fact will give to the expert's testimony, not to its admissibility." Wigmore: Expert Evidence § 3.1 (3d ed. 2022); *see also D.F. by and through Amador v. Sikorsky Aircraft Corp.*, 2017 WL 4922814, at *14 (S.D. Cal. Oct. 30, 2017) (a witness "may serve as an expert so long as she has experience in that general area" of testimony); *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) ("In assessing whether a witness can testify as an expert, courts have liberally construed the expert qualification requirement.").

Ultimately, an expert's opinion is "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline," and a "court is not tasked with deciding whether the expert is right or wrong." *City of Pomona v. SQM North Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (citation omitted). The test for reliability of expert testimony is "flexible," and once the court satisfies its gatekeeping role "[c]hallenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge." *Id.*

## ARGUMENT

### I.   Dr. Levine Is Qualified to Offer His Opinions

Dr. Levine has been working in technology related to Internet crimes against children for approximately a quarter century. He is a full, tenured Professor at the University of Massachusetts and the director of its Cybersecurity Institute. Levine Decl. ¶ 12. He has been recognized both within his own industry and by state, federal, and foreign governments as an expert in "thwarting [online] crimes against children." *Id.* ¶¶ 12-13. When bodies like the United States Department of Justice, the Federal Bureau of Investigations, the United States Congress, the Internet Crimes Against Children Task Forces, and the Massachusetts Attorney General need expert input regarding issues such as "tools for forensic investigation of crimes against children" and how "Internet-based platforms [are] leveraged by individuals who commit child sex crimes," they turn to Dr. Levine. *Id.* ¶¶ 13, 15.

Dr. Levine has written over 100 peer-reviewed (and influential) scientific papers on the same topics, such as "Indications of Child Sexual Abuse Revealed in App-Store Reviews" and "Characterization of Contact Offenders and Child Exploitation Material Trafficking on Five Peer-to-Peer Networks," and his writing on topics such as "child exploitation in mobile apps" has appeared in the *New York Times* and the *Wall Street Journal*. Levine Decl. ¶¶ 13, 15; Ex. C (Dr. Levine CV). His academic work includes "research[ing], design[ing], buil[ding], evaluat[ing], and deploy[ing] many tools" to stop "Internet-based crimes against children," many of

1   which have been adopted by "state and federal law enforcement in the US and
2   investigators internationally." *Id*. ¶ 16. He has been repeatedly qualified as an expert
3   witness in "Internet-based crimes against children" by federal and state courts around
4   the country and abroad. *Id.*

5        This background ***more*** than meets the "minimal qualifications" necessary for
6   Dr. Levine to express his opinions in this case. *See Cap Export*, 2019 WL 982883, at
7   *3 (citation omitted); *see also Rose*, 2016 WL 9023602, at *3 (noting that to meet
8   the qualification bar, "an expert does not [even] need to possess specific credentials
9   or qualifications in the subject matter in which he testifies"). MindGeek cites no case
10  where an expert as eminently qualified as Dr. Levine was excluded for supposedly
11  lacking qualifications. In fact, the opposite is true: just a few months ago (in a case
12  MindGeek's brief neglects to mention), Dr. Levine was qualified as an expert and
13  permitted to testify in federal court regarding CSAM-related technology. *See Brown*,
14  2023 WL 5424293, at *1.

15       In order to support its spurious argument that Dr. Levine lacks sufficient
16  qualifications, MindGeek erects a strawman, arguing that "the entire purpose of
17  Levine's report is to opine that MindGeek's content moderation policies are
18  inadequate." Mot. at 5. Thus, according to MindGeek, Dr. Levine must be a certified
19  expert in the narrow (and perhaps nonexistent) field of "content moderation policies
20  for user-generated content for . . . adult website[s]" in order to offer his opinions in
21  this case. *Id.* at 5-6.

