1             UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

3

4   JANE DOE,                    ) Case No. SA CV 21-00338-CJC-
                                 )                     (ADSx)
5            Plaintiff,          )
                                 ) Santa Ana, California
6   vs.                          )
                                 ) Wednesday, October 18, 2023
7   MINDGEEK USA INCORPORATED,   )
    et al.,                      ) (10:21 a.m. to 11:00 a.m.)
8                                )
             Defendants.         )
9   _____)

10

11       TRANSCRIPT OF PLAINTIFF'S MOTIONS TO COMPEL [159]
            BEFORE THE HONORABLE AUTUMN D. SPAETH
12               UNITED STATES MAGISTRATE JUDGE

13

14  Appearances:              See next page.

15  Court Reporter:           Recorded; CourtSmart

16  Courtroom Deputy:         Kristee Hopkins

17  Transcribed by:           Jordan Keilty
                              Echo Reporting, Inc.
18                            9711 Cactus Street, Suite B
                              Lakeside, California 92040
19                            (858) 453-7590

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

2

APPEARANCES:

For the Plaintiff:          DAVIDA P. BROOK, ESQ.
                            Susman Godfrey, LLP
                            1900 Avenue of the Stars
                            Suite 1400
                            Los Angeles, California 90067
                            (310) 789-3100

For the Defendants:         MICHELLE H. YEARY, ESQ.
                            Dechert, LLP
                            Cira Centre
                            2929 Arch Street
                            Philadelphia, Pennsylvania
                             19104
                            (609) 955-3277

3

1   Santa Ana, California; Wednesday, October 18, 2023 10:21 am

2                        --oOo--

3                   (Call to Order)

4         THE CLERK:  Calling case SA CV 21-338-CJC(ADSx),

5   Jane Doe versus MindGeek USA, Inc., et al.

6         Counsel, please state your appearances, starting

7   with Plaintiff.

8         MS. BROOK:  Good morning, your Honor.  Davida Book

9   of Susman Godfrey, on behalf of Plaintiff Jane Doe.

10        THE COURT:  Good morning.

11        MS. YEAR:  Good morning, your Honor.  Michelle

12  Yeary from Dechert on behalf of the Defendant.

13        THE COURT:  All right.  Good morning.  How are you

14  two ladies today?

15        MS. BROOK:  Very well, your Honor.

16        MS. YEARY:  Great.

17        THE COURT:  You guys have already done better than

18  the other case because you showed up in the right

19  courthouse.  We've got somebody here.  Wonderful.  Welcome.

20        Did you go to L.A.?

21     (Pause.)

22     THE COURT:  Okay.  Good.  Yeah.  So, one of the

23  intricacies of the Central District of California is the

24  number of courthouses we have, and it happens fairly often.

25  Not great.  I'm sure that will never happy to you again now

*Echo Reporting, Inc.*

4

1  that you've been through it.  But we're like, okay.  We're

2  deciding if we're going to have to enter minute orders now

3  in our consent cases, make sure people are aware.  I feel

4  like with discovery cases people mess it up a little bit

5  less, but it still happens.  Yeah.  All good.

6          So, okay.  Moving party, the floor is yours.  You

7  have my tentative ruling.  I'm happy to hear any and all

8  argument that you'd like to make.

9          MS. BROOK:  Thank you, your Honor.  And we

10  appreciate the tentative ruling.

11          Plaintiff's position is that Defendants have not

12  met their burden on either the work product or attorney-

13  client privilege standard.  On work product, your Honor,

14  both sides agree that in order for this recording to be

15  considered work product, it needs to have been done in

16  anticipation of litigation.

