**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| **JANE DOE, on behalf of herself and all others similarly situated,** | **Case No.: SACV 21-00338-CJC (ADSx)** |
| **Plaintiff,** | **ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [Dkt. 124], DENYING DEFENDANTS' MOTION TO EXCLUDE DECLARATION OF DR. BRIAN LEVINE [Dkt. 176], AND DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO EXCLUDE DECLARATION OF ROBERT MILLS [Dkt. 173]** |
| **v.** | |
| **MINDGEEK USA INCORPORATED, MINDGEEK S.A.R.L., MG FREESITES, LTD, D/B/A PORNHUB, MG FREESITES II, LTD, MG CONTENT RT LIMITED, and 9219-1568 QUEBEC, INC. D/B/A MINDGEEK,** | |
| **Defendants.** | |

## I.     INTRODUCTION

This is a case about whether one of the world's largest pornography companies systematically participated in sex-trafficking ventures involving tens of thousands of children by receiving, distributing, and profiting from droves of child sexual abuse material ("CSAM").  Plaintiff Jane Doe brings this putative class action against

Defendants Mindgeek USA Incorporated, Mindgeek S.A.R.L., MG Freesites, LTD, d/b/a Pornhub, MG Freesites II, LTD, MG Content RT Limited, and 9219-1568 Quebec, Inc. d/b/a Mindgeek, alleging they violated sex trafficking and child pornography laws. (*See* Dkt. 107 [Third Amended Complaint, hereinafter "TAC"].)  Now before the Court is Plaintiff's motion for class certification.  (*See* Dkt. 124 [Notice of Motion and Motion to Certify Class].)  For the following reasons, Plaintiff's motion is **GRANTED**.

## II.   BACKGROUND

Defendants are a group of privately held companies that operate many of the most popular pornographic websites, including Pornhub, Redtube, and YouPorn.  (TAC ¶ 38; Dkt. 125 Ex. 1 [Declaration of Dr. Brian Levine, hereinafter "Levine Decl."][1] ¶ 18.) They also operate a variety of well-known pornographic film companies such as Brazzers, Digital Playground, Men.com, Reality Kings, Sean Cody, and WhyNotBi.com. (TAC ¶ 38.)  Their "flagship video sharing platform is Pornhub.  Created in 2007, Pornhub is a leading free, ad-supported, adult content hosting and streaming website,

---

[1] Also before the Court is Defendants' motion to exclude the declaration of Dr. Brian Levine.  (*See* Dkt. 176.) Defendants' motion is **DENIED**.  Dr. Levine's declaration satisfies the requirements of Federal Rule of Evidence 702.  Dr. Levine is a tenured Professor of Information and Computer Sciences and an expert in internet-based crimes against children with over 20 years of experience.  A review of his publicly available work demonstrates his expertise applicable to this case.  In a 2022 report to Congress titled "Increasing the Efficacy of Investigations of Online Child Sexual Exploitation," (*see* Levine Decl. app. 2 at 3), Dr. Levine thoroughly explains how the internet has transformed the character and practice of child sexual exploitation and that the "consequences of a lax approach to moderation by industry can be disastrous."  In a paper titled "Measurement and Analysis of Child Pornography Trafficking on P2P Networks," (*see id.* at 2 ["Runner-up for Best Paper Award at the 2013 International World Wide Web (WWW) Conference for 'Measurement and Analysis of Child Pornography Trafficking on P2P Networks' (Hurley et al.); Out of 122 accepted papers and 831 submissions)."]), Dr. Levine explains how removing various types of sharers of CSAM from networks most effectively reduces content availability.  While Defendants do not utilize a peer-to-peer network, it is easy to see how Dr. Levine's work in that space translates to Defendants' sites, which also rely on users uploading content.  Dr. Levine's specialized knowledge will help the trier of fact understand, among other issues, the adequacy of Defendants' policies and practices, including the availability of technology and techniques Defendants elected not to utilize.  Dr. Levine's declaration is based on the reliable application of his knowledge and experience to the evidence in this case, which he has carefully reviewed and incorporated.  Defendants' arguments to exclude Dr. Levine's declaration go to weight, not admissibility.  *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010), *as amended* (Apr. 27, 2010) ("When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony.").

offering visitors the ability to view content uploaded by verified users, models, and
third-party adult entertainment companies.  Pornhub Premium, [their] subscription
service, provides subscribers with additional exclusive studio-produced content in an ad-
free environment." (*Id.* ¶ 39.)  Pornhub had roughly 42 billion visits in 2019, making it
the eighth most visited website in the United States, behind only Google, Youtube,
Facebook, Amazon, Yahoo, Twitter, and Instagram.  (*Id.* ¶ 40.)