22       The problem with MindGeek's argument is that the "entire purpose" of
23  Dr. Levine's declaration is not to comment on "content moderation policies for user-
24  generated content for adult websites," but to opine on known and available
25  technologies, tools, strategies, and techniques that work to either prevent or to
26  encourage the sexual exploitation of children online, and MindGeek's use or nonuse
27  of these technologies, tools, strategies, and techniques—evidence that will generate
28  common answers to common questions applicable classwide. *See supra* at 4-6. To

9

the extent MindGeek's manual content moderation process is relevant to Dr. Levine, it is in contrast to the many other strategies that Dr. Levine is a nationally recognized expert in. For example, in his declaration, after discussing background information on MindGeek's actual practices with respect to CSAM on its websites, as well as various technological anti-CSAM tools Dr. Levine is expert in, he offers the "opinion that common evidence shows throughout the class period that MindGeek failed to deploy technological tools readily available and designed to aid Internet platforms, like MindGeek, in detecting, removing, and preventing the upload or download or child sexual abuse material." Levine Decl. ¶ 3. He is extremely qualified to offer this opinion.

MindGeek is wrong that the Federal Rules of Evidence require an expert to have the kind of very specific experience that MindGeek demands. *See United States v. Brooks*, 610 F.3d 1186, 1196 (9th Cir. 2010) ("No specific credentials or qualifications are mentioned [by Rule 702]." (quoting *United States v. Smith*, 520 F.3d 1097, 1105 (9th Cir. 2008)); *United States v. Pac. Health Corp.*, 2018 WL 1026361, at *4 (C.D. Cal. Feb. 20, 2018) ("Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." (quoting *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)); *Taylor v. Union Pac. R. Co.*, 2010 WL 3724287, at *2 (S.D. Ill. Sept. 16, 2010) ("[A]n expert need not have credentials narrowly tailored to the subject matter of a case in order to pass muster under Rule 702, so long as the expert is testifying to matters within the area of his or her expertise.").

Dr. Levine's credentials and background more than qualify him to testify about the matters he proposes to opine on, for which he is a recognized expert. MindGeek's complaints about his qualifications go to weight, not admissibility, and its cases are far afield. *See Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 5955666, at *2-3 (N.D. Cal. Nov. 6, 2013) (concluding that damages expert in patent case could not offer technical opinions about (for example) "the scope of the similarity between the patent

technologies and Samsung's products" and whether that supported "copying"); *Whiting v. Bos. Edison Co.*, 891 F. Supp. 12, 17–19 (D. Mass. 1995) (excluded expert had no formal training in the testing he would opine on, for which he used "a formula of his own invention").[1] Nor is Dr. Levine's proffered testimony similar to an expert in "the preparation of residential loans" improperly opining on "the specifics of loan servicing," or an expert in "FDA labeling" improperly opining on "ethical standards." Mot. at 5 (citing *Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *4 (N.D. Cal. Nov. 3, 2020)*; Georges v. Novartis Pharms. Corp.*, 2012 WL 9064768, at *13 (C.D. Cal. Nov. 2, 2012)). Here, a nationally recognized expert in preventing Internet-based crimes against children is proposing to testify about the methods MindGeek used (or did not use) to prevent Internet-based crimes against children. Dr. Levine is well qualified to do this, and MindGeek cannot (and does not) show otherwise.

## II.    Dr. Levine's Opinions are Reliably Based on His Experience and on Scientific Literature

Dr. Levine's opinions are also reliably derived from his decades of experience studying how to prevent the upload and dissemination of CSAM, and (where applicable) supported by peer-reviewed scientific literature.[2]

As a veteran working to stop Internet-based crimes against children, he offers testimony on general background issues related to MindGeek's actual practices, *see* Levine Decl. ¶¶ 25-100, as well his specialized knowledge regarding technologies and methods that either hinder or promote online CSAM, including:

---

[1] MindGeek's attempt to rely on *Stambolian v. Novartis Pharms. Corp.*, 2013 WL 6345566, at *6 (C.D. Cal. Dec. 6, 2013), also flops, as Dr. Levine's declaration is rife with examples of relevant "articles" he has "published," "research" he has "done," and "literature" he is "familiar" with. Mot. at 7; *see supra* at 8-9 (discussing Dr. Levine's relevant publications and research); Levine Decl. ¶¶ 12-16 (same), *id.* ¶¶ 144-149 (discussing relevant published scientific literature).

[2] In connection with its opposition to Plaintiff's motion for class certification (Dkt. 168), MindGeek submits three expert declarations that likewise rely on the proposed experts' experience. *See* Declaration of Sherrie Caltagirone (relying on experience as Executive Director of Global Emancipation Network); Declaration of Joseph Fonesca (relying on experience as a Federal Bureau of Investigation Special Agent); Declaration of Dr. Janine Shelby (relying on experience as a trauma psychologist to opine on stress and trauma reactions).