17          Our perspective is we don't see how a recording

18  that, once discovered, was so not done at the direction of

19  MindGeek, let alone at MindGeek's counsel, that it resulted

20  in this woman having a private investigator put on her,

21  called into the GCC's office, and promptly terminated, that

22  that could be something that was done in anticipation of

23  litigation.  It just wasn't.  Whether or not the meeting was

24  is a separate question.  But whether the recording that she

25  made and the recording at issue here, which I'll note for

5

1    the Court, and I think this is important, as far as we're

2    aware and based on the disclosures we have received frm

3    MindGeek, the recording I believe also contained some back

4    and forth between ███████████ (phonetic) and ███████████

5    (phonetic) that wasn't from that meeting.  So, how this

6    recording that's at issue now can be something that was done

7    in anticipation of litigation we don't think it meets that

8    definition given how it was made, who it was made by, and

9    what the reaction of MindGeek was discovering its existence.

10              And I'll pause there because that's sort of the --

11   the speech on work product, your Honor.

12              THE COURT:  Understood.  Have you provided to me

13   any case law that specifically holds -- because I think the

14   distinction that you're making -- and, you know, we've

15   talked through this -- is that there's two levels of the

16   issue here, the original communication, meeting, and then

17   the recording.  Okay.  Have you provided me any case law

18   that says simply because something was recorded, that that

19   negates the attorney-client privilege or attorney work

20   product?

21              MS. BROOK:  No, your Honor.  We couldn't find a

22   case on all fours with this situation.  But I've also been

23   giving it a lot of thought, and I think there's two points

24   I'd like to bring up.  One of them I already made, but I'll

25   reemphasize it, which is that the recording that we're

6

1  talking about is not the recording of the meeting, right.

2  The recording that we're here sort of fighting over is a

3  recording of a conversation between ███████████and ████

4  █████ where then a piece of that meeting was recorded and

5  was played and re-recorded, right.  And, so, at a minimum, I

6  think it would make sense to do the in camera review of the

7  actual recording at issue to see whether or not there's some

8  discussion between ████████████and ████████████that surely

9  wouldn't be work product, surely wouldn't be privileged, and

10  to see whether there's any there there.

11          I also then, your Honor, tried to --

12          THE COURT:  One second, though, before you move

13  on.

14          MS. BROOK:  Of course.

15          THE COURT:  If we were to separate out if there

16  is, in fact, a portion of it that is the conversation

17  between ███████████and ███████████.  That portion itself

18  would need to be responsive to some discovery requests.

19          Is there -- do you have any details about the

20  information that was discussed there to know that that

21  information would be responsive to one of the discovery

22  requests at issue?

23          MS. BROOK:  As the Court knows, counsel from

24  MindGeek wouldn't let ███████████answer most questions

25  about the substance of the recording.  But, from what I can

7

1  glean from both the ████████ declaration and from ██

2  ████████ testimony is that she was flagging this recording

3  for ████████ because she thought it was important to their

4  work, to their jobs.  And, so, I think there's a reasonable

5  inference there that she's flagging, Hey, I think that what,

6  you know, they're discussing here is problematic or

7  something like that.  But, no, because I haven't been given

8  access to the recording, I don't know what exactly it says.

9  But I think it's a reasonable inference that ████████ was

10  flagging for ████████ that she had real troubles or real

11  concerns about what was being discussed at that meeting, and

12  her expression of concern, of doubt, would not be work

13  product.

14          THE COURT:  Right.  But it wouldn't necessarily be

15  responsive to your discovery requests.

16          MS. BROOK:  So, I think that it would be

17  responsive to discovery requests where we've asked for

18  information about the content moderation policy.  And, so,

19  if the woman that MindGeek brought in from NCMEC is

20  expressing concern about the content moderation policies,

21  then I do think that that is responsive to our --

22          THE COURT:  Which -- do you have a specific

23  request number so I can look at it?

24          MS. BROOK:  RFP Number 3, documents and

25  communications concerning your efforts, policies or

8

procedures concerning the elimination of CSAM or child sex trafficking, if she's discussing that kind of a policy, her views of that kind of a policy.  I think it would be responsive there.  If they're discussing a policy about the hiring or training of employees in order to flag this content, that would be responsive to RFP Number 4.  If they're discussing just generally her views of the efforts or policies or procedures to identify people, that would be RFP 13.  If she's expressing concern about the tracking of CSAM or child sex trafficking by MindGeek, that would be RFP 14.  If she's expressing -- if she's communicating about changes in MindGeek's CSEM policies, that would be RFP 26.