Pornhub is a tube site, meaning much of the site's content comes from individual
users who create content and upload it to Pornhub themselves.  (*Id.* ¶¶ 44–45.)  Pornhub
offers users the opportunity to share in the revenue from the content they upload.  (*Id.*
¶ 48.)  For instance, if a user joins Pornhub's "Model Program," they may be paid as
much as 80 percent of the advertising revenue their videos generate depending on the
number of video views and performance of the advertisements by clicks, user country,
and sales.  (*Id.*)  To maximize revenue for both themselves and uploaders, Defendants
share this content across their stable of pornography websites.  (*Id.* ¶ 64.)  To put it
simply, Defendants want as many eyes and clicks as they can get.  Users create and
upload much of the content that drives the eyes and clicks.

Defendants have successfully monetized those eyes and clicks in a variety of
ways.  They sell premium subscriptions, which allow users to access content that is
behind a paywall.  (*Id.* ¶ 67.)  They sell a variety of advertisements that appear both on
webpages as banners and inside videos.  (*Id.* ¶ 68.)  And they harvest and monetize user
data that they share with advertisers and other companies.  (*Id.* ¶ 69.)

Tragically, some of those eyes and clicks come from videos and other content
depicting children.  The toll of these materials on survivors cannot be overstated.
Survivors "are significantly impacted—emotionally, mentally, and physically—as a
result of their abuse, and experience continuing and pervasive symptoms such as

feelings of shame and humiliation, powerlessness, hopelessness, fear, anger, anxiety, and depression, as well as sleeping disturbances, body image disturbances, self-harm behaviors, eating disorders, and suicidal ideation." (*Id.* ¶ 30.)  Given that insidious and lingering impact, coupled with the vulnerability of the targets—children—acts involving CSAM are viewed as some of the most reprehensible conduct imaginable.

Plaintiff alleges that Defendants facilitate and profit from child sex trafficking involving CSAM.  (*Id.* ¶¶ 2–3, 35.)  Defendants have known about, and been investigated for, significant amounts of CSAM on their sites.  (*Id.* ¶¶ 98–134; Levine Decl. ¶¶ 29–30, 52–63, 68, 70, 72–73, 81–85, 94–95, 184–85.)  But according to Plaintiff, Defendants, despite their actual knowledge that their sites were being used to share CSAM, did not take adequate steps to curb its propagation, motivated at least in part by financial considerations.  In fact, according to Plaintiff, Defendants actively contributed to the dissemination of CSAM by making it easier to find on their websites. This includes "featuring" content suggesting CSAM, permitting "playlists" with titles like "less than 18," suggesting search terms like "middle school girls," and making recommendations based on user preferences.  (TAC ¶¶ 81–83, 103; Levine Decl. ¶¶ 163–69, 171–73.)  And even when Defendants removed CSAM, they, at least some of the time, left up the link, title, and description to drive site traffic to the site, allowing further revenue generation.  (TAC ¶ 77; Levine Decl. ¶ 95.)  As a concrete example, Defendants took down a video featuring a prepubescent victim that had been reported to the National Center for Missing and Exploited Children.  (TAC ¶ 78.)  But the link was left live, leading to a page with the title "DADDY PUNISHES TINY YOUNG BARELY LEGAL DAUGHTER BDSM ANAL ABUSE."  (*Id.*)  The tags included "teenager," "young," "daddy," "daughter," "abuse," "punished," "tiny," and "torture." (*Id.*)  One user commented, "This isn't barely legal.  This is fucking C***d Porn," eliciting a reply from another user that "im not complaining."  (*Id.*)

The heart of Plaintiff's allegations is Defendants' failure to address their CSAM problem on a systemic level despite clear indications there is a systemic problem. Defendants employ content moderators, but simple math suggests they do not have enough time to properly screen all user uploads and are incentivized to let as much content as possible go live to maximize revenue.  (*Id.* ¶¶ 85–93; Levine Decl. ¶¶ 32–38.) The evidence also shows that moderators did not receive adequate training, and some moderators themselves felt that Defendants' policies were inadequate.  (Levine Decl. ¶¶ 39–51, 78–80.)  Nor did Defendants take sufficient steps to ensure that users could not upload more CSAM after already having taken down CSAM videos from those users.  (*Id.* ¶ 73–76, 89–91.)  Plaintiff claims Defendants also have failed to implement an adequate age-verification system, which Plaintiff asserts would prevent CSAM uploaded to Defendants' sites from going live and being shared to thousands of users. (TAC ¶¶ 2, 53, 73, 140, 187.)  A key part of this failure is the lack of a requirement for a government-issued photo identification for all individuals that appear in media posted to Defendants' sites.  (Levine Decl. ¶¶ 21, 41–44, 46.)  Evidence also suggests Defendants failed to implement technology as it became available, which could have helped stop the proliferation of CSAM on Defendants' sites.  (*Id.* ¶¶ 101–132.)