- The operation and availability of technologies that are used to combat online CSAM, and MindGeek's failure to appropriately use them. *See id.* ¶¶ 101-140. These opinions are reliably based on Dr. Levine's 24 years of experience researching, evaluating, writing about, and designing such tools and technologies. *See id.* ¶¶ 12-17.

- The contrast between peer-reviewed scientific research on age verification and MindGeek's age verification practices. *See id.* ¶¶ 141-154. These opinions are reliably based on the peer-reviewed scientific studies cited by Dr. Levine, which demonstrate with both quantitative and qualitative analysis "error rate[s]" for methods of "age estimation." *See id.*

- The widespread use on MindGeek's websites (either by MindGeek, or by MindGeek's users with MindGeek's permission) of other technologies that enable the dissemination of online CSAM. *See id.* ¶¶ 155-207. These opinions are reliably based on Dr. Levine's decades of experience in the field, cited scientific literature, *see, e.g.*, *id.* ¶ 191 & n.308, and are the same sort of issues he is regularly qualified as an expert on in criminal trials related to CSAM. *See id.* ¶ 16; *Brown*, 2023 WL 5424293, at *1.

- An overview of NCMEC (which a lay jury will have no knowledge of), the important role NCMEC plays in combatting CSAM, and MindGeek's unusual prior position with respect to cooperating with NCMEC. *See id.* ¶¶ 208-218. These opinions are also reliably based on Dr. Levine's experience as a recognized expert in combatting CSAM. *See id.* ¶¶ 12-16.

MindGeek's main issue with Dr. Levine's testimony appears to be that he does not apply a "known methodology" or a "recognized standard of care." Mot at 2, 8-11. This is another red herring: MindGeek does not point to any "known methodology" or "recognized standard of care" that Dr. Levine **should** have but failed to use. There are none and it is bedrock law—reflected in the very text of the

Rule—that experts may reliably testify based on their experience. *See* Fed. R. Evid. 702 (permitting testimony based on "experience" and "specialized knowledge"); *see also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."); *Nat'l Fire Prot. Ass'n, Inc. v. UpCodes, Inc*, 2023 WL 6194385, at \*3 (C.D. Cal. Sept. 7, 2023) ("[E]xtensive experience is a method that can support an adequate methodology."); *United States v. Sullivan*, 2022 WL 3716594, at \*11 (N.D. Cal Aug. 28, 2022) (holding that an expert's "proposed testimony is reliable" given "his experience . . . over the last 20 years" in the cybersecurity industry); *U.S.A v. Torres*, 2021 WL 2017290, at \*15 (C.D. Cal. May 20, 2021), *aff'd sub nom. United States v. Torres*, No. 21-50285, 2023 WL 4077347 (9th Cir. June 20, 2023) ("Irigoyen has been employed by the LAPD for 21 years, the last 17 of which as a narcotics investigator. The fact that Irigoyen's expertise is based on his experience does not prohibit his testimony under Rule 702.").

MindGeek's cases, which mostly involve flaws in medical causation expert analysis, *see* Mot. at 9, do not hold otherwise. *See In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 265-68 (S.D.N.Y. 2018), *aff'd sub nom. In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020) (medical causation expert failed to appropriately apply the established "Bradford Hill factors" to support his testimony that "Mirena causes IIH"); *Lopez v. I-Flow Inc*., 2011 WL 1897548, at \*10 (D. Ariz. Jan. 26, 2011) (excluding witness because he "improperly expresses legal conclusions" and "lacks foundation," not because he supported his opinions with his experience); *Dennis v. Pertec Computer Corp*., 927 F. Supp. 156, 158, 161 (D.N.J. 1996), *aff'd sub nom. Dennis v. Commc'n Mach. Corp*., 135 F.3d 764 (3d Cir. 1997) (holding that expert witness who made up his own "not defined" "protocol" to study the causal relationship between "specific design deficiencies in the CMC–108 keyboard" and "upper extremity disorders" was not reliable).