THE COURT:  Okay.

MS. BROOK:  The second -- I think it's helpful to analogize here, your Honor.  So, if a company -- you know, let's say a company's anticipating litigation over a toxic waste site and they, in anticipation of litigation and everyone agrees it's in anticipation of litigation, decide to clean up that toxic waste site, but then an employee totally on their own accord, not instructed by counsel, not asked to do it, in fact, maybe in contravention of a policy of the company not to take pictures on the work site, photograph that cleanup, under MindGeek's analysis, those photographs that that employee did on their own initiative and maybe even in contravention of their company policy,

9

1  would be work product because they capture, right, they

2  capture an underlying event that they contend was in

3  anticipation of litigation.  And I just don't think that's

4  the law, your Honor, and I think it's helpful to think of

5  that analogy to this recording situation.  Just because

6  MindGeek contends -- and I'll get to this because we also

7  disagree that the underlying meeting that they've met their

8  burden, that that was -- had a primary legal purpose, but

9  just because they contend, assuming for argument that the

10 Court agrees with them, that the underlying meeting was in

11 anticipation of litigation, that someone chose to

12 memorialize it in a different way does not mean that that

13 secondary item, that secondary communication, the recording,

14 is itself attorney-client privilege or work product, your

15 Honor.

16         THE COURT:  All right.  Thank you.

17         MS. BROOK:  On the attorney-client privilege

18 point, your Honor, there we just simply don't think they've

19 met their burden.  And it's their burden, as I know the

20 Court knows, to show that the principal purpose of this

21 meeting was for litigation.  And I will admit that when I

22 read their portion -- the portion of the joint stipulation,

23 they stitched together a narrative that I think makes some

24 intuitive sense.  But when you actually dig into the ███████

25 declaration, it's resting on three pillars.  And I think

10

1    close scrutiny of each of those pillars causes them to

2    crumble.  And the three pillars, your Honor, that I

3    discerned were pillar number one is that ████████ now

4    claims in his declaration that based on an investigation he

5    did in consultation with outside counsel, he's determined

6    that the meeting in question was called for by him, the

7    general counsel, and it was to discuss legal issues.  But

8    while that's what they say in the brief, the -- the

9    declaration is I think very careful.  And I appreciate it

10   being careful.  The declaration says -- and I quote:

11                "I reviewed several meeting

12           invitations from February 2021 where the

13           invitees included myself, ████████,

14           and others, either whom ████████

15           recalled attending the meeting at issue

16           or whom I heard on the ██████ recording,

17           based on my review of the ██████

18           recording and the invitation, I

19           determined that the meeting that ████

20           ████████ recorded and played for ████

21           ██████ was held on February 16th, 2021

22           at my invitation."

23                So, he sort of had to back into this -- or he

24   certainly had to back into this.  It's not as though ████

25   ██████ submitted a declaration that said, having been faced

11

1 with this recording that, again, was the subject of a pretty

2 serious employment violation, I have an independent

3 recollection of the meeting.  I remember that I initiated

4 this meeting.  I remember what it was about.  I remember

5 what we discussed there.

6         Instead, he's very careful to say, I backed into

7 this, and I think that there's disputing facts there on the

8 record.  If you go back to the ████ deposition, every

9 time she even dates the meeting, your Honor, she's very

10 clear she can't even remember whether it's February 2021 or

11 February 2022.

12         So, for -- I appreciate ████████████and

13 MindGeek's efforts to do the work to try to figure out when

14 this meeting took place, but I don't think that his

15 declaration as written overwhelms her testimony at the -- at

16 the deposition.  So, that's pillar one.