Based on Defendants' policies and practices, Plaintiff seeks to certify a class and subclass challenging Defendants' policies and practices related to CSAM.  (*See* Dkt. 124 [Notice of Motion and Motion for Class Certification] at 1.)  The class includes "[a]ll persons who were under the age of 18 when they appeared in a video or image that has been uploaded or otherwise made available for viewing on any website owned or operated by MindGeek from February 19, 2011, through the present."  (*Id.*)  The subclass consists of members of the class "residing in California who were under the age of 18 when they appeared in a video or image that has been uploaded or otherwise made available for viewing on any website owned or operated by MindGeek from February 19, 2011, through the present."  (*Id.*)  Plaintiff proposes that she be appointed as class

representative for the class and subclass and Plaintiff's counsel, Susman Godfrey L.L.P, be appointed as class counsel.  (*Id.*)

## III.   DISCUSSION

Under Federal Rule of Civil Procedure 23, district courts have broad discretion to determine whether a class should be certified.  *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001).  The party seeking class certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Rule 23 is not merely a pleading standard—a party seeking class certification must affirmatively demonstrate compliance with the rule by proving the requirements in fact.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The Court must find by a preponderance of the evidence that the plaintiff has satisfied the requirements of Rule 23.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir.) (2022).

### A.   Rule 23(a) Requirements

Under Rule 23(a), a class may be certified if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

### 1.    Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  There is no magic number required to satisfy numerosity.  Instead, courts consider the facts of each specific case.  *See Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980).  As a general matter, however, courts have found that "classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough."  *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1095 (C.D. Cal. 2015); *see also Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602–03 (C.D. Cal. 2015).

Plaintiff asserts that the proposed class numbers in the tens of thousands.  (Dkt. 125 [Memorandum in Support of Motion, hereinafter "Mot."] at 8.)  Having reviewed the evidence submitted in connection with the instant motion, the Court finds that the proposed classes satisfy the numerosity requirement.  *See Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *2 (S.D.N.Y. June 12, 2023) (certifying TVPRA class based on evidence of at least 137 class members).  Indeed, there is evidence from Defendants' own records demonstrating the presence of thousands of pieces of CSAM on their sites.[2]  (*See* Dkts. 123-15–17.)

### 2.  Commonality

To prove "questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), a plaintiff must "demonstrate that the class members have suffered the same injury,"

---

[2] To the extent Defendants argue that their records include, in addition to CSAM, mere "content that *appears* to be CSAM," even a small percentage of the individuals appearing in the media reported by Defendants to be CSAM or "content that *appears* to be CSAM" would satisfy the numerosity requirement.  (*See* Dkt. 168 [Opposition to Plaintiff's Motion for Class Certification] at 14.)

*Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 (1982)).  This does not "mean merely that they have all suffered a violation of the same provision of law," but rather that the plaintiff's claim depends on a "common contention," the truth or falsity of which "will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*; *see also Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019) ("The commonality element may be fulfilled if the court can determine 'in one stroke' whether a single policy or practice which the proposed class members are all subject to 'expose[d] them to a substantial risk of harm.'").  "So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)."  *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (cleaned up).

CSAM depicting Plaintiff and putative class members was uploaded to Defendants' websites, and Plaintiff alleges that Defendants' policies and practices encouraged dissemination of that CSAM and that Defendants profited from dissemination of that CSAM.  Plaintiff seeks to certify a class and subclass based on violations of four statutes: (1) 18 U.S.C. § 2252A, (2) the Trafficking Victims Protection Reauthorization Act ("TVPRA"), (3) the California Trafficking Victims Protection Act ("CTVPA"), and (4) California's Unfair Competition Law ("UCL").  (Mot. at 10, 14, 16–17.)  To establish liability under Section 2252A, Plaintiff must prove Defendants knowingly received or distributed child pornography in interstate or foreign commerce.  18 U.S.C. § 2252A(a)(2).  To prevail under the TVPRA, Plaintiff must show that Defendants knowingly benefitted financially or by receiving anything of value from participation in a venture that Defendants knew or should have known has engaged in child sex trafficking.  18 U.S.C. § 1595(a).  Under the CTVPA, Plaintiff must make a similar showing in addition to proving that "Defendants had the intent to distribute, possess, prepare, publish, produce, develop, duplicate, or print matter depicting sexual conduct by a minor."  *Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 843 (C.D. Cal.),