13

1      MindGeek also quibbles with the reliability of Dr. Levine's opinions on well-
2  known technologies and practices that MindGeek did not employ, arguing that the
3  technologies are not foolproof, "government IDs" are "easily faked," and
4  Dr. Levine's opinions are not sufficiently prescriptive since he "cannot say what
5  'adequate' moderation would look like." Mot. at 11-12. MindGeek is free to explore
6  these disagreements in cross-examination, but they do not support exclusion.

7  **III.    Dr. Levine's Opinions Are Supported by Evidence**

8      MindGeek also claims Dr. Levine's opinions are unreliable and should be
9  excluded wholesale because he supposedly "cherry-pick[ed]" evidence with
10  "obvious errors fed to him by Plaintiff's counsel." Mot. at 13-15. As a preliminary
11  matter, Dr. Levine had full access to the record in this case; he did not rely on "cherry-
12  picked" documents from Plaintiffs' counsel. *See* Ex. D (Levine Tr.) at 133:11-
13  134:22.

14      Other than reprising the same misleading complaints that Dr. Levine did not
15  "cite any scholarly articles about content moderation," *id.* at 13, MindGeek raises
16  only a limited number of minor disagreements with Dr. Levine's treatment of the
17  evidence, including that: (1) in a single paragraph of his 200+ paragraph declaration,
18  Dr. Levine relied on one document (of two) that MindGeek contends he took out of
19  context, *see id.* at 13-14; (2) Dr. Levine "cites to unverified news and online articles,"
20  such as the "*New Yorker*" magazine, *see id.* at 14; (3) he opined that Virtual Private
21  Network (VPN) services are a way to "protect users' online activities from being
22  monitored by law enforcement and governmental authorities," Levine Decl. ¶¶ 188-
23  201, but "could not provide a single example of a law enforcement investigation
24  hampered by MindGeek's practices," Mot. at 15; (4) he did not have certain dates
25  and facts reflected in documents he considered memorized during his deposition, *see*
26  *id.*; and (5) he opined on the importance of NCMEC's work to combat CSAM, and

27

28

noted MindGeek's refusal to cooperate with NCMEC, Levine Decl. ¶¶ 208-218, but MindGeek was "***not*** legally required to do so," Mot. at 15 (emphasis in original).[3]

Even if MindGeek were correct (it is not), MindGeek does not cite a single case that supports excluding an expert entirely for such minor factual disputes. *See Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (excluding expert's single-sentence "entirely conclusory" opinion which "was neither accompanied by any evidentiary citation nor followed by any elaboration . . . ."); *Nelson v. Matrixx Initiatives*, 2012 WL 3627399, at *10 (N.D. Cal. Aug. 21, 2012), *aff'd sub nom. Nelson v. Matrixx Initiatives, Inc.*, 592 F. App'x 591 (9th Cir. 2015) (excluding medical causation expert for failing to use "scientifically valid methods and procedures for ruling in and out each significant possible cause of the alleged injury," not for allegedly taking a single document out of context).[4] On the contrary, it is well established that such disagreements with experts should be dealt with on cross examination. *See National Fire*, 2023 WL 6194385, at *3 ("Professor Schiavon's examples are used as illustrations for his overall argument . . . . His choice of examples is both illustrative of and based upon his relevant expertise."); *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 135 (S.D.N.Y. 2022) ("even crediting" critiques that the relevant expert was "less thoroughgoing that he might have been," "rel[ied] on unverified" figures "as part of his analysis," and "cherry-pick[ed] among . . . data," they were "suitable subjects for cross-examination but do not warrant exclusion").

---

[3] As Dr. Levine appropriately acknowledged in his deposition, he could not "offer any legal conclusion[s]" on "whether certain types of entities are legally required to report to NCMEC." Ex. D (Levine Tr.) at 174:7-12.

[4] MindGeek also relies on *Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018), *see* Mot. at 15, but Plaintiff's counsel was unable to find the language purportedly quoted from *Owens* in the cited opinion. In any event, *Owens* is inapposite, as it involved an expert who "conceded that he could not offer an opinion," which has not happened here. 895 F.3d at 973.

## IV.    Dr. Levine Does Not Offer State of Mind Opinions

MindGeek grossly overreads and plucks out-of-context language from Dr. Levine's declaration, which does not attempt to opine on MindGeek's state of mind.