17         Pillar two is that this meeting took place five

18 days after Alabama filed a -- there was a similar class

19 action filed in Alabama.  But, again, your Honor, if you

20 actually look closely at the declaration -- and this is

21 paragraph nine of the declaration -- ████████████very

22 clear.  He does not say that he had notice of that Alabama

23 action at the time that he believes the meeting in question

24 took place.  He's -- and it's different.  There's a

25 distinction.  He talks about how he specifically was aware

12

1  of some other maybe pending litigation that he'd received

2  notice of in 2020 and in January of 2021, but he doesn't go

3  so far to say that he was aware of the Alabama litigation.

4  And, so, I think this gloss that MindGeek is trying to put

5  on the timing on the sequence to say, Well, of course, this

6  was a meeting to discuss legal issues because it was five

7  days after Alabama, actually doesn't survive close scrutiny.

8          The third pillar that I think the █████████

9  declaration sort of rests on, that their argument rests on,

10  is that they, of course, have listened to the recording, and

11  they've given us these snippets, right, these snippets that

12  they say show that what was being discussed there was

13  clearly attorney-client privileged material.  And, you know,

14  there it's hard for me, having not been given access to the

15  recording to argue with it, but I will say that, again, if

16  yo go to the ████████ declaration -- and this is paragraph

17  seven -- and you look very closely at what they actually

18  quote from, it's very very limited quotes, right.  The only

19  actual quotes from the recording are sitting in a

20  deposition, discovery as a standalone word, build our

21  defense.

22          We have no idea how these select quotes feed into

23  that larger conversation.  And while I will be the first to

24  admit those are some lawyerly sounding words, I think it's

25  perfectly possible that they don't meet the attorney-client

13

privilege standard of the primary purpose of the meeting

being, you know, in anticipation of litigation.  And can

explain it.  I -- there -- there are many a cases I've had

where you have business executives who are saying to each

other in they think an email that will never be seen again

or a text message that won't ever be revealed, oh, gosh,

this is going to land me in the hot seat at trial, you know,

or, oh, gosh, we're going to get sued or, you know, oh,

gosh, this is going to look really bad if it ever comes out

at deposition.

       Those types of communications are not necessarily

privileged just because they include these sort of legal

buzz words.

       So, I think, your Honor, the most convincing part

of the ███████ declaration is paragraph 10 where he then

kind of puts this all together and says, based on all of

this, I think -- he thinks the purpose was legal in nature.

But, again, that's directly refuted by what ████████████ said

under oath at her deposition.

       So, he says, The reason I know this is because I

told people to come to this meeting for the express purpose

of discussing legal issues.  But this is what she said under

oath.  The question was:

              "Q    I understand you didn't set

              the meeting, but you arrived at the

14

1       meeting knowing what you were going to

2       be talking about, right?"

3       And she answers:

4            "A     I did not, actually."

5       And the questioner continues:

6            "Q     So, you just showed up to

7       the meeting unprepared and you didn't

8       know what was going to be discussed?

9            A      That's correct."

10      So, when you balance the ███████ declaration

11 against the ███████ testimony, I think there's a clear

12 disputed set of facts over what actually happened at that

13 meeting versus what didn't.  And, frankly, I appreciate ███

14 ████████ not going farther than it sounds like his memory

15 would allow him to go.

16      So, you have him saying, I tried to reconstruct

17 this, and you have her saying, Based on my best

18 recollection, what was discussed was CSAM material -- CSAM

19 policies, and I don't remember it being specifically for any

20 particular purpose.  And in that situation, your Honor, I

21 think MindGeek, at a minimum, hasn't -- I mean, I think

22 MindGeek hasn't met its burden.  But, at a minimum, I think

23 it would behoove an in camera review of what the four-minute

24 recoding, to make sure that given the importance of these

25 issues, there isn't any non-attorney client privileged

15

1    information on the tape.