*adhered to on denial of reconsideration*, 574 F. Supp. 3d 760 (C.D. Cal. 2021). Plaintiff's UCL claim is based on violations of the other three statutes.[3]

Deciding Plaintiff's claims raises a host of common questions, including, among others:

- Whether Defendants received or distributed CSAM;
- Whether Defendants knew there was a high probability of CSAM on their websites;
- Whether Defendants took deliberate actions to avoid learning of CSAM on their websites;
- Whether Defendants failed to implement sufficient policies and practices related to CSAM;
- Whether Defendants knowingly benefitted from sex trafficking ventures; and
- Whether Defendants knew or had reason to know of the existence of sex trafficking ventures.

*See, e.g.*, *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *4 (certifying TVPRA class based on common questions including whether JP Morgan knew (or recklessly disregarded) that a sex-trafficking venture existed and participated in it); *see also Campbell v. Vitran Express Inc*, 2015 WL 7176110, at *4 (C.D. Cal. Nov. 12, 2015) (finding commonality when "all putative members' claims arise from the same source" of violative policies).  These common questions will "generate common *answers* apt to drive the resolution of [this] litigation."  *Wang*, 737 F.3d at 543 (citation omitted).

---

[3] Defendants argue "Plaintiff's UCL claim is entirely derivative of her trafficking and possession claims and thus cannot be proven by common evidence for the same reasons."  (Dkt. 168 [Opposition to Plaintiff's Motion for Class Certification] at 18 n.4.)  Accordingly, the Court focuses its analysis on the underlying trafficking and possession claims.

### 3.  Typicality

Rule 23(a)(3) requires the "claims or defenses of the representative parties" to be "typical of the claims or defenses of the class."  A representative's claims are "typical" if they are "reasonably coextensive with those of the absent class members; they need not be substantially identical."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  The typicality inquiry asks "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  The purpose of the typicality requirement is to "assure that the interest of the named representative aligns with the interests of the class."  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017).

Plaintiff's claims are "reasonably co-extensive with those of the absent class members."  *Hanlon*, 150 F.3d at 1020.  Plaintiff contends, just like the proposed class members, that Defendants' websites hosted pornographic videos depicting her when she was a child.  She alleges that Defendants' policies and practices made dissemination of this CSAM, both of her and the putative class members, possible—in other words, Defendants' same conduct caused common injuries.  The typicality requirement is satisfied.  *See, e.g.*, *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *4 ("Since Jane Doe's claims arise out of the same course events as those of other class members, and since similar legal arguments bear on her and other class members' claims, the Court finds that the typicality requirement is satisfied.").

### 4. Adequacy

To satisfy the adequacy requirement, Plaintiff must show that she and her counsel
will fairly and adequately represent the class. *Hanlon*, 150 F.3d at 1020. This
requirement ensures that the constitutional protections of due process and full faith and
credit are afforded to absent class members. *Hansberry v. Lee*, 311 U.S. 32, 43 (1940).
"Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and
their counsel have any conflicts of interest with other class members and (2) will the
named plaintiffs and their counsel prosecute the action vigorously on behalf of the
class?" *Hanlon*, 150 F.3d at 1020.

There is no evidence that Plaintiff or her counsel have any conflict of interest with
other class members. Rather, because Plaintiff's claims are consistent with those of the
class members, she has every reason to vigorously pursue those claims and fairly and
adequately represent the class. *See JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at
*7 (finding the plaintiff adequate when she was "incentivized to promote the interests of
the class, since her own interest—like that of other class members—is to secure a
judgment against JP Morgan and to secure as large an award of damages as is possible"
and she had "confirmed her commitment to success in this matter through her active
participation up to this point"). The same is true of Plaintiff's counsel, who have
"served as lead counsel in some of the largest and most complex class actions," and are
"widely recognized as one of the nation's leading trial firms." (Dkt. 125-9 [Declaration
of Krysta Kauble Pachman] ¶¶ 11–13.) Plaintiff's counsel has already invested
significant resources in litigating this case, and the Court is not aware of any reason that
this will not continue to be true.