For example, MindGeek argues that in paragraph 49 of his declaration, Dr. Levine improperly opines that MindGeek "did not care about detecting CSAM." Mot. at 20. Paragraph 49 says nothing of the sort. Instead, the declaration discusses evidence in the record demonstrating that "human moderators" at MindGeek used their personal "judgment" to override the recommendations of "technical tools [that] indicate[d] content is CSAM," including one example in which a MindGeek moderator determined the video "to me looks fine" without any investigation. Levine Decl. ¶ 49. While it would be eminently reasonable for the eventual fact finder to conclude on this basis that MindGeek did not, in fact, care about detecting CSAM, Dr. Levine does not state this, or anything about MindGeek's state of mind, including its "intent behind how it designed various site features." Mot. at 20.[5]

Nor is MindGeek correct, *see id.*, that Dr. Levine improperly opines on state of mind in paragraphs 174-180 of his declaration, which actually discuss evidence of third-party organizations and advertisers raising issues to MindGeek with purported "teen" content on its websites, including evidence of MindGeek's internal discussions to instead make the "argument[ ]" that "teen refers to 18/19." At most, Dr. Levine's declaration describes "whether a certain practice is consistent with a particular state of mind"—an entirely permissible subject of expert testimony. *Kane v. PaCap Aviation Fin., LLC*, 2022 WL 3446314, at *16 (D. Haw. Aug. 17, 2022); *Munoz v. PHH Mortg. Corp.*, 2022 WL 138670, at *4 (E.D. Cal. Jan. 14, 2022) (experts can testify "about whether Defendants' actions were consistent with (or

---

[5] In any event, courts routinely admit expert opinions that explain the purpose of particular and technical design features at issue in a case. *See, e.g.*, *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 414 (S.D.N.Y. 2011) (rejecting argument that expert "opined on the parties' state of mind" because he "provided information on the *design* and *functionality* of the [] program." (emphasis in original)).

16

inconsistent with) what is discussed in the documentary evidence"); *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at \*14–15 (S.D.N.Y. Sept. 30, 2020) ("[A]n expert can testify to whether a given state of mind is consistent with a given practice—i.e., a defendant likely knows X if they do Y" (internal quotation marks omitted)).

MindGeek's other examples—most of which it does not even provide, instead relying on a blanket statement that Dr. Levine's declaration is "littered" with state of mind opinions, Mot. at 20—similarly fall flat. Dr. Levine discusses and relies on the documentary and other evidence regarding the statements and actions of MindGeek's employees to draw conclusions about the adequacy of MindGeek's CSAM policies and practices. From this evidence, the jury will make its own inferences about MindGeek's state of mind. ‼

Regardless, none of MindGeek's arguments warrant exclusion of Dr. Levine's opinions, particularly at the class certification stage. Even if some stray portions of Dr. Levine's report were deemed "state of mind" testimony that would not be admissible at trial, the Court should still consider Dr. Levine's report at class certification so long as the underlying classwide evidence—e.g., evidence of age-verification tools available to MindGeek during the class period—"likely could [be] presented in an admissible form at trial." *Sali*, 909 F.3d at 1006 ("[A] district court is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met"). And even at the trial stage, MindGeek's complaints would not justify wholesale exclusion of Dr. Levine's testimony, but instead could and should be policed through contemporaneous objections to particular questions or testimony. *See In re HIV Antitrust Litig.*, 2023 WL 3089820, at \*6 (N.D. Cal. Mar. 7, 2023) ("[A]n objection" to an expert's opinion "based on state of mind is better adjudicated at trial because context matters."); *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 255 (S.D.N.Y. 2022), *on reconsideration in part*, 2022 WL 3018104 (S.D.N.Y. July 29, 2022) ("[M]any of [Defendant's] arguments (for

instances, its arguments that some experts improperly offer legal opinions or opinions as to AXA's intent or regulators' states of mind) implicate only isolated opinions or sentences in Plaintiffs' experts' reports and can be adequately addressed through particularized objections at trial.").

**V.    Dr. Levine Does Not Offer a Factual Narrative and His Testimony Assists the Court in Assessing Rule 23 Requirements**

According to MindGeek, the Court should also exclude the entirety of Dr. Levine's testimony because "***the entire purpose of his declaration*** is to present a factual narrative," Mot. at 17 (emphasis in original), but "expert testimony cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence," *id.* at 16 (quoting *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021)).