2              THE COURT:  All right.  Thank you.

3              MS. BROOK:  Thank you.

4              THE COURT:  Counsel?

5              MS. YEARY:  Yes, your Honor.  I guess to sort of

6    start at the beginning, which is the question about what

7    comments were made between ███████████ and ███████████ on the

8    recording -- and, as a reminder, we are talking about four

9    minutes.  This is not -- and -- and the bulk of that four

10   minutes is the -- the underlying recording.  We did not make

11   any representations in the declarations as to what was said

12   between those two parties.  I'm happy to say that they --

13   they are limited to things like, Do you hear that, record?

14   I did put in -- the papers do say that she gave a direction

15   to record.  And then at the end -- we also say at the end,

16   she says the meeting goes on for 25 more minutes.  We put

17   that in there as well.

18             There is no substantive discussion whatsoever

19   between ███████████ and ███████████.  And if we need to put

20   that into some sort of a stipulated representation, we

21   absolutely can.

22             The analogy I think with respect to pictures of a

23   scene, I'm not exactly sure that holds here.  I would think

24   that this is more akin to notes of a meeting, and certainly

25   if you had a meeting that was at the direction of counsel

16

1  where there was a discussion about, you know, things leading

2  to litigation or the underlying basis of litigation, that if

3  someone took notes from that meeting, those notes would be

4  subject to both the attorney-client privilege and the work

5  product privilege, for the same reason that a physical

6  recording of the meeting would have that same protection.

7        We disagree that the -- with Plaintiff's

8  representation that you can divorce the physical recording

9  from what was actually recorded.  And, as the Court pointed

10 out, there was no case law suggesting that that's a viable

11 argument.

12       With respect to the -- the three points that she

13 makes about the ▮▮▮▮▮▮ declaration, the -- one thing that

14 when we produced the privilege log that indicate -- that

15 gave information about the recording, the metadata from the

16 actual recording that ▮▮▮▮▮▮▮▮▮ made shows that she -- she

17 -- the phone call took place in March of 2021.  So, there's

18 no dispute as to when this happened.  ▮▮▮▮▮▮▮▮▮▮ couldn't

19 remember if was February of 2021 or February of 2022.  She

20 couldn't have forwarded a conversation -- a recording from

21 2022 in 2021.  So, we've narrowed it down to February of

22 2021.

23       And, as a result of discovery in this case, we've

24 collected the documents from everybody who anybody could

25 remember either from the recording or from ▮▮▮▮▮▮▮▮▮

17

1   testimony was at the meeting.  We went back, and we pulled

2   every meeting invitation for all of those individuals.  We

3   didn't -- not limited to what was produced in the

4   litigation, not limited to search terms, not limited to

5   anything.  We looked at every single one of them.  We gave

6   them over to ███████ to review.  We talked about them.

7   There is one that has the same participants and has in the

8   description of the meeting, CSAM policies.  That meeting

9   invitation has been produced in this litigation since July.

10  It identifies when the meeting took place, who the

11  participants were, and it redacts and withholds as privilege

12  ███████ communication as to the purpose of the

13  meeting.  They have not challenged that meeting invite or

14  that redaction.

15          There are no other -- there's nothing else from

16  all the invites that suggest that any other meeting was held

17  about CSAM at that time.

18          She says that there's no statement that they were

19  on notice that the litigation had been filed.  That may have

20  just been poor wording on our part.  I apologize.  I think

21  we can confirm that that was, in fact, the case.  In

22  addition to the cases being filed five days earlier, the

23  lawyers in that case had previously sent a preservation

24  notice so that the client was aware of the fact that that

25  litigation was coming and was looking out for it and was

18

1  aware of it at the time.

2          And then, also, you have the -- the comments

3  directed to ████████ (phonetic) on the tape, and there

4  was one that Plaintiff left out of her quotes that is in the

5  ████████ declaration, which is he says, We're going down a

6  long path with courts.  So, recognizing that he was already

7  well aware that there was litigation.  He was soliciting

8  information to prepare for litigation.  So this idea that

9  ████████ maybe didn't know why she was there, whether she

10 was seeking legal advice, all those things don't really

11 matter because there was somebody at the meeting who was

12 directly saying, We need to have a conversation about these

13 policies in light of litigation.