Defendants argue Plaintiff is not an adequate representative because she "has
chosen not to pursue compensation for the physical and emotional damages she alleges

the absent class members sustained." (Dkt. 168 [Opposition to Plaintiff's Motion for Class Certification, hereinafter "Opp."] at 18.) But Plaintiff made this decision for a reason—she recognizes the trauma that litigating this type of case can inflict on survivors and endeavors to present the strongest case for certification to limit further unnecessary suffering on the part of class members. *See Doe v. Boland*, 698 F.3d 877, 882 (6th Cir. 2012) (explaining that Section 2255 provides for minimum damages to allow child pornography victims to recover without having to endure potentially damaging damages hearings that would increase their suffering). There is no indication that Plaintiff chose not to pursue these remedies on any improper basis, such as a personal or other competing relationship. *Cf. Drimmer v. WD-40 Company*, 2007 WL 2456003, at *3 (S.D. Cal. Aug. 24, 2007), *aff'd*, 343 F. App'x 219 (9th Cir. 2009) (finding adequacy lacking because "[w]hile any *one factor* would not disqualify [the plaintiff], the *combination* of a personal relationship, landlord-tenant relationship, and an *inexplicable* disinterest in pursuing all remedies available to him strongly suggest that he may direct the litigation to benefit his friend rather than his fellow class members") (emphasis added). And proceeding with the strongest case is a "hallmark of competence, not inadequacy." *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 2023 WL 4191651, at *6 (C.D. Cal. May 24, 2023). The requirements of adequacy are satisfied.[4]

## B.    Rule 23(b) Requirements

In addition to the Rule 23(a) requirements, Plaintiff must also establish one or more of the grounds for maintaining a class action under Rule 23(b). Rule 23(b) defines

---

[4] Defendants also argue that the videos of Plaintiff uploaded to Defendants' sites "may very well depict Plaintiff after she turned 18." (Opp. at 9.) The Court is unpersuaded, particularly in light of the uploader's criminal conviction for possessing underage photos and videos of Plaintiff. (*See* Dkt. 199 [Reply in Support of Motion for Class Certification] Ex. 7 at 261:10–19.)

three different types of classes.  *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 512 (9th Cir. 2012).  Plaintiff seeks certification under Rules 23(b)(3) and 23(b)(2).

### 1.    Rule 23(b)(3)

Rule 23(b)(3) allows certification when the court finds that (1) questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### a.  Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Rule 23(b)(3) requires a showing only that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  It also "does not require a plaintiff seeking class certification to prove that each element of her claim is susceptible to class-wide proof." *Id.* at 1196 (cleaned up) (emphasis omitted).  While similar to commonality, the inquiry requires a heightened showing that facts and issues common to the class predominate over any individual issues that may be present.  *See* Fed. R. Civ. P. 23(b)(3); *Hanlon,* 150 F.3d at 1019.  The main concern is the "balance between individual and common issues." *Mevorah v. Wells Fargo Home Mortg.* (*In re Wells Fargo Home Mortg. Overtime Pay Litig.*), 571 F.3d 953, 959 (9th Cir. 2009).  "The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (internal quotation marks and citation omitted).

A district court may not "decline to certify a class that will require determination of some individualized questions at trial, so long as such questions do not predominate over the common questions." *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 668. To "require a plaintiff to show that *no* individual issues exist . . . would be an impossibly high standard." *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *8.

In assessing predominance, the court "is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Coop., Inc.*, 31 F.4th at 666–67 (cleaned up). A court does not have "license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 667. And it "cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Id.*

Resolving Plaintiff's claims rests on key questions common to the class which predominate over individualized issues. Plaintiff alleges that Defendants permitted and even promoted the publication of sexual videos depicting her as a minor on their websites. All putative class members had their CSAM posted to one of Defendants' websites. Defendants' policies and practices that allowed, facilitated, and encouraged CSAM, profiting Defendants, made those injuries possible. Determining whether Defendants' conduct violated Section 2252A, the TVPRA, and the CTVPA involves resolving key questions including whether Defendants benefitted from the CSAM on their sites, whether their policies and practices allowed or even encouraged CSAM to be posted on their sites, and whether they knew what was happening. *See, e.g.*, *JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *8 (finding common questions predominated when individual plaintiffs would all "have to prove that Jeffrey Epstein conducted a sex-trafficking venture; that JP Morgan participated in it by providing material banking

services for Epstein (among other things); that JP Morgan benefited from its

participation; and that JP Morgan either knew, recklessly disregarded, or (in the case of

negligence) should have known that Epstein conducted as sex-trafficking venture”);

*Brown v. Abercrombie & Fitch Co.*, 2015 WL 9690357, at *18 (C.D. Cal. July 16, 2015)

(finding common questions predominated because of evidence of a company-wide

policy or practice, even with some variations in how the policy or practice was conveyed

and received).  In short, class members “have the same or similar injury” resulting from

“the same course of conduct” and “the action is based on conduct which is not unique to

the named plaintiffs.”  *Hanon*, 976 F.2d at 508.