Just like MindGeek's prior (and inconsistent) argument that "the entire purpose of Levine's declaration is to opine that MindGeek's content moderation policies are inadequate," Mot. at 5, MindGeek mischaracterizes Dr. Levine's declaration and his testimony.

MindGeek's brief presents several examples of bolded-text excerpts from Dr. Levine's deposition where he supposedly admitted that the "***entire purpose of his declaration*** is to present factual narrative," but he says nothing of the sort. Mot. at 17 (emphasis in original). What Dr. Levine actually "admits" in these passages is that his declaration includes discussion of facts in the record. *See id.* Dr. Levine explains the actual "entire purpose" of his declaration on page 3 ("Scope of the Engagement"), which was to "analyze, evaluate, and render opinions concerning MindGeek's policies and practices with respect to child sexual abuse material ('CSAM')." Levine Decl. ¶ 8. That is what his declaration does, in robust detail. *See supra* at 4-6. That Dr. Levine found cause to discuss portions of the record relevant to his opinions, *see* Mot. at 18-19, is no great surprise, not improper, and certainly

does not support that his entire declaration should be stricken or not considered by the Court for purposes of class certification.[6]

The "central concern" of Rule 702 is whether expert testimony will be "helpful to the jury," which is "when it provides information beyond the common knowledge of the trier of fact." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 554 (C.D. Cal. 2014) (cleaned up). Dr. Levine offers opinions beyond the normal expertise of a layperson that help the Court and the factfinder contextualize and understand how MindGeek's CSAM practices apply uniformly to all proposed class members and stack up in light of the available anti (and pro) CSAM tools, strategies, and technologies out there. *See, e.g.*, *Cooper-Harris v. United States*, 2013 WL 12125527, at *4 (C.D. Cal. Feb. 8, 2013) (expert permitted to offer statements about employee incentives and motivation in the military since the industry was specialized and the expert's experience "exceeds the common knowledge of the average layman").

MindGeek does not cite a single case where an expert was forbidden from testifying about background facts that support his or her opinion because "the documents and deposition transcripts speak for themselves." Mot. at 16. In *In re Trasylol Products Liability Litigation*, the expert in question "d[id] not analyze the facts" and instead "simply regurgitate[d] them." 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010). Dr. Levine does not "merely repeat[] facts or opinions" found in documents, *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) (cited by MindGeek), but instead ***analyzes those facts*** in order to reach his opinion, for example, that MindGeek "failed to deploy technological tools readily available and designed to aid Internet platforms, like MindGeek, in detecting,

---

[6] By contrast, MindGeek's expert declarations submitted in connection with MindGeek's opposition to Plaintiff's motion for class certification cite practically no documents or testimony produced in this litigation. *See* Declaration of Sherrie Caltagirone (citing four documents produced by MindGeek and excerpts from a single deposition); Declaration of Joseph Fonesca (citing no documents or deposition testimony); Declaration of Dr. Janine Shelby (citing only documents produced by Plaintiff and third parties).

removing, and preventing the upload or download of child sexual abuse material."
Levine Decl. ¶ 3.

Dr. Levine's testimony, including regarding the background facts he relies on for his analysis, is helpful to the Court in determining class certification and MindGeek does not show otherwise.

## CONCLUSION

For each of the foregoing reasons, MindGeek's motion should be denied.

Dated: October 23, 2023                    Respectfully submitted,

DAVIDA BROOK
KRYSTA KAUBLE PACHMAN
HALLEY W. JOSEPHS
AMY B. GREGORY
SUSMAN GODFREY L.L.P.

STEVE COHEN (*Pro Hac Vice*)
SCohen@pollockcohen.com
POLLOCK COHEN LLP
60 Broad St., 24th Floor
New York, NY 10004
Phone: (212) 337-5361

By:    */s/ Krysta Kauble Pachman*
            Krysta Kauble Pachman
            Attorneys for Plaintiff

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 6,402 words, which complies with the word limit of L.R. 11-6.1.

/s/ *Krysta Kauble Pachman*
Krysta Kauble Pachman