14          So, I think all of that together shows that we've

15 demonstrated and met our burden to show that not only is

16 there attorney client based on the fact that the

17 communication was from ████████ to hold the meeting, the

18 fact that he was present, and we do not in any way, shape,

19 or form take any type of argument that his mere presence

20 makes it attorney-client privilege.  We have produced

21 thousands of documents with ████████ name on them,

22 communications that he has been involved in that we do not

23 -- that we understand are business communications or where

24 ancillary to the communication we've produced those.  This

25 is different.  And the Work Product Doctrine, I just don't

19

1  see how there would be any way to separate out any types of

2  bits or pieces from a four-minute recording that would get

3  us around the Work Product Doctrine.  And the Work Product

4  Doctrine is not a primary purpose.  The Ninth Circuit has

5  said it's because of.  So, it's a different standard, and it

6  doesn't have to be that the sole purpose was for litigation.

7  It has to be one of the purposes for the meeting, and you

8  can't separate out.  And I think that's exactly what we have

9  here.  And the -- the important things I think to note is

10  that nowhere has there been any argument by Plaintiff of any

11  waiver, whether by us or by the participants in the meeting.

12  There's been no argument of waiver.  There's also been no

13  argument of substantial need here that would take you beyond

14  the Work Product Doctrine.

15      They have asked to depose every single person

16  other than ███████████who was party to that meeting.  They

17  have deposed I think at least two of them to date.  The rest

18  they have requested, including ███████████████████

19  (phonetic), everybody else who was involved.

20      So, we're not denying that they can't take their

21  depositions and ask them what their impressions of the CSAM

22  policies were, what information they had.  They can ask them

23  what they recall about the meeting generally.  We're not

24  saying that the fact that the meeting took place is

25  privileged, but the underlying discussion, given all the

20

1  information that we had about the meeting, including what se

2  have disclosed is on the recording itself, certainly

3  justifies it.

4          THE COURT:  Thank you.

5          Counsel?

6          MS. BROOK:  I'll briefly respond if the Court will

7  allow it.

8          I think counsel for MindGeek made six points that

9  I will just briefly touch on, and I'll try to just go in

10  reverse order so they're fresh -- as fresh in our minds as

11  possible.

12          The because of standard, we agree the because of

13  standard governs work product, but we're not looking at

14  whether or not the meeting was because of litigation.  We're

15  looking at whether the recording of the meeting was because

16  of litigation, and they have not offered any evidence, any

17  argument that the recording itself was because of

18  litigation.

19          That, your Honor -- I think I'll jump around --

20  brings us to their comment that the recording should be more

21  likened to notes than to a recording.  It's not notes.  It's

22  possible to take notes at a meeting.  There may very well be

23  notes of this meeting on their privilege log somewhere.

24  What this was was something very different.  There was a

25  member of that meeting in attendance that felt compelled to

21

create a recording of it.  And then, again, we're not looking now at a recording of that.  We're looking at a secondary recording that includes some conversation before and after.  And, so, we contend that the more appropriate analogy is the photograph one I made earlier and not notes.

Another point that counsel for MindGeek made is that we don't take issue with the meeting invitation itself. I mean, until very recently, we had no idea that they contended this meeting invitation had any connection to this particular meeting.  But, no, based on what they've put on their log, we -- there's -- they redacted everything.  So, there's really no way for us to challenge it based on the information we have right now.  I think if it turns out that the meeting itself, the recording itself shows that it wasn't attorney-client, not work product, then it is appropriate to challenge that as well.  But the fact that we haven't challenged that invitation is sort of neither here nor there.