Common evidence will be used to prove the class’s claims.  As has been

explained, the central component of this case is how Defendants’ policies and practices

contributed to CSAM on their sites.  Common evidence, such as Defendant’s moderator

handbook, will demonstrate how Defendants noted and reported content as CSAM.

Common evidence will demonstrate whether all the material Defendants noted and

reported as CSAM went live on their sites.  And common evidence, such as the various

government investigations and reporting on the issue, will prove whether Defendants

were willfully blind to the problem of CSAM on their sites.  This common evidence,

largely based on Defendant’s policies and practices, will dictate the answers to the

common questions which predominate in the case.  *See Owino v. CoreCivic, Inc.*, 60

F.4th 437, 445 (9th Cir. 2022) (“In other words, the question is appropriate for class-

wide resolution because either [the defendant’s] company-wide policies and practices

violated the law and the rights of the class members, or they didn’t.”).


Defendants also argue that that common issues do not predominate because

“Plaintiff and each absent class member must prove they were a minor at the time

content depicting them was created.”  (Opp. at 9.)  But class members may self-identify,

and defendants may challenge the claims of absent class members during the claims

administration process.  *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th

Cir. 2017).  So long as Defendants "will receive a fair opportunity to present its defenses

when putative class members actually come forward," due process is not offended.  *Id.*

at 1132.  And again, the focus of this litigation is not on any one video but rather

Defendants' policies and practices that resulted in the posting of thousands of CSAM

videos, upon which "the claims of every member of the class are uniformly premised."

*See In re Napster, Inc. Copyright Litig.*, 2005 WL 1287611, at *7 (N.D. Cal. June 1,

2005).


Defendants further point to various elements of the relevant statutes to argue that

individual issues predominate.  (Opp. at 9–16.)  Defendants miss the forest for the trees.

For instance, Defendants assert proof of whether class members were trafficked in the

commercial sex act context is highly individualized.  (*Id.* at 9–10.)  As the Court

previously explained, "[t]he TVPRA . . . defines a commercial sex act broadly" and

"posting child pornography is a commercial sex act."  *Doe v. Mindgeek USA Inc.*, 558 F.

Supp. 3d at 840.  In this regard, the claims here "rest on a core of questions that are

common to the class" and "the individual inquiries that remain are peripheral."

*JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at **8–9.  And Defendants are

incorrect that "each plaintiff will need to prove the uploader 'had the intent to monetize

the videos at the time they were made.'"  (Opp. at 10 [quoting *Doe v. Mindgeek USA

Inc.*, 558 F. Supp. 3d at 840].)  There is no such requirement in the TVPRA.  *See Doe #1

v. MG Freesites, LTD*, 2022 WL 407147, at *19 (N.D. Ala. Feb. 9, 2022) (holding the

TVPRA does not require "alleg[ations] that their abusers had the intent to monetize the

CSAM videos at the time they were made").


Similarly, Defendants argue that their mens rea—specifically, willful blindness—

with regards to each proposed class member is an individualized inquiry.  (Opp. at 15–

16.)  But that again ignores the theory of this case.  Plaintiff argues, and evidence

suggests, that Defendants knew that users were uploading significant amounts of CSAM to their websites.  And despite that knowledge, Defendants did not implement sufficient policies and practices to prevent that from occurring over and over again.  Plaintiff asserts that if Defendants had instituted a robust age verification process, CSAM would have never gone live.  But they elected not to do so knowing there was a high probability users would continue to post CSAM.  Ultimately, this is a merits issue that Defendants will no doubt vigorously litigate, determined by common evidence such as Defendants' general awareness of CSAM on its sites, how that awareness drove their relevant content moderation policies and practices, and their reasons for any action or inaction (such as profits from the CSAM on their sites).

Defendants also assert that Plaintiff's damages claims defeat predominance. (Opp. at 17.)  Not so.  Plaintiff seeks considerable statutory damages, which supports a finding of predominance*.  See In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 300 F.R.D. 347, 377 (C.D. Cal. 2013) ("Courts have been more willing to find predominance where, as here, the class seeks only statutory damages.").  Indeed, such logic is particularly apt here, where Plaintiff seeks to certify a class to spare class members from having to litigate their claims individually, because "[t]he point of a minimum-damages requirement [in Section 2255] is to allow victims of child pornography to recover *without* having to endure potentially damaging damages hearings.  Were it otherwise, a fresh damages hearing might inflict fresh wounds, *increasing* the child's suffering *and* increasing the compensatory damages to which she is entitled." *Doe v. Boland*, 698 F.3d 877, 882 (6th Cir. 2012).  To the extent Plaintiff also seeks compensatory damages and restitution, any need for individual calculations does not override the predominating common issues present in this case.[5]  *See*