MindGeek points out they've produced a lot of information with ███████ on it, and that's appropriate, and we thank them for that.  But that cuts both ways, right. They've produced information with ███████ on it from after the time that Alabama filed its lawsuit.  So, just because it's after that significant event and ███████ is on it doesn't mean that we should buy their inference that

22

1   this was an attorney-client privileged communication or work

2   product.

3          And then, most important, your Honor, I go back to

4   some of the first points counsel for MindGeek made, which is

5   that we're only talking about four minutes, and, you know,

6   Trust us, there's no substantive conversation between ███

7   ████ and █████████.

8          Respectfully, taking them at their word that maybe

9   there's no substantive conversation, a lot can be gleaned

10  from tone of voice, from the aura around this telephone

11  conversation if you can discern that what ██████████ is

12  doing is very frighteningly, very cautiously, or maybe very

13  con -- with a lot of conviction, sharing something with ███

14  ██████ that she thinks it's important for her to know about.

15  There's a lot that can be learned there, and there's a lot

16  of nonsubstantive commentary I could think of such as, you

17  know, You have to listen to this.  This is important or

18  something like that.  I don't know because, again, I haven't

19  seen the recording.  But the fact that it's only four

20  minutes I think, again, really just pushes us into the one

21  thing that counsel for MindGeek really didn't address about

22  my argument, which is the option of in camera review.  The

23  standard there is if the party opposing privilege need only

24  a factual basis sufficient to support a reasonable good

25  faith belief that in camera inspection may reveal evidence

23

1  that information in the materials is not privileged.

2          I think we've done that, your Honor, based on the

3  ████  deposition and based on the holes that we've pointed

4  out in ███████████ declaration and that given the other

5  factors that courts then look at under the discretionary

6  prong two standard, it makes sense to listen to the four-

7  minute recording, and if the Court determines that it is

8  principally purposed for litigation, then so be it.

9          THE COURT:  Thank you.

10          MS. BROOK:  Thank you.

11          THE COURT:  All right.  Let's take a short break.

12      (Proceedings recessed briefly.)

13          THE CLERK:  Recalling case SA CV 21-338, Doe

14  versus MindGeek.

15          THE COURT:  All right.  Thank you, everybody.

16  Please be seated.  Okay.

17          So, I'm going to grant the request for an in

18  camera review.  All right.  And then I'm going to take the

19  rest of the motion under submission.  I want to check a few

20  things, and then we'll be issuing a ruling.

21          Counsel, how can you get me that recording?

22          MS. YEARY:  I -- probably the easiest thing is to

23  put it on with a USB or something like that.

24          THE COURT:  Um-hmm.  Um-hmm.

25          MS. YEARY:  I can have that done by our California

24

1  office and hand delivered.

2          THE COURT:  Okay.  That's totally fine.  Whatever

3  you feel most comfortable with.  If you want to have it

4  messengered on a flash drive, we can -- we can do that.

5          MS. YEARY:  Okay.

6          THE COURT:  Okay.

7          MS. YEARY:  That's probably the easiest.

8          THE COURT:  What is your ability to turn it

9  around?  How quickly?

10          MS. YEARY:  Oh, I just have to give them the say

11  so, but maybe tomorrow.  I would say that should be the

12  easiest to -- to do.

13          THE COURT:  All right.  Any concerns about that?

14          MS. BROOK:  No, your Honor.  Thank you.

15          THE COURT:  All right.  Let's -- yes?

16          MS. YEARY:  The only thing is that you also had on

17  the -- the papers for the motion to seal.  Is that ruling

18  going to stand or --

19          THE COURT:  I'm going to wait.  I'll rule after I

20  make a decision on this.  But nobody made any oral argument

21  about it.  Do you need to?

22          MS. YEARY:  The only thing that I would say, your

23  Honor, is I'm not -- it looks to me like you were granting

24  it except for the -- the attorney declarations and the

25  actual joint stipulation itself.

1           THE COURT:  Correct, only the exhibits that are

2   marked confidential.

3           MS. YEARY:  Right.

4           THE COURT:  Because, as I read it, I didn't see

5   anything that was actually attorney-client privilege or

6   attorney work product.  What I saw was names largely.