---

[5] Also before the Court is Defendants' motion to exclude the declaration of Robert Mills.  (*See* Dkt. 173.)  In deciding Plaintiff's motion for class certification, the Court did not rely on Mills's declaration.  The issue of whether and what type of restitution is available is more appropriately resolved by way of summary judgment or pretrial motions.  Any individual calculations that prove necessary on this issue do not predominate over the common issues.  *See Olean Wholesale Grocery Coop., Inc.*, 31 F.4th 651, 669 (9th Cir.) ("The presence of

*JPMorgan Chase Bank, N.A.*, 2023 WL 3945773, at *10 (explaining that it is "commonplace in class actions certified under Rule 23(b)(3)" "that damages will have to be resolved on an individualized basis," and granting class certification for TVPRA and negligence claims).  Nor do punitive damages bar a finding of predominance. Defendants argue that "[c]ourts agree that punitive damages cannot be awarded without first establishing individualized harm." (Opp. at 17.)  The Court disagrees.  The availability of punitive damages here "hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole." *Opperman v. Path, Inc.*, 2016 WL 3844326, at *16 (N.D. Cal. July 15, 2016).  Punitive damages on a class-wide basis are particularly appropriate here because the conduct is inherently harmful to class members who were sexually exploited as children due to Defendants' policies and practices.

Lastly, in arguing against certification, Defendants lean heavily on this Court's order granting a motion to sever in *Fleites v. MindGeek S.A.R.L*, but key issues distinguish that case from this one.  In that case, 34 plaintiffs brought 18 different federal and state law claims against MindGeek defendants and other defendants, including Visa and financiers.  *Fleites v. MindGeek S.A.R.L*, 2022 WL 1314035, at *6 (C.D. Cal. Feb. 10, 2022).  The complaint alleged that the defendants "engaged in racketeering activity, including sex trafficking, possession and distribution of child pornography, use of the mails and wires in furtherance of a scheme, money laundering, criminal copyright piracy, internet hacking, bank and creditor fraud, tax evasion, blackmail, extortion, harassment, defamation, and hacking," and that "the MindGeek Defendants . . . engaged in activity 'just like the Sopranos' and that a 'bro-club' gave rise to extensive criminal conduct, impacting Plaintiffs." *Id.* at *3.  The issues here are far more focused.  Unlike *Fleites*, the core of this litigation is Defendants' content

---

individualized damages issues does not preclude a court from certifying a class because class-wide proof is not required for all issues.") (cleaned up).  Thus, Defendants' motion to exclude Mills's declaration is **DENIED WITHOUT PREJUDICE**.

moderation policies and practices related to CSAM.  And critically, only some *Fleites* plaintiffs were minors at the time when the recordings at issue were made, while others were adults.  *Id.* at *2.  Here, definitionally, all putative class members were minors at the time the violative recordings were made.[6]

### b.  Superiority

Rule 23(b)(3) also requires a finding that the class mechanism is superior to other methods of adjudication.  "The purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (citation omitted).  "Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant.  The listing is not necessarily in order of importance of the respective interests.  Superiority must also be looked at from the point of view of the issues." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 713 (9th Cir. 2010) (quoting *Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975)).

The Court has no hesitation in finding that a class action is the superior method of adjudicating Plaintiff's claims over Defendants' practice and policies related to CSAM. Coming forward as a survivor of child pornography and trafficking is an extremely difficult task.  *See Jane Doe 30's Mother v. Bradley*, 64 A.3d 379, 385 (Del. Super. Ct. 2012) (explaining victims of sexual abuse "would have been emotionally traumatized by separate litigation and trials").  It may be difficult to find an attorney, especially as a young person who has endured significant trauma.  It is terrifying to face a person or

---

[6] In any event, putting aside the differences between the two cases, the Court is not bound by its earlier decision. *McGinley v. Houston*, 361 F.3d 1328, 1331 (11th Cir. 2004) ("The general rule is that a district judge's decision neither binds another district judge nor binds him[.]").

entity who participated in a venture that caused trauma.  It requires participating in discovery, possibly being deposed, and almost certainly reopening deep and awful wounds.  Litigating against a well-resourced opponent, in general, can be a daunting task.  Here, individual survivors face one of the world's largest pornography companies, in an aggressive litigation posture, who have retained law firms with considerable reputations.  *See Bentley v. United of Omaha Life Ins. Co.*, 2018 WL 3357458, at *11 (C.D. Cal. May 1, 2018) ("Defendant's aggressive litigation posture could dissuade class members from pursuing their individual claims.").  Few, if any, individual survivors could muster comparable resources, nor is there any guarantee they could find counsel willing to work pro bono or on a contingency basis.  Pooling these burdens among a group of survivors helps more survivors bring claims.  Proceeding as a class action would also maximize efficiency, particularly in light of the considerable discovery the parties have already undertaken.