7           MS. YEARY:  That's -- that's what I'm going to

8   raise with you --

9           THE COURT:  Okay.

10          MS. YEARY:  -- your Honor, which is we would -- we

11  are fine if those four pieces get filed publically.  But we

12  would ask for the ability to react the names.

13          THE COURT:  Why is somebody's name confidential?

14          MS. YEARY:  Sure.  So, we've been asking -- all

15  the class cert briefing that's been recently filed, Judge

16  Carney has granted us taking out all of the names in all of

17  the briefing and everything that's public, every exhibit,

18  every -- everything, the people's names, their titles, all

19  of it.  The reason is that there are several anti-

20  pornography social media campaigns that watch every single

21  thing that gets filed in this case and others.  They pull

22  every single thing off the docket, and they publish it on

23  their websites.  So, to put these peoples' names out there

24  for the public when they are just employees, they are not

25  parties to this suit, we think can be potentially harmful,

26

1  and I will go as far as to say that before the litigation

2  even started, ███████████████████████████████████████

3  ████████████████████████████████   We are just trying

4  to protect the individuals.

5           THE COURT:  Okay.  And you're saying that Judge

6  Carney has been granting request to seal?

7           MS. YEARY:  Right.

8           THE COURT:  Even over just names?

9           MS. YEARY:  Every -- there is not a single name in

10  a public filing in any of the class cert briefing.  They're

11  all redacted.

12          THE COURT:  Okay.  Counsel, do you have any

13  thoughts on that?  Is that an accurate description of what

14  Judge Carney has been ruling?

15          MS. BROOK:  I believe that's an accurate

16  description, your Honor, with the caveat that I honestly

17  don't know for 100 percent certain as I haven't been

18  handling the sealing exhibits with the class cert briefing.

19  But to the extent it's -- I trust counsel for MindGeek to be

20  making an accurate representation to the Court.

21          THE COURT:  Okay.  All right.  I didn't understand

22  that dynamic.  We will go back and look and see what Judge

23  Carney's doing to confirm what you say.  And if that's

24  accurate, then -- now, it's -- how is he handling having

25  things redacted?  Because, obviously, the Court doesn't go

27

1    around and redact.

2            MS. YEARY:  We're -- we're putting in the redacted

3    version as part of -- so, after the order gets granted, we

4    then file the pieces that are allowed to be filed publically

5    on the public docket with the information redacted.  So,

6    it's like black lined.

7            THE COURT:  Okay.  So, in order for that to

8    happen, so that the joint stipulation stays public but the

9    names stay redacted, that would be granting your request for

10   redacting, correct?  Okay.  Thank you for that

11   clarification.

12           MS. YEARY:  Thank you.

13           THE COURT:  All right.

14           MS. BROOK:  And I believe, your Honor, even though

15   it was Plaintiff's joint stipulation in that case, MindGeek

16   would refile the joint stipulation with the redactions.

17           MS. YEARY:  We'll either refile it or if it has to

18   come under your name, we'll give you the entire redacted.

19   There will be no effort that you have to take.  We'll take

20   care of it.

21           THE COURT:  Okay.  All right.  All right.  Thank

22   you.

23           I'm going to order that the recording be provided.

24   I'm going to say by close of business on Friday, but I hope

25   that you will get it to me before that.  All right.  And

28

1    I'll attempt to get a ruling out to you as quickly as

2    possible thereafter.

3              All right.

4              MS. YEARY:   Thank you, your Honor.

5              MS. BROOK:   Thank you, your Honor.

6         (Proceedings adjourned at 11:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1      I certify the foregoing is a correct transcript

2   from the electronic sound recording of the proceedings in

3   the above-entitled matter.

4

5   /s/Jordan Keilty                    10/25/2023
    Transcriber                         Date
6
    FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
    /s/L.L. Francisco
9   L.L. Francisco, President
    Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*