Defendants argue that the complexities of this case outweigh any potential benefits.  (Opp. at 19.)  First, Defendants claim, pointing to *Fleites*, that a class action would be unmanageable, and the class definitions are overbroad.  (*Id.*)  As explained, the concerns in *Fleites* are not present here.  Although holding a trial for the class may present difficulties, such difficulties are present in any contentious litigation involving substantial sums, complex legal issues, and parties represented by able counsel.  In the event that management issues do arise, Rule 23 gives the Court tools to deal with them. *See JPMorgan Chase Bank*, *N.A.*, 2023 WL 3945773, at *11 (describing class management tools "including but not limited to the authority to alter or amend the class certification order pursuant to Rule 23(c)(1)(C), to certify subclasses pursuant to Rule 23(c)(5), and the authority under Rule 23(d) to issue an order ensuring the fair and efficient conduct of the action").

Second, Defendants argue that because "[t]he statutes under which Plaintiff seeks class relief allow recovery of substantial statutory and punitive damages as well as attorneys' fees for a successful litigant . . . [t]here is thus adequate incentive for individuals to pursue any claims they may have." (Opp. at 20.)  This assertion is troubling.  The concern in this case has never been that individual damages are too small to warrant any single plaintiff's efforts.  The concern is that any individual's efforts to litigate this case involve reliving considerable trauma.  To say that a given sum of money is an "adequate incentive" for survivors to relive the unconscionable acts they experienced as *children* and continue to live with is willfully blind to the unimaginable suffering Defendants allegedly inflicted.

### 2.    Rule 23(b)(2)

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (internal quotation marks and citation omitted).  "Unlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class." *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 587 (N.D. Cal. 2015).  "Rule 23(b)(2)'s requirements are unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019) (internal quotation marks and citation omitted).

Here, Plaintiff alleges that she and class members were injured by Defendants'
policies and practices facilitating the dissemination of CSAM depicting them.  Those
common policies permitted CSAM of the class to be uploaded to Defendants' sites.
Plaintiff seeks injunctive relief to address Defendants' CSAM related policies and
practices that generally apply to all class members.  Specifically, she seeks "injunctive
relief that would enjoin MindGeek from uploading visual depictions of sexually explicit
content onto its websites without obtaining government-issued identification confirming
that all performers are over the age of eighteen."  (Mot. at 22.)  Such relief, at a
minimum, would make it less likely that videos of Plaintiff, class members, and future
abused and exploited children would be shared on Defendants' sites.  Class treatment
under Rule 23(b)(2) is therefore entirely appropriate and, indeed, necessary to obtain that
injunctive relief.  *See Parsons v. Ryan*, 754 F.3d 657, 688 (9th Cir. 2014) (granting class
certification when all members of the putative class "are allegedly exposed to a
substantial risk of serious harm by a specified set of . . . policies and practices of uniform
. . . application"; *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 57 (D. Md.
2020) (granting class certification when the challenged policies "apply generally to the
class, and the requested relief—declaring the [policies] unlawful . . . and preventing
Defendants from applying those policies—would provide the same relief to all class
members") (cleaned up).

Defendants provide two arguments against certification under Rule 23(b)(2).
First, they assert that Plaintiff lacks standing because she is unable to show a concrete
and particularized risk of future injury.  (Opp. at 20.)  But videos depicting Plaintiff as a
minor have already gone live on Defendants' sites once.  As has become a commonplace
cliché amongst schoolteachers and lawyers alike, once something is on the internet, it is
nearly impossible to remove it completely.  Plaintiff has a real and justifiable fear that
her videos may again appear on Defendants' sites.  Were Defendants required to ensure

that all individuals appearing in videos are over eighteen *prior* to allowing the videos to go live, Plaintiff's fears would be at least somewhat assuaged.

Second, Defendants argue that certifying this case under both (b)(3) and (b)(2) would be inappropriate because the case is primarily about money.  (Opp. at 21.)  As to the premise, it appears to the Court that this case is about compensating class members, protecting them from future harm, and changing Defendants' alleged behavior, which would be well-served by both damages and an injunction.  That is to say, the final relief does not relate exclusively or predominantly to money damages.  As to the law, certifying a damages class and a separate injunctive relief class is permissible.  *Nozzi v. Hous. Auth. of the City of Los Angeles*, 2016 WL 2647677, at \*5 (C.D. Cal. May 6, 2016).

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for class certification is **GRANTED**.

DATED:      November 17, 2023

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE