```
                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
                    (SOUTHERN DIVISION - SANTA ANA)



JANE DOE,                      ) CASE NO: 8:21-cv-00338-WLH-ADS
                               )
            Plaintiff,         )            CIVIL
                               )
    vs.                        )     Los Angeles, California
                               )
MINDGEEK USA INCORPORATED,     )     Friday, July 19, 2024
ET AL,                         )
                               )    (11:18 a.m. to 11:59 a.m.)
            Defendants.        )    ( 1:32 p.m. to  2:33 p.m.)
```

                          HEARING RE:

           DEFENDANTS MINDGEEK USA INC, MINDGEEK S.A.R.L.,
          MG FREESITES II LTD, AND MG CONTENT RT LIMITED'S
                MOTION FOR SUMMARY JUDGMENT [DKT.NO.282];

           DEFENDANTS MINDGEEK USA INC, MINDGEEK S.A.R.L.,
     MG FREESITES LTD, MG FREESITES II LTD, 9219-1568 QUEBEC INC,
        AND MG CONTENT RT LTD'S MOTION FOR SUMMARY JUDGMENT
                          [DKT.NO.283];

          PLAINTIFF JANE DOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT
                          [DKT.NO.291];


                       STATUS CONFERENCE

                BEFORE THE HONORABLE WESLEY L. HSU,
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:              SEE PAGE 2

Court Reporter:           Recorded; CourtSmart

Courtroom Deputy:         Holidae Crawford

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 8365
                          Corpus Christi, TX 78468
                          361 949-2988
Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES**:


For Plaintiff:            KRYSTA K. PACHMAN, ESQ.
                          DAVIDA P. BROOK, ESQ.
                          HALLEY W. JOSEPHS, ESQ.
                          ROHIT D. NATH, ESQ.
                          Susman Godfrey
                          1900 Avenue of the Stars, Suite 1400
                          Los Angeles, CA 90067
                          310-789-3100


For Defendants:           SEAN TAHERI, ESQ.
                          DIANE CAFFERATA, ESQ.
                          MICHAEL E. WILLIAMS, ESQ.
                          DILLON BONFIGLI, ESQ.
                          Quinn Emanuel Urquhart & Sullivan
                          865 S. Figueroa St., 10th Flr.
                          Los Angeles, CA 90017
                          213-443-3000

1          **Los Angeles, California; Friday, July 19, 2024; 11:18 a.m.**

2                                  --oOo--

3          **THE CLERK:**  Calling item 3, 8:21-cv-338, Jane Doe

4    versus MindGeek USA, Inc., et al.  Counsel, please state your

5    appearances, starting with plaintiff.

6          **MS. PACHMAN:**  Good morning, Your Honor, Krysta

7    Pachman of Susan Godfrey and the class.  With me are my

8    colleagues Davida Brook, Halley Josephs and Rohit Nath.

9          **THE COURT:**  All right.  Thank you.

10         **MR. WILLIAMS:**  Good morning, Your Honor, Michael

11   Williams from Quinn Emanuel on behalf of defendants, Dillon

12   Bonfigli also from Quinn Emanuel on behalf of defendants.

13         **MR. TAHERI:**  Sean Taheri, Quinn Emanuel on behalf of

14   defendants.

15         **MS. CAFFERATA:**  And Diane Cafferata of Quinn Emanuel

16   on behalf of defendants, good morning.

17         **THE COURT:**  Good morning.

18         All right.  The matter is on calendar for multiple

19   motions for summary judgment from both sides, as well as a

20   status conference.  I'll take the status conference last.  I

21   apologize that I did not have tentatives on the motions for

22   summary judgment today.  I just did not have time to prepare

23   tentatives for today, but I do have some questions.

24         So I guess I would ask to address some specific

25   factual questions about the record that I have and then after

4

1    that, you know, I'm going to leave you free to argue however

2    you would like.

3            So the first question is, can either side point to

4    any evidence in the record of where, and if so, where it is,

5    that would tell me or indicate to me or a reasonable juror

6    where the tags on the plaintiff's video at issue in this case

7    came from.  Are they formatter tags, are they poster tags, is

8    there any evidence in the record of where these specific tags

9    came from as opposed to, you know, the defendant's general

10   pattern and practice of adding tags sometimes?

11           Then the second question is, can either side point me

12   to specific evidence in the record as to actual knowledge with

13   respect to the videos that are at issue in the case?

14           I suppose a corollary to that question is the legal

15   ramification.  So let's assume, if you assume for the sake of

16   argument, and I guess this is a question for Ms. Pachman.  If

17   you assume for the sake of argument that there is no evidence

18   from which a reasonable juror could draw the inference that the

19   tags on the plaintiff, the lead plaintiff's videos were

20   MindGeek or some other defendant's tag, what happens to the

21   class if we can't -- if you -- just for the sake of the

22   argument you can't prove to the jury that the defendant added

23   these tags in this case, even though you have evidence that

24   they added tags in other cases?

25           So maybe I should -- with your permission,

1  Mr. Williams, maybe I should have Ms. Pachman talk first on

2  those questions.

3          **MS. PACHMAN:**  Your Honor, my colleague Rohit Nath is

4  going to be addressing this motion.

5          **THE COURT:**  Okay.  Great, thank you.

6          **MS. PACHMAN:**  Thank you.

7          **THE COURT:**  Just the factual questions for now and

8  then the one legal question and then I'll have -- because it's

9  their motion I'll have Mr. Williams talk.

10         **MR. NATH:**  Yes, Your Honor, thank you.

11         So I'll start with the first question, can you just

12  point to evidence of where the tags on plaintiff's particular

13  videos come from.

14         The evidence in the record -- there's no evidence in

15  the record of where these particular tags came from.  There is

16  evidence of MindGeek's general practice of adding tags and what

17  their content formatters did was the -- when the video was

18  uploaded it went to a content moderator and a content formatter

19  and there is evidence that MindGeek actually did add teen and

20  young tags to videos, the types of tags that --

21         **THE COURT:**  Yes, but that's what I thought is that

22  they do this in general, but we don't know whether or not that

23  was done with respect to plaintiff's videos.

24         **MR. NATH:**  Well, I would take exception to one thing.

25  I think we're talking about tags.  There's something else

1   called categories that MindGeek --

2           **THE COURT:**  Okay.

3           **MR. NATH:**  -- puts together and the categories are

4   listed on the website and that's in a drop down menu and

5   MindGeek as matter of practice for everybody in the class

6   created the categories.

7           And so among those categories were teen and

8   babysitter and we know that plaintiff's videos were categorized

9   as teens -- teen.  And so that we know the category for which

10   MindGeek -- for which plaintiff's videos fell under was created

11   by MindGeek and it couldn't have been created by a user because

12   MindGeek creates the categories --

13           **THE COURT:**  Okay.  But I just --

14           **MR. NATH:**  -- -- and that's from a drop down menu.

15           **THE COURT:**  I want to make sure I understand it

16   functionally.  It's your understanding if a user puts the young

17   or teen or whichever tag that is the offending tag on a video

18   when they post it, it automatically gets categorized because

19   the category that was created by MindGeek or someone actually

20   has to look at it and say, this belongs in that category.

21           **MR. NATH:**  So it's a little bit different.  So that

22   when you upload a video, when a user uploads a video, they're

23   presented with a drop down menu --

24           **THE COURT:**  Okay.

25           **MR. NATH:**  -- and then a blank text box.  The drop

 1  down menu is for categories and the user has to select among

 2  categories to add.

 3          **THE COURT:**  Okay.

 4          **MR. NATH:**  And that's a preset menu, they can't

 5  change the text, they can't change anything.

 6          **THE COURT:**  I see.

 7          **MR. NATH:**  And so one of the tags there, there are

 8  two tags there are sort of CSAM coded.  One is teen --

 9          **THE COURT:**  Yes.

10          **MR. NATH:**  -- the other is babysitter.

11          **THE COURT:**  Okay.

12          **MR. NATH:**  And then there's a third that's old and

13  young.  But the teen one is particularly relevant to our

14  plaintiff because obviously her videos were categorized as teen

15  and the evidence that the categories are created by MindGeek,

16  you can look at Cronin Exhibit 17 which is the Franklin

17  deposition from pages 153 to 156.  And you can also look at

18  MindGeek's website, we have a print out of MindGeek's website

19  which is Cronin Exhibit 110, which shows examples of the tags,

20  included among -- or sorry, the categories and included among

21  them is a teen category.

22          And so the categories are created by MindGeek,

23  selected by the user and then checked by MindGeek, but the

24  actual text teen as a category is not user created.

25          **THE COURT:**  Okay.

1    **MR. NATH:**  And so those are that for plaintiff's

2    videos that would have been created by MindGeek and I think

3    there can be really no disputed fact that MindGeek creates the

4    categories.

5         **THE COURT:**  Okay.  Thank you.

6         **MR. NATH:**  In terms of specific evidence of actual

7    knowledge of the videos at issue in this case, if we're talking

8    about both the plaintiff and the punitive class.  So from --

9    for the plaintiff herself when the videos were uploaded the

10   plaintiff reached out to MindGeek and informed that these were

11   -- that this was child pornography.  MindGeek took them down

12   but then they were reuploaded by the same user with the same e-

13   mail address, Jane Doe's trafficker.

14        And so from that point, they certainly had actual

15   knowledge.  Obviously our argument is that we wouldn't have

16   needed to show actual knowledge, that willful blindness is

17   sufficient for the sake of a 2252(a) claim --

18        **THE COURT:**  Yes.

19        **MR. NATH:**  -- as well as the TVPRA but just for the

20   actual knowledge question, MindGeek at a certain point, once

21   the videos were uploaded at a minimum had actual knowledge of

22   the video.

23        **THE COURT:**  Okay.

24        **MR. NATH:**  There's a second point -- I'm sorry.

25        **THE COURT:**  So let me -- I just wanted to make sure

9

1    that everybody understands what my concern is.  I've already

2    held in a different case that involved artist's work on Red

3    Bubble, essentially.  I've already held that -- so infringer

4    number 1 uploads the infringed work to Red Bubble.  Artist

5    informs Red Bubble that infringer number 1 has uploaded the

6    piece of art.  They take it down.  And they create a digital

7    footprint of -- they create a hash value for the piece of art.

8         Infringer number 2 comes along, re-uploads it, but I

9    don't know, changes something, takes a picture, a different

10   picture of the art --

11        **MR. NATH:**  Right.

12        **THE COURT:**  -- hash value different.  Red Bubble

13   doesn't catch it, it goes through.

14        Artist says, take it down.  They take it down.

15   Infringer number 3 comes along, it once evades the AI block and

16   now artist sues and says, they were willfully blind or they had

17   actual knowledge of that third posting.  And I've already held

18   that that's not right.  They needed to be told that that

19   posting was there in order for them to -- the fact that the

20   posting evaded their AI is not constructive knowledge or actual

21   knowledge.

22        **MR. NATH:**  In the Red Bubble case, if I can just deal

23   with the Red Bubble case very briefly.

24        **THE COURT:**  Yes, please.

25        **MR. NATH:**  In the Red Bubble that makes sense.  Here,

1    it doesn't make sense for a couple of reasons.

2         **THE COURT:**  Okay.  The first is that unlike Red

3    Bubble which was like a marketplace for people to place art, et

4    cetera, what we're dealing with here is a pornography site

5    where we have evidence that MindGeek took affirmative steps to

6    actually elevate and promote the child pornography, teen

7    content, babysitter content, young, old content.

8         So unlike Red Bubble, where the actual website was

9    not doing anything to promote the -- like infringing content

10   more generally, MindGeek can be held to a different standard

11   when it comes to willful blindness or at least the evidence is

12   very different when it comes to willful blindness, because they

13   actually are taking affirmative steps to promote this very

14   specific type of content which is illegal.

15        And so this -- we're dealing with a very different

16   set of facts comparing it to something like Red Bubble, which

17   is a massive marketplace where, you know, it happens to be that

18   people will post infringing content.  They're not saying, come

19   here and post your infringing content we have a marketplace for

20   it.

21        MindGeek -- there's evidence for a reasonable juror

22   to find that MindGeek is doing that.  So I think that's

23   distinction number one.

24        The second distinction here is that MindGeek

25   actually, unlike I think in Red Bubble, MindGeek is reviewing

1    and approving every video before it comes up.  And so that has

2    two implications.  One for plaintiff's video, some of which

3    were titled young viat (phonetic) teen for example, right, or

4    young teen, for plaintiff's videos, that means someone looked

5    at that title, looked at that video and approved it and put it

6    onto MindGeek's website.

7            And so it was that -- you would've had actual

8    knowledge just from looking at the video that this was child

9    pornography.  And if we're talking about with respect to the

10   class, the TOSA spreadsheet which was -- TOSA was terms of

11   service A, with respect to that spreadsheet, those were all

12   examples of videos that MindGeek just from the face of the

13   video or metadata was able to confirm, okay, this is child

14   pornography.  And so when they reviewed and approved it, they

15   would have actual knowledge of the specific -- that the

16   specific video was child pornography in that instance.

17           And as a corollary, unlike Red Bubble, that's also

18   sufficient to show willful blindness, not just actual knowledge

19   but willful blindness, because they're actually reviewing and

20   approving every video.  And so if they're failing to

21   investigate it after knowing it or failing to take any other

22   action, that's enough to establish willful blindness in that

23   scenario.

24           So I think that's how we are -- just a totally

25   different world than Red Bubble.

12

1          **THE COURT:**  Okay.

2          **MR. NATH:**  So with that, I think I would like to

3    proceed to your third question unless you have --

4          **THE COURT:**  Yes, please.

5          **MR. NATH:**  -- a further question on number two.

6          Okay.  So let's just assume for the sake of argument

7    that there's no evidence that the lead plaintiff's tags were --

8    the lead plaintiff's tags came from MindGeek as opposed to a

9    user what happens to the rest of the class.

10         So there's an argument that not just the lead

11   plaintiff's tags, but there are other sort of MindGeek related

12   content.  MindGeek related affirmative actions are sufficient

13   to establish that MindGeek had a hand in promoting her content,

14   but let's take that for the time being.

15         In a class action like this, it is possible that the

16   plaintiff's claim may fail and the rest of the class member's

17   claims may succeed.  And so like we could still go to trial on

18   those triable questions.  And as a matter of procedure, there's

19   no issue with that.

20         Obviously we disagree that plaintiff's tags, like

21   obviously plaintiff had a category of teen that was --

22         **THE COURT:**  Yes.

23         **MR. NATH:**  -- created by MindGeek.  The other thing I

24   would point to if this is related to kind of a Section 230

25   related issue, the other thing I would point to is MindGeek

1    also had search terms and auto complete and related search

2    functions, which were actually -- it's not user content, that's

3    MindGeek suggesting to a user, saying, hey, you search this,

4    here are a bunch of related searches that you could do to find

5    the content that you like.  And included in those, I have a ton

6    of examples, but like very young teens, 16-year old, 16-year

7    old virgin, that's not user generated content, that's MindGeek

8    saying, hey, go search this.  And those search functionalities

9    existed during the class period, which is class-wide evidence

10   that MindGeek was actually taking affirmative steps to promote

11   child pornography on its website, which distinguishes it from,

12   say a passage search function like Google or something like

13   that.

14           So we think that's enough classified evidence to

15   basically defeat any hope of Section 230, because MindGeek is

16   actually a content creator promoting a particular type of

17   content, as opposed to just a neutral passive observer.

18           So I'm assuming I will have more time to address

19   other questions --

20           **THE COURT:**  Yes, after --

21           **MR. NATH:**  -- but I will --

22           **THE COURT:**  -- Mr. Williams speaks, yes.

23           **MR. NATH:**  Okay.  Thank you.  Thank you very much.

24           **THE COURT:**  All right.  Mr. Williams.

25           **MR. WILLIAMS:**  Thank you, Your Honor.  I will try to

1  follow the same order.

2         With regard to the evidence in the record, at least

3  with regard to -- well, I'll say this, there's no evidence that

4  MindGeek did anything with regard to the tags for plaintiff's

5  video.

6         **THE COURT:**  Okay.

7         **MR. WILLIAMS:**  We do have the declaration of Andreas

8  Ignitio (phonetic) which was submitted and in paragraph 35, 36

9  and 37 he talks about the issues of tags.  None of them

10  encourage or require the posting of CSAM or child pornography,

11  none of them indicate that the videos are CSAM or child

12  pornography.

13         I will say the obvious, teen is not the equivalent of

14  child pornography.  18 and 19 is legal and it's lawful and so I

15  don't think you can make that assumption.

16         He also says that he's aware of the titles of the

17  video and based on his review of the information in the system,

18  MindGeek did not alter any of the titles related to the videos,

19  as well.

20         So there is that.  I want to address another

21  misconception about the evidence.  Counsel made reference to

22  the fact that MindGeek goes in and adds young and teen to

23  different videos.  There is no support in the record for that.

24         What they cite to and if you look at -- and this is

25  consistent with what plaintiff does throughout their briefing.

1    They make these bold assertions that mimic their allegations in

2    the complaint and then you dig through the evidence they

3    actually cite and it doesn't say that.

4           The evidence cited for that particular proposition is

5    a discussion between two MindGeek content moderators when they

6    realize that certain people could be adding --

7           **THE COURT:**  Formatter.

8           **MR. WILLIAMS:**  -- a tag -- formatters, could be

9    adding the word teen for one, and they could also be adding the

10   word young and those could wind up coming up next to each other

11   and they're trying to address that problem.

12          I mean, this is the exact opposite of willful

13   blindness.  They are seeing the problem that is being proposed

14   to them and they're trying to take affirmative action to

15   address it.

16          Ms. Franklin -- they cite the declaration or

17   deposition --

18          **THE COURT:**  Well, hold on though.

19          **MR. WILLIAMS:**  Sure.

20          **THE COURT:**  Yes.  I agree with you that that is the

21   context in which that particular discussion takes place.  But

22   necessary to the analysis of that discussion is the fact that

23   MindGeek has apparently been doing that for a long time

24   beforehand, before these two people on this discussion realized

25   that and then fixed the problem, so.

1          **MR. WILLIAMS:**  I don't know, Your Honor, that there's

2     evidence of that particular issue had been going on for a long

3     time.  I mean, I don't think that there is any evidence in the

4     record to suggest how long that particular issue had come up.

5          It is true -- and Ms. Franklin's deposition which

6     they also cite at page 153, line 23 to 156, line 24, which

7     counsel just referred to, she testifies that users input the

8     tags in the titles.  And that the auto complete is based on

9     what other users have typed in the past.  It is not a

10    suggestion by MindGeek.

11         So the idea that -- and again, MindGeek has over time

12    built up band words and different things to try to address

13    issues as they come up and they see other people that are

14    taking advantage of the system and they've tried to fix those

15    issues or stop those issues --

16         **THE COURT:**  Right.  Because as I understand the

17    discussion that you're referencing, the problem that they

18    identified was that young and teen could be together and

19    together it's a band word, but independently next to each

20    other, it would not be caught as a band word.

21         **MR. WILLIAMS:**  Right.  And they were trying to

22    address that.

23         **THE COURT:**  Yes.

24         **MR. WILLIAMS:**  And I think the key is, could appear

25    together.  It's not that they were seeing this pop up time and

17

1    time again.

2            With respect to actual knowledge on the videos --

3            **THE COURT:**  So -- I'm sorry.

4            **MR. WILLIAMS:**  Sure.

5            **THE COURT:**  Just one last thing.  So what you're

6    telling me is that there's no evidence in the record that that

7    actually happened, that instead that this was a hypothetical

8    discussion that they had I think it was in '21 between these

9    two employees; is that right?

10            **MR. WILLIAMS:**  I'd have to go back.  That discussion

11   is the only one I'm aware of that deal with this young and teen

12   issue and I can't recall off hand and I can take a look at it -

13   -

14            **THE COURT:**  I mean, the only evidence that a

15   formatter in fact added young or teen to any video is just this

16   discussion of the hypothetical possibility that a formatter

17   could do that; is that accurate?

18            **MR. WILLIAMS:**  I can't say that there's no other

19   evidence in the record where a formatter did or did not add one

20   of those terms or both.  I just don't know off hand because --

21   whether there's some reference to that.  I just know what

22   plaintiffs are relying upon and it's talking about the fact

23   that this is a possibility that could exist.

24            **THE COURT:**  Okay.  Thank you.

25            **MR. WILLIAMS:**  Now with regard to the actual

1  knowledge of the videos, again, the evidence is undisputed,

2  plaintiff alerted it to MindGeek, that was the first time they

3  had knowledge.  They were taken down within hours.  They were

4  digitally fingerprinted.  And the question is, were these other

5  videos already up there.

6           MindGeek later found other videos and they were later

7  informed about other videos that were up about the plaintiff

8  and they took the same action.  There is no evidence that I'm

9  aware of that it was re-upped -- the same exact videos were re-

10 uploaded after the fact.  But even if that's the case, to Your

11 Honor's point, it doesn't change the liability analysis.

12          In fact, Section 2258(a) talks about not only is

13 there no affirmative duty to search for this, a provider has no

14 duty to monitor a particular user.  There's no obligation for

15 it to go around and say, oh now we know this particular person

16 posted CSAM, so we've got to scour every other post that they

17 might have put up there.  That's not what the law says.  The

18 law says the opposite.

19          So with regard to the actual knowledge, the plaintiff

20 admits she's not aware of any instance where she reported a

21 video to MindGeek that they did not promptly remove.

22          On the question about what the issue of tags does for

23 the class, I mean first of all, Your Honor, I think the issue

24 of tags is a bit of a red herring.  The question it goes to

25 obviously is whether or not MindGeek can be considered the

1   creator or developer of the content under Section 230.

2          **THE COURT:**  Or materially contributed to its

3   illegality.

4          **MR. WILLIAMS:**  Correct.  And if you look at the

5   cases, and particularly the Carafano (phonetic) case from the

6   Ninth Circuit and the Roommates (phonetic) case --

7          **THE COURT:**  Yes.

8          **MR. WILLIAMS:**  -- these are two -- I think if you

9   sort through all the other cases about Section 230 they really

10  put it into focus.  Carafano talks about the statute says a

11  provider, an information content provider cannot be liable for

12  information or content provided by another individual.

13         And so the question becomes, and you have to look at

14  the particular content at issue.  What is the provider being

15  held or sought to be held liable for, what is the content

16  they're being held liable for.

17         In this case, the content are the CSAM videos that

18  they've identified.  They're trying to hold MindGeek liable for

19  that content.  It is undisputed that that content was created

20  solely by her ex-boyfriend, it was uploaded by her ex-

21  boyfriend, there's no indication that MindGeek had any role in

22  the creation or development of those videos and that's the same

23  for all of the alleged CSAM on the site.  There's no indication

24  that we did that.

25         Those videos were illegal when they were made if the

20

1    person was under age.

2         **THE COURT:**  Yeah.  I was thinking about this at a

3    theoretical level, but yes, they were illegal when they were

4    under age, but if MindGeek advertised them or transmitted them

5    or trafficked them, that's a separate illegality that they

6    could theoretically be liable for, right?

7         **MR. WILLIAMS:**  Well, Your Honor, we dispute that

8    because I think the question is -- well, I dispute the evidence

9    of encouragement or posting, because I think it's the same as

10   some of the other issues that we'll talk about.

11        But to that particular point I would direct Your

12   Honor's attention to a statement in the Roommate's case where

13   it's at 1174 and it says, websites are complicated enterprises

14   and there will always be close cases where a clever lawyer

15   could argue that something the website operator did encouraged

16   the illegality.  Such close cases, we believe, must be resolved

17   in favor of immunity, lest we cut the heart out of Section 230

18   by forcing websites to face death by 10,000 duck bites,

19   fighting off claims that they promoted or encouraged or at

20   least tacitly assented to the illegality of third parties.

21        That's what the Ninth Circuit is saying.  The

22   distinction between Roommates and Carafano and other cases that

23   have held Section 230 immunity is, in Roommates the website

24   created the questions and they required the user to answer the

25   questions that were alleged to violate fair housing laws.  They

1   created the illegal content or the alleged illegal content in

2   that situation.  As opposed to here, where the illegal content

3   is being solely created and developed by third parties and

4   posted to MindGeek's website.

5           Obviously, Your Honor, I know you wanted to -- I

6   don't know if that answers your questions.  I'm happy to answer

7   any others or proceed to the argument.

8           **THE COURT:**  I mean, I still see a distinction because

9   what we're talking about here is CSAM.  Like the Roommates

10  information once they had illegally acquired that information,

11  the trafficking of the information was not in and of itself

12  illegal.  I think because it's CSAM any transmission or

13  advertising of it, again, setting aside the factual question

14  whether or not that happened, is a separate illegality that I

15  feel like the plaintiff could argue to a jury that MindGeek

16  contributed to.

17          **MR. WILLIAMS:**  But there are elements that they need

18  to establish to prove that up.  I mean, for -- you know, with

19  regard to the receipt and distribution of child pornography

20  claim under 2252(a), they need to show actual knowledge or, you

21  know, willful blindness as to that.

22          And, Your Honor, I wholeheartedly agree with your

23  comment that, you know, this case is governed by Red Bubble,

24  that is the relevant standard.  You know, plaintiff makes the

25  point well that was a trademark case.  Well, Global Tech which

1    was the U.S. Supreme Court case that clarified the decision on

2    willful blindness was a patent infringement case, involving

3    inducing patent infringement.

4         Global Tech was involved contributory trademark

5    infringement.  That same standard is applied in criminal cases

6    involving 2252(a).  It is the same standard.  And under Ninth

7    Circuit precedent, you have to show as to the specific

8    illegality here.  And that's the point that we think is a

9    problem with that.

10        They also have to show, particularly under the Ninth

11   Circuit's Reddit decision to prove up a trafficking claim and

12   to get around Section 230 they have to show that MindGeek

13   itself actively participated in the sex trafficking and

14   committed a criminal violation of 1591.

15        And so for a host of reasons, we don't believe and I

16   would be happy to address some of those at a high level.  I

17   know you've obviously read the papers very carefully and you're

18   familiar with the facts, but I would like to touch on some of

19   the issues that I think are fundamental flaws in the

20   plaintiff's case here.

21        **THE COURT:**  Okay.  My questions are answered, so you

22   can just proceed with whatever argument.

23        **MR. WILLIAMS:**  Thank you, Your Honor.

24        To that point before I get to the particular evidence

25   regarding Jane Doe's claim I do want to mention there are

23

1    certain fundamental flaws with their overall theory of the

2    case.

3           The thrust of their complaint and you can read it, is

4    that MindGeek failed to do enough, it failed to take enough

5    actions to prevent CSAM from being uploaded to its site.  And

6    they talk about all the things that it did, didn't have proper

7    content moderators, you know, that allowed people to do this,

8    all of that.

9           **THE COURT:**  But you're going to say that that's

10   exactly why the Communications Decency Act is designed to

11   prevent to be litigated.

12          **MR. WILLIAMS:**  Not just that.  Under 18 U.S.C.

13   2258(a), Congress declared that websites have no duty to

14   affirmatively search for or seek out CSAM.  Clear as day.  You

15   have no duty to do it.

16          And their theory is also counter factual.  Because

17   Ms. Franklin talks about all of the steps that MindGeek has

18   taken, going back at least to 2009 to implement various

19   features to try to weed out and detect CSAM and other illegal

20   content on their site.

21          But plaintiffs ignore that entirely or they say you

22   didn't do enough, or you didn't do it soon enough, but that's

23   exactly what 2258(a) says there's no obligation to do.  And you

24   can't hold a company liable for not taking enough when they

25   have no duty to do it in the first place.  And that's where it

24

1  walks squarely into Section 230 because Section 230 says, we

2  don't want websites -- we don't want to discourage websites

3  from taking some editorial action, but then being held liable

4  because they didn't get everything or they left certain things

5  out there, and that's the 230 issue.

6            And so, you know, this indemnity includes the fact

7  that they might have reviewed plaintiff's videos and putting

8  aside the fact that she admits there was nothing in the videos

9  that would indicate she was underage, that they allowed them to

10 go forward.  That's protected by Section 230.  The decision to

11 allow or not allow is publishing activity.  All of the things

12 that they identify that MindGeek supposedly did or didn't do

13 falls squarely within publishing activity.

14           And again, you have to look at did they contribute to

15 the illegality of that particular content.  And we think that

16 it's barred by Section 230.  And then the other issue -- and

17 again before I get to the plaintiff's claims, is that their

18 theory is at odds with Congress' intent in 2258(a).  The whole

19 purpose of that section it says right at the beginning, is to

20 reduce the proliferation of online child sexual exploitation.

21           So Congress set up that reporting system.  And what

22 plaintiffs are trying to do is say, for their receipt and

23 distribution of child pornography they're trying to say and you

24 heard counsel say it, well, you reported all this stuff on this

25 TOS 8 list and you reported it to NCMEC.  So by doing that, you

1  have now acknowledged that you had -- you were aware of child

2  pornography on your website and you're liable for receipt and

3  distribution of child pornography.

4          That theory is absurd because first of all and

5  there's a number of problems with it.  First of all, the

6  statute requires companies that are covered by it to report

7  apparent CSAM, apparent child pornography.  So there's no

8  admission by reporting something to NCMEC that it's actual

9  child pornography.  Even NCMEC has trouble trying to determine

10 how and when something qualifies when you're talking about

11 people who are post pubescent.

12         But to hold that by reporting to NCMEC you can now be

13 exposed to liability for receipt and distribution of child

14 pornography would undermine the entire purpose of that statute.

15 Because that statue also says, companies have no obligation to

16 actually search for it.

17         So what's going to happen?  Every company, Facebook,

18 Instagram, Snap, everyone is just going to just shut down

19 content moderation, because they said, you know what, if we're

20 not aware of it, we have no obligation to report it.

21         You have to have actual knowledge of apparent CSAM.

22 And so what plaintiffs are trying to do is say, well, you're

23 reporting it to NCMEC, therefore it's actual knowledge, there

24 it must equal CSAM, therefore you're liable.  And it doesn't

25 work that way.  It would undermine the purpose of the statute

26

1    and, you know, fortunately Congress passed 2258(b), which is

2    the next section which says, providers who report to NCMEC

3    can't be held civilly and criminally liable for making those

4    reports unless they engage in some other type of intentional

5    misconduct or bad faith, which we don't have here.

6           So these are fundamental flaws with their entire

7    theories that have to be kept in mind when you're going through

8    plaintiff's claims.

9           Now, let me turn to that and again, I don't want to

10   repeat everything, but another thing to keep in mind that this

11   is the same plaintiff who brought a lawsuit against Reddit

12   involving the same videos, the same ex-boyfriend, the same

13   allegations, similar in terms of encouraging, trafficking, all

14   of that, brought by the same counsel.  It was assigned to a

15   different judge than this one, Judge Selna granted a motion to

16   dismiss for failure to state a claim under 230 and that

17   decision was affirmed by the Ninth Circuit in Doe v Reddit.

18          The allegations are extremely similar.  Reddit

19   encouraged child pornography, it sought it out, it was making

20   money off of it, it didn't do things to remove it, it didn't do

21   things quick enough.

22          So you can't ignore the fact that at the end of the

23   day we've gone through a lot of discovery here, but the result

24   is the same.  They can't get around Section 230 for the same

25   reason.

1          The Court in Reddit acknowledged the allegations that

2    well you're -- plaintiffs allege that you're encouraging,

3    you're promoting people to use CSAM and that wasn't sufficient

4    to get around it.

5          So again, we talked about Section 230 and I don't

6    want to belabor it, but the question is, did MindGeek

7    contribute or create the illegal content of the plaintiff here.

8    And the undisputed evidence they did not.  There's no evidence

9    that they did anything with regard to those videos; tags,

10   titles, promotion, anything.

11         They make reference to the fact that well, MindGeek

12   at one point put it up on like the home page and featured the

13   videos on the home page, but the Gonzales v Google case makes

14   clear that websites always decide when and how to display

15   conduct or content and that's clearly part of the publisher's

16   right, covered by Section 230.

17         So in our view, there's nothing that MindGeek did or

18   even could have done with regard to the tags that would have

19   enhanced the illegality of it.  It's illegal from the

20   beginning.

21         So I want to turn briefly to the trafficking claim

22   and as Reddit makes clear, plaintiffs can't rely on fostive

23   (phonetic) exception to get around 230 here.  They have to

24   prove that MindGeek itself engaged in some actual trafficking

25   and a criminal violation, a violation of 1591, the criminal

1    statute.

2              And as despicable as the conduct is by her ex-

3    boyfriend this is not a sex trafficking case.  This is two

4    people, a boyfriend and girlfriend who are both 17, he

5    videotapes them with her knowledge having sex, and four years

6    later as a form of revenge, he posts it on the internet.  This

7    is not sex trafficking under any plausible definition of it.

8              There's no evidence she was solicited, coerced, got

9    anything of value, this is just not a trafficking case.  And as

10   a result, there's no evidence that MindGeek did anything to

11   activity participate in that sex trafficking, you know, non-

12   existent sex trafficking.

13             There's no evidence of a continuous business

14   relationship with the ex-boyfriend which is required.  There's

15   no tacit agreement, there's no evidence the ex-boyfriend ever

16   received any money as a result of this.  There's just no

17   evidence on the trafficking claim, separate and apart from 230.

18             And then I want to address 2252(a) briefly once again

19   -- because we've talked about, but again their theory for that

20   is that by reporting this to NCMEC, that's what they rely upon.

21   I mean, my partner Ms. Cafferata will address their motion for

22   summary judgment but they're relying on the fact that we have a

23   list of what we reported to NCMEC and that that somehow is an

24   admission of receipt and distribution of child pornography.

25             For the reasons I talked about, that theory just

29

1    can't fly.  It doesn't -- it would undermine the very purpose

2    of the reporting statute and violate Section 2258(b).

3            On willful blindness, we've talked about it.  We

4    think the Red Bubble case is the pertinent standard here, you

5    have to have knowledge of the specific instance.  And I would

6    submit that all of the evidence and Ms. Franklin talks about it

7    in her declaration, that shows all of the different things that

8    MindGeek did.  And even the evidence they cite to as part of

9    their support, it's not talking about hey, let's put this out

10   there so people will be attracted for child pornography, it's

11   addressing, hey, this could be abused by someone, let's take

12   action to correct it.

13           That is the opposite of willful blindness.  They were

14   not trying to bury their head in the sand and ignore it.  When

15   an issue came up, they tried to figure out a way to address it.

16   They implemented new technology whenever it became available to

17   them.  They did all sorts of things.

18           I mean, you know, it is telling that in -- and this

19   is in Exhibit H to my declaration, I believe it was submitted

20   in opposition to their motion, but there's testimony from NCMEC

21   to the Senate about this.

22           NCMEC applauds MindGeek because it says, even though

23   MindGeek is not legally obligated to report to NCMEC because

24   they're not a U.S. based provider, they are providing more

25   reports than most U.S. companies that are required to.

1          It calls them out as a way of saying like, this is

2  what companies should be doing because we're proactive.  And

3  that's exactly the story even when you read through the actual

4  evidence that's cited by the plaintiff.  There is no evidence

5  of willful blindness.  It is a company that is taking content

6  moderation seriously, it is trying to prevent illegal content

7  on its site and it is doing things that go well above and

8  beyond what the law requires.

9          We think that it's finally time for this case to come

10  to the same end as the case did in Doe v Reddit and be

11  dismissed.  Plaintiff's claims fail to get past summary

12  judgment.  She doesn't have the evidence to prove up the

13  allegations.

14          I'm also going to address the -- unless the Court has

15  questions, I know we're pushing through the separate motion on

16  alter ego issues, but I don't know if you want to keep on one

17  or I'm happy to submit on the papers for that one if the Court

18  doesn't have any particular questions.

19          **THE COURT:**  I didn't have any particular questions

20  about that out coming out, so.

21          **MR. WILLIAMS:**  Okay.  Thank you, Your Honor.

22          **THE COURT:**  All right.  Thank you.  So I think

23  procedurally we should have Mr. Nath speak next because you'll

24  be responding to his motion, right?  But I have a lunch

25  appointment that was made a long time ago and so we're now

1  three minutes before noon and so the question is, Mr. Nath, do

2  you want to start and only use three minutes or should we just

3  reconvene at 1:30 and just proceed from there to conclusion?

4          **MR. NATH:**  Your Honor, I think it maybe makes sense

5  for us to reconvene afterwards and I would ask, is it possible

6  for me to have a brief period of time to respond to

7  Mr. Williams' arguments as well?

8          **THE COURT:**  Oh, yes.  Well, that would be your

9  opportunity, yes.

10          **MR. NATH:**  Thank you, Your Honor.

11          **THE COURT:**  We'd be doing both of that and your

12  affirmative motion, your client's affirmative motion.

13          **MR. NATH:**  Absolutely.

14          **THE COURT:**  And then before I turn it back to them.

15          **MR. NATH:**  Thank you, Your Honor.

16          **THE COURT:**  All right.  Let's reconvene at 1:30.  Oh,

17  I'm sorry, was there --

18          **MS. JOSEPHS:**  Oh, yes, Your Honor, Halley Josephs,

19  given Mr. Williams' statements regarding the second motion for

20  summary judgment and your indication that you did not have any

21  questions, will we just be submitting that motion on the

22  papers?

23          **THE COURT:**  Yes, that motion is submitted.  We'll

24  issue an order as soon as we can.  I'll just issue an order on

25  everything.  Okay?  All right.  Thank you very much, we'll see

1   you at 1:30.

2           **THE CLERK:**  All rise.

3       **(Recessed at 11:59 a.m.; reconvened at 1:32 p.m.)**

4           **THE COURT:**  All right.  We're back on the record in

5   the Doe v MindGeek case, counsel for both sides are present.

6   Mr. Nath.

7           **MR. NATH:**  Good afternoon, Your Honor.  So I'd like

8   to start now by going back to some of the evidentiary questions

9   that Your Honor had at the beginning of the case that

10  Mr. Williams responded to.

11          So here's what MindGeek doesn't dispute or have a

12  response to.  MindGeek does not dispute that it created

13  categories and that it created a teen category and that

14  plaintiff's video and a variety of other videos were assigned

15  within the teen category and it basically promoted teen

16  pornography on its pornography website.

17          The second thing that MindGeek does not dispute is

18  that MindGeek had a policy of having recommended searches,

19  that's different from the auto complete function, recommended

20  searches that it proposed to users of its website, that

21  included recommendations like very young teen, 16-year old

22  virgin and things like that, and that's in Exhibit 38 and 39.

23  This is MindGeek generated content.  It is not user generated

24  content, or at least there is a disputed fact on that question

25  because this is a Section 230 defense, it's an affirmative

33

1    defense.

2            MindGeek bears the burden to establish that its

3    recommended searches that it's proposing to users are a content

4    neutral and not encouraging child pornography.  But there can

5    be no -- this isn't coded, it's not teen porn or anything like

6    that, it's directly saying, you search this, why don't you

7    search very young teen, why don't you search 12-year old

8    virgin.  And I would encourage the Court to look at Exhibits 38

9    and 39 to see examples of what those recommended searches

10   actually are.

11           The two -- those two facts are fatal to their motion

12   for summary judgment.  Because they need to prove beyond any

13   disputed fact that no reasonable juror could find that MindGeek

14   essentially encouraged child pornography on its website and it

15   did so in a non -- without neutral tools and it did so -- yeah,

16   and it did so without neutral tools.

17           So that, the inquiry can end there.  But I'll go on

18   because here's what MindGeek does dispute.  MindGeek disputes

19   whether the promotion of teen pornography or young pornography

20   on its website is actually the promotion of child pornography.

21   The Court doesn't need to reach that question because MindGeek

22   actually promoted the very young teen porn, but that's -- that

23   is a triable -- at least this question, whether the promotion

24   of teen pornography and young pornography is actually a

25   promotion of child pornography, that is a triable question of

1    fact that a jury will need to resolve.

2         The jury will see, for example, Exhibit KK to the

3    Cronin declaration which is a conversation between MindGeek

4    employee Juan Dukay (phonetic) and Scott Walsh where they talk

5    about how the term young can be used to refer to something

6    illegal and actually most of the time does refer to something

7    illegal more likely than not.

8         And in that same conversation, Mr. Walsh says, we

9    work backwards as a company, basically acknowledging the fact

10   that the company's policies on this is backwards.

11        The jury will also hear from our expert, Brian

12   Levine, who's a professor of computer science at UCLA who's an

13   expert in child pornography on the internet and testifies based

14   on both the record and his own experience that teen and young

15   and those types of words are coded words for child pornography.

16        So at a minimum, this is a triable question.  There's

17   no question that MindGeek used the category teen, that they

18   promoted teen pornography on its website.  There's definitely a

19   triable question of fact over whether that is a promotion of

20   illicit content that would put it outside the scope of Section

21   230 liability.

22        The second thing that MindGeek does dispute is

23   whether the tags on plaintiff's videos and the tags added to

24   videos of other class members were generated by MindGeek or

25   users.  Before I get into the actual details of this dispute I

1  will also say, this is again this is a Section 230 affirmative

2  defense, it is MindGeek's burden, it will be MindGeek's burden

3  before the jury to show that any particular tag was user

4  generated content as opposed to MindGeek generated content.

5       The evidence in the record shows that MindGeek had a

6  policy of having its content moderators change tags and

7  actually add tags that included tags like teen and young.  One

8  of the disputed exhibits that we're talking about is Exhibit Z,

9  which -- to the Cronin declaration, that was specifically

10 mentioned during the last -- during -- in this morning's

11 session.

12      And I'd like to just pull out, if I can find my copy,

13 a part of Exhibit Z to discuss.  So if you turn on Exhibit Z,

14 I'm reading from page -- the page ending in 657, it says, Nat

15 Kaliche (phonetic), one of MindGeek's employees said, do you

16 know if when a formatter adds tags, does moderation need to

17 approve that, formatter being a MindGeek employee.  Matt

18 Kaliche adds, I found out they, the formatters, add tags.

19      Mr. Ignitio, another MindGeek employee responds, yes,

20 I told Chung (phonetic) about this a few weeks ago.  And then

21 on top of that, Mr. Ignitio on the next page says, I mentioned

22 this in the -- sorry, Mr. Ignitio says, I mentioned this in the

23 past but I saw they, again still talking about content

24 formatters, put in the tags the words young and teen beside

25 each other.

1          There is no question that this document -- at a

2     minimum, it's a disputed fact of whether this document shows

3     that MindGeek had a policy one of having their moderators add

4     tags, and two, that their moderators did add tags, young and

5     teen.

6          **THE COURT:**  Formatters.

7          **MR. NATH:**  The -- yeah, the formatters.  So

8     MindGeek's burden on summary judgment and it will be their

9     burden at trial will be to show that the tag on plaintiff's

10    video or any other videos are user generated as opposed to not

11    and they have no evidence in the record for this Court to find

12    as a matter of law that the tags added to plaintiff's videos

13    related to teen and underage content were in fact user

14    generated as opposed to MindGeek generated.  So at a minimum,

15    that's another dispute triable question that this Court can't

16    resolve on summary judgment.

17         The -- I -- what MindGeek does cite on this point is

18    the Ignitio declaration, which my friend on the other side

19    said, basically said that Ignitio was a MindGeek video, went

20    back to plaintiff's videos, checked the tags and confirmed that

21    they were user -- they were not MindGeek generated.  That is

22    not what that declaration says.

23         Page -- paragraph 37 of the declaration describes

24    what Mr. Ignitio does, and he says he checked the title of the

25    video, not the tag.  And that is an important distinction.  And

37

1    so there is no evidence in the record, at least none that

2    MindGeek has pointed to, that suggests that the tags on

3    plaintiff's videos were actually user generated as opposed to

4    the title of the video.

5            And it's telling, I will say, that Mr. Ignitio wrote

6    a declaration for summary judgment, went back and looked at

7    plaintiff's videos, confirmed that the title was user

8    generated, but was unable to confirm in his declaration that

9    the tags were user generated.

10           So briefly before I move on to -- I'd like to go to

11   the legal question or the legal standard for Section 230.  We

12   had a brief conversation about the Red Bubble case.  My friend

13   on the other side said one similarity between this case and the

14   Red Bubble case is that there was fingerprinting in the Red

15   Bubble case, fingerprinting of the videos and also

16   fingerprinting of the videos here.

17           As a matter of fact, Exhibit 6 to the Cronin

18   declaration, row 6, column L, this is a giant spreadsheet that

19   describes a lot of CSAM on this website, that's the TOSA

20   spreadsheet, row 6, column L is plaintiff's videos and that

21   data indicates that her video was not fingerprinted, even

22   though MindGeek represented to her that it was.

23           I will move on -- I want to briefly turn to Section

24   230 and start with the legal standard.  This is again an

25   affirmative defense on which MindGeek bears the burden.  Under

38

1    the Roommates.com test, Roommates held that the development of

2    content -- the content -- discussed the content creator

3    exception and said that development of content includes the

4    gathering and organization of information.

5            And so if you're involved in the gathering and

6    organization of information and you're doing it in a way that

7    is not content neutral and you're doing it in a way that

8    promotes illegal conduct, then you're outside the scope of

9    Section 230, even if you are simultaneously also an ICS under

10   Section 230.

11           And so the question here is, is -- what is MindGeek

12   doing that it's violating.  The claims at issue here are

13   related to MindGeek's distribution and MindGeek's promotion and

14   distribution of child pornography -- sorry, its receipt and

15   distribution of child pornography.

16           And so MindGeek, as a matter of fact, is actually --

17   and is encouraging child pornography on its website.  The

18   example of Roommates, this is like a super charged version of

19   Roommates because there's a mountain of evidence that -- of

20   MindGeek's encouragement.  We've discussed the categories that

21   MindGeek uses to promote teen pornography.  We discussed the

22   tags and the examples of auto completes or auto completes and

23   recommended searches, which are not user generated content that

24   MindGeek actually uses to encourage people to -- encourage the

25   distribution of child pornography on its website.

1          **THE COURT:**  Wait, I thought the auto completes were

2    user generated.

3          **MR. NATH:**  I think there's some dispute over whether

4    the auto completes are user generated.  MindGeek argues that

5    the auto completes are user generated, because they are based

6    on user's past searches at least --

7          **THE COURT:**  Right.

8          **MR. NATH:**  -- in part.  The evidence in the record is

9    a little mixed on this because it suggests that the -- it is

10   based on user generated content in part but it might also be

11   based on other factors, it's not entirely clear.

12         The recommended searches, on the other hand, there

13   appears to be no evidence about whether there is -- there's no

14   evidence of that as actually user generated content as opposed

15   to MindGeek generated content.

16         I will add another independent way that MindGeek is

17   outside the scope of a Section 230 defense in this case, and

18   that is the revenue sharing theory.  In Gonzales v Google there

19   was -- the claim was material support of terrorism and in that

20   case, the Court held that that claim survived, a claim related

21   to revenue sharing survived because Google was found to be

22   revenue sharing with ISIS or not found, but the complaint

23   alleges Google was revenue sharing with ISIS and that was

24   material support of terrorism because there was an element of a

25   claim related to actually supporting terrorism.

1          Here, at least with respect to the TVPRA claim, where

2    the element of the claim is the benefit that MindGeek receives

3    from the distribution of child pornography.  The revenue

4    sharing theory is sufficient to get them outside the scope of

5    Section 230.  And that's just an independent reason why even if

6    they're right about everything else, which we think they're

7    not, they can't establish summary judgment on revenue sharing.

8          **THE COURT:**  Okay.

9          **MR. NATH:**  Two more points on Section 230, Your

10   Honor.

11         So with respect -- my friend on the other side makes

12   the argument that there is a concern that holding MindGeek

13   liable here might open the floodgates to holding neutral search

14   -- neutral platforms like Google or Facebook liable in these

15   situations, extremely unlikely given the way that Section 230

16   case law has played out.

17         First of all, there's Gonzales v Google, that

18   protects neutral -- a platform that uses neutral tools.  And

19   the question here and the difference here is MindGeek's

20   extraordinary encouragement of direct affirmative acts

21   encouraging child pornography on its website.

22         **THE COURT:**  So I confess, I'm not terribly moved by

23   that argument, but I'm concerned about the related argument

24   that if your client succeeds in this case, the incentive

25   structure that's left for MindGeek is to abandon all of its

Case 8:21-cv-00338-WLH-ADS   Document 370   Filed 07/26/24   Page 41 of 75   Page
ID #:97891

41

1   moderation tasks or checks because if they don't know about it,

2   they can't be held liable for it.

3           **MR. NATH:**  That's actually not the case.  So there's

4   no incentive problem here.  So if -- if the incentive structure

5   after MindGeek after this case is actually to stop encouraging

6   child pornography, right, that's the biggest incentive.  If

7   they're held liable in this case, any other porn provider will

8   know that we shouldn't be promoting CSAM coded terms, we

9   shouldn't be promoting actual child pornography.

10          They are protected if they're using neutral tools and

11  on -- conversely, so if they're only using neutral tools for,

12  you know, search functions or what content ends up on their

13  website, their content moderation practices would otherwise be

14  protected.

15          If they act the way Google acted in Gonzales v Google

16  where a -- if you watch a bunch of cat videos you're going to

17  get a recommendation for a cat videos, but if you watch a bunch

18  of ISIS videos, you're going to get a recommendation for ISIS

19  videos.

20          Google then has and enjoys the shield of Section 230

21  in that case and their incentives are not out of whack with

22  respect to content moderation practices.  Because if they see

23  something they can take it down.  And in MindGeek's case, if

24  they were to employ entirely neutral tools and not encourage

25  child pornography, then they get back within the ambit of

EXCEPTIONAL REPORTING SERVICES, INC

1    Section 230.  So that really isn't a concern.

2            The real incentive is to avoid incentivizing, that's

3    the reason why MindGeek should be held liable here, because the

4    real incentive that that would create is to avoid companies

5    from taking affirmative steps to promote illegal content.  And

6    that's kind the upshot of Roommates.com and the perfect

7    illustration of this, Your Honor, is Judge Carney's decision on

8    MindGeek's motion for reconsideration, where he says, if

9    MindGeek is right about how they interpret Section 230, someone

10   could create the URL childpornography.com and create a platform

11   where everyone is encouraged to put their child pornography on

12   it and as long as they're not behind the camera, and as long as

13   they're not in the cutting room, then they're shielded from

14   liability even if they catch like 50 percent of child

15   pornography on their website.

16           And so that is an absurd result that this Court needs

17   to avoid and it avoids it by basically upholding this

18   encouragement standard set forth in Roommates.com.

19       **THE COURT:**  And do you think that the decision by

20   Judge Selna in the Reddit version of this case, would I just be

21   finding something inconsistent with it and that's the way it

22   goes because I disagree with him?  Or do you think the two

23   rulings could be consistent?

24       **MR. NATH:**  Not at all, Your Honor.  So this would not

25   be consistent with the decisions in Reddit in any way.

43

1          **THE COURT:**  Inconsistent?

2          **MR. NATH:**  Yeah, sorry.  It would not be inconsistent

3    with the decisions in <u>Reddit</u> in any way for two reasons.

4          First of all, the facts are very different.  In

5    <u>Reddit</u> ultimately we went up to the Ninth Circuit, the Ninth

6    Circuit decision has nothing to do with Section 230, it was

7    just about the TVPRA.  But what the Ninth Circuit ultimately

8    concluded was that the allegations in that complaint didn't go

9    beyond alleging that Reddit did anything more than turning a

10   blind eye to content that was illegal, child pornography.

11         There was no -- the Court held there was no

12   allegation sufficient to plausibly allege that Reddit was

13   actually encouraging child pornography in any way.  And that is

14   a critical difference.

15         If there's any question about that, you can turn to

16   the <u>Doe v Twitter</u> case, the district court decision on remand.

17   In particular footnote 5.  That case actually references

18   MindGeek and it says, MindGeek was very different than <u>Reddit</u>

19   or MindGeek operated very differently than Reddit or Twitter

20   because the allegations in the MindGeek case were that MindGeek

21   was actually encouraging child pornography on its website.

22         **THE COURT:**  I see.

23         **MR. NATH:**  So that's the key distinguishing factor.

24   And then I'd also add that at least with respect to the Ninth

25   Circuit decision, that's not Judge Selna's decision, there was

44

1    no -- it did not address the content creator exception under

2    Section 230.

3            **THE COURT:**  Okay.

4            **MR. NATH:**  There -- I'll briefly cover Section

5    2258(a) which MindGeek reads to say that there's no duty for

6    MindGeek to search child pornography.  I'll make a couple of

7    very brief points.

8            First of all, MindGeek and the undercurrent of this

9    is that MindGeek has kind of its done best to find child

10   pornography on its website.  I will say that is not absolutely

11   the case.

12           MindGeek reporting to NCMEC started for the first

13   time at the end of the class period in 2020, only after -- not

14   after it received bad publicity, not after it received a ton of

15   complaints from victims, but only after Visa and MasterCard

16   said, look, people are not going to be able to use credit cards

17   on your platform.  And their bottom line was threatened.  And

18   that's the first time they reported to NCMEC and they went back

19   and looked at all of the videos that they had had on their

20   website and the spreadsheets are horrifying, the names of

21   videos on that spreadsheet are ridiculous.

22           **THE COURT:**  Well, but I'm not sure that that

23   addresses the legal issue.  Because if they had no obligation

24   to do so, the fact that they got financial pressure to do it

25   doesn't sort of move the needle here nor there.  That's just a

45

1    business decision that they're making.

2            I think the real question is, did they have some

3    obligation to be doing a better job prior to Visa and

4    MasterCard applying the pressure.

5            **MR. NATH:**  So they had an obligation not to receive

6    or distribute CSAM on their websites, in a way that encouraged

7    CSAM on their website.  Right.  So if they were receiving and

8    distributing CSAM on their websites and they were also

9    encouraging it and taking affirmative steps to help it

10   flourish, then they're outside the scope of Section 230

11   entirely.

12           Under 2258(a), that is related to their reporting

13   requirements.  The claims in this case are about receipt and

14   distribution of CSAM.  We're not trying to hold them liable for

15   actually reporting something to NCMEC.  Our argument is that

16   they failed to report to NCMEC.  They weren't making

17   contemporaneous reporting to NCMEC over the course of those

18   several years.

19           And, in fact, MindGeek's position is that 2258 does

20   not actually even apply to them, and so they're trying to take

21   advantage of the statute that they actually claim doesn't

22   require them to do anything.  And so it's essentially just

23   irrelevant to the 230 analysis, irrelevant to any of the

24   analysis here.

25           I'll turn, unless the Court has further questions

46

```
 1   about Section 230, I'll turn to the TVPRA claim very briefly.
 2              THE COURT:  All right.
 3              MR. NATH:  So there are two things.  I already
 4   discussed the Reddit case and the differences between there,
 5   that case and this one.  Under the TVPRA I just want to clarify
 6   the actual claim elements.
 7              So we need to show -- the plaintiff needs to show the
 8   defendant participated in a venture that the defendant had
 9   essentially knowledge or constructive knowledge that the
10   venture engaged in some sort of violation of 1591.
11              So MindGeek did not have to actually participate in a
12   violation of 1591, they had to have knowledge that the venture
13   at issue committed a violation under 1591, and that MindGeek
14   knowingly benefitted from their participation in the venture.
15              The main issue that MindGeek raised is that there's
16   no sex trafficking here.  And under 1591 which defines sex
17   trafficking, it's defined incredibly broadly and I'll actually
18   point the Court to Judge Birottes' opinion in the Acevedo
19   (phonetic) case, where he says -- Judge Birotte concludes that
20   sex trafficking as it's defined in 1591 is not kind of your
21   conventional sex trafficking, it doesn't have to be a ring of
22   people who do nothing but sex trafficking, it can include
23   things like recruiting, soliciting, providing, obtaining,
24   maintaining anyone under 18 that's ultimately caused to commit
25   a commercial sex act.
```

47

```
1              So there's no question that obtaining a person as
2    Jane Doe's abuser did in this case for the purpose of
3    committing a commercial sex act is sufficient to show sex
4    trafficking under the statute.  It does not have to be any sort
5    of -- there doesn't have to be coercion particularly when it's
6    someone under the age of 18.
7              THE COURT:  Wait, what's the commercial sex act?
8              MR. NATH:  So the commercial sex act, there's a
9    specifically defined term in the statute.  Commercial sex act
10   is sex, and I quote, sex on account of which anything of value
11   is given or received by any person.
12             Judge Carney has held that this means that if there
13   is a sex act that is videotaped and the video is later put on a
14   website, that's sufficient to establish a commercial sex act,
15   which is the very reading of the statutory text.  Because sex -
16   - because it says, sex on account of which anything of value is
17   given to any or received by any person.
18             THE COURT:  So, in other words, it wasn't criminal
19   when the video was taken, it wasn't, but then it became
20   criminal the moment it was uploaded to the defendant's website?
21             MR. NATH:  Yeah.  Well, so, it was criminal under
22   another statute at the time the video was taken.
23             THE COURT:  Yeah, right.
24             MR. NATH:  But it wasn't a crime under 1591, it
25   wasn't a commercial sex act under 1591 at the time the video
```

48

1  was taken, but the moment that it was uploaded to the website

2  and MindGeek, because any person can get a thing of value from

3  it, for it to satisfy the commercial sex act definition,

4  because MindGeek got something -- a benefit in terms of

5  traffic, views, and revenue.  That turns it in -- that is

6  sufficient to establish a commercial sex act.

7         THE COURT:  Do you have a case or is Acevedo the case

8  that basically says that the two things can be separated like

9  that?

10         MR. NATH:  So Judge Carney's prior decisions in this

11  case --

12         THE COURT:  Yeah.

13         MR. NATH:  -- have come to that conclusion.  The

14  decision in the Alabama case, again MindGeek Free Sites that

15  came to the same conclusion.  The Doe v Twitter case also came

16  to that same conclusion.  That decision was later vacated by

17  the Ninth Circuit.  But really the two decisions in this case

18  come to that conclusion.

19         And there's really no question under the statutory

20  text that that's the right answer because it doesn't say -- it

21  doesn't have any temporal requirement, it just says that

22  there's a sex act on account of which anything of value was

23  given.

24         And so if there's a sex act and anything of value is

25  given because of that sex act, then it's sufficient to

49

 1    constitute a commercial sex act.

 2              **THE COURT:**  Possibly tangential procedural issue,

 3    because Judge Carney issued that ruling in this case, is it law

 4    of the case?

 5              **MR. NATH:**  It is law of the case, Your Honor.

 6              **THE COURT:**  Okay.

 7              **MR. NATH:**  Correct.

 8              **THE COURT:**  Okay.  Thank you.

 9              **MR. NATH:**  With that, I will turn to the 2252(a)

10    claim and I'll deal with the arguments again on summary

11    judgment and why we think summary judgment should be granted on

12    at least the liability elements.

13              So there are two elements really that are in dispute.

14    There are three elements really, so receipt of distribution,

15    not the knowledge requirement, and the interstate commerce

16    argument.  The third element is not -- MindGeek does not

17    dispute, so I'll just deal with the first two.

18              On receipt of and distribution, there really is no

19    dispute that there is the TOSA spreadsheet, that MindGeek --

20    that there is a ton of child pornography in that spreadsheet

21    and we know that because MindGeek identified each video on the

22    basis that it was either so obvious that based on the face of

23    the video that it was child pornography or based on the

24    metadata on that video.

25              And so at a minimum, MindGeek has received or

1    distributed child pornography.  And so the Court can enter

2    summary judgment as to MindGeek and we can go to the trial at a

3    later date over, you know, the membership of that class.  But

4    at a minimum on the liability question, MindGeek has received

5    or distributed child pornography, there's really no question

6    about that.

7            As to knowledge, there are two different ways to show

8    that.  One is actual knowledge as we've already discussed and I

9    think there's an argument, there's certainly a very strong

10   argument that there's actual knowledge beyond a disputed

11   material fact because MindGeek reviewed every single one of

12   those videos and approved them before they -- before it went

13   on, and those videos included titles like a 9-year old's foot

14   tickled, middle school hand job, very young tiny teen, other

15   things of that sort.  The spreadsheet is Exhibit 6 through 12

16   and you can kind of look through that spreadsheet and see just

17   a litany of examples like that.

18           And so MindGeek reviewed and approved every single

19   one of those videos.  There's no question that it had actual

20   knowledge.  But there's also at a minimum no question that it

21   willfully blind.  It reviewed every single one of those videos

22   and it was also involved in encouraging child pornography on

23   its website, yet it went out of its way to actually report

24   things to NCMEC.  It went out of its -- it did not include --

25   it did not require -- it had -- it was operating a pornography

1  website where they were promoting teen porn, but they also

2  didn't require anyone to provide IDs of the people in the

3  videos before uploading them.  And MindGeek avoided

4  implementing technological tools that would have helped them

5  identify child pornography and remove them from their websites

6  automatically.

7        And maybe the best example of willful blindness is

8  their 15 flag policy under which MindGeek refused to actually

9  view a video or check a video for child pornography until it's

10 flagged at least 15 times because -- and there was a

11 consequence of the fact that they had understaffed their

12 content moderation department, but also the fact that they were

13 getting so many flags of child pornography or problematic

14 content on their website that they needed to triage and said,

15 okay, we're not even going to touch these unless they've been

16 flagged 15 times.

17        And that is very good evidence that MindGeek

18 certainly had -- was willfully blind because it avoided looking

19 at videos with 14 flags or fewer to the child pornography on

20 its website.

21        **THE COURT:**  I mean, so I guess my problem is, isn't

22 this the sort of the spirit of why the CDA was passed in the

23 first place, is that I should not be allowing a jury to grade

24 what MindGeek did in terms of trying to prevent the CSAM being

25 on their website?  I understand the argument that like they're

1    not supposed to be promoting it, but aren't we not supposed to

2    be grading what they did to affirmatively prevent it from being

3    uploaded in the first place?

4         **MR. NATH:**  So, Your Honor, that is true in a

5    situation where a company's policies as a whole are content

6    neutral.  But once MindGeek is venturing into the world of

7    encouraging child pornography on its websites, its

8    encouragement dovetails with its content moderation practices.

9    And I'll give a couple of examples of that.

10        So for example, MindGeek promotes teen porn.  It

11   creates a category of teen porn and then creates hashtags with

12   teen and young.  MindGeek also has, what you could call a

13   content moderation policy which is a banned words list.  That

14   includes all the words that are banned.

15        They declined to include teen and young and words

16   like that in that banned words list for a long time.  And so

17   those two policies interact with each other and actually

18   supercharge the promotion of child pornography on its website.

19        So when a party is actually encouraging child

20   pornography their content moderation policies that turn a blind

21   eye interact with its encouragement and actually and, you know,

22   basically supercharge the encouragement.  And that's a good

23   example of how MindGeek is promoting teen content and they're

24   also avoiding taking steps to remove teen content, the same

25   teen content they're promoting on the website.

1          Another good example is that for a long time,

2    MindGeek was un -- if you wanted to enter a tag, you couldn't

3    enter a tag of teen 18 plus on the website, but you could enter

4    a tag of teen on its own, as a standalone term.  And that, you

5    could argue, is maybe a content moderation policy.  But at the

6    same time, that coupled with the fact that MindGeek is

7    promoting teen content on its website and creates an ecosystem

8    where MindGeek has encouraged child pornography to flourish on

9    its pornography website.

10         So we don't think that that evidence of content

11   moderation is excluded in a world where MindGeek has --

12   MindGeek is encouraging content.  At a minimum, that's a

13   question that should be left for, you know, can be left for a

14   motion in limine or pretrial motions.  It's not something

15   relevant to summary judgment at this stage because we have

16   evidence that MindGeek took affirmative steps to encourage

17   child pornography on its websites.

18         **THE COURT:**  Okay.

19         **MR. NATH:**  With that, I don't have anything else

20   unless Your Honor has further questions.

21         **THE COURT:**  I do not, thank you.

22         **MR. NATH:**  Thank you.

23         **THE COURT:**  Mr. Williams.

24         **MR. WILLIAMS:**  Thank you.  Before I turn it over to

25   Ms. Cafferata, I just want to address and I will try to be

1    brief.

2         You know, it's easy to come up with a -- what sounds

3    like a horrendous story and a horrendous company here, but the

4    question is what does the evidence actually show.  Mr. Nath

5    referred to Exhibit Z to the Cronin declaration which is one

6    that we talked about earlier about the reference to adding tags

7    to young and teen.

8         I had an opportunity to look at that a little closer

9    during lunchbreak and what you will see, and he skipped over

10   this part when he was reading portions of it.  It talks about

11   how these -- they only tags to partner content, which is

12   studios that license their content, or model content, which are

13   models that are again they're out there promoting, they fall

14   under the guidelines of 2257.  There's no suggestion that those

15   tags are ever added to user generated content, which is what

16   we're dealing with with the plaintiff here.

17        He also referenced Exhibit 38 and 39 about how

18   MindGeek is affirmatively recommending searches like 12-year

19   old virgin and the like.  And again, Your Honor, it's easy to

20   tell a bad set of facts when you don't actually read the

21   document.

22        The document makes clear, these are problems that

23   were being brought to MindGeek's attention due to the auto

24   complete feature.  And the exchange in those exhibits talk

25   about how they need to address this in the auto complete,

55

1   because people are typing that in and then it's causing -- with

2   the age issue, it says, it's a function of the algorithm that's

3   being used there.  That's not MindGeek affirmatively

4   recommending to users to search for 12-year old virgin.

5   There's no evidence in the record of that absolutely.

6          **THE COURT:**  And can I ask you a question that's been

7   --

8          **MR. WILLIAMS:**  Sure.

9          **THE COURT:**  -- bothering me since Mr. Nath spoke.

10          So they have an expert that's going to say the teen

11   category is a code word for CSAM.  Assume that that expert is

12   going to say that on their behalf.  How do I get by summary

13   judgment on that?  So you have an expert that says -- well, you

14   have the argument that you and I, Judge, know that teen

15   includes a category of lawful people.  Well, that's true;

16   however, if it is true that if it is also true that the users

17   of MindGeek generally see it as a code word and MindGeek knows

18   that and still uses it, how is that not a jury trial issue as

19   opposed to a me issue?

20          **MR. WILLIAMS:**  Sure.  So first of all with regard to

21   Section 230 and I want to -- because it's important to break

22   this down by claim.  As I mentioned before, the tagging, the

23   titles, all of that is irrelevant to the claim and I'll explain

24   why.

25          Under Section 230 you have to look at the particular

1  content for which MindGeek is being held liable.  Here it is

2  CSAM.  It is the video itself.  Think of a situation, someone

3  could put a video up and the title could be 12-year old

4  pornography, child pornography and you open the video and it's

5  an 80-year old person.

6       Clearly not illegal.  The title may have suggested

7  that, maybe it's click bait to get people to go there.  But the

8  title doesn't make it illegal.  What makes it illegal is

9  whether the video actually is CSAM.  And that is not -- it's,

10 you know, what is it horseshoes, you know, it's not close

11 enough.  It's horseshoes, it doesn't count to be close.  If the

12 video is of someone a day before they're eighteenth birthday,

13 it's illegal.  If it's the day of their eighteenth birthday it

14 is not illegal.

15      So you have to look at what element does this go to

16 for their claim.  Mr. Nath referred to, well it goes to the

17 receipt and distribution of child pornography.  It does not.

18 The receipt and distribution of child pornography has nothing

19 to do with whether there's a tag on it or whether there's a

20 title on it, it's whether or not there's actual knowledge of

21 the age of the individual and that individual is under 18.

22 That's the issue.

23      **THE COURT:**  Well, yes, okay.  But -- so a couple of

24 thoughts on that.  Again, assuming for the sake of this

25 hypothetical that teen is a code word for CSAM material and

1    that everybody knows that.  The customers know that, MindGeek

2    knows that.  Just assume that for the sake of argument.

3           The fact that MindGeek creates a category that is the

4    code word for CSAM and then users are using that category to

5    find material on MindGeek, on MindGeek's website.  Doesn't -- I

6    mean, isn't that promotion in and of itself?

7           Because if every video in the teen category were of

8    80-year olds, I don't think MindGeek's business model would

9    last very long, right.  So why isn't that promotion of the

10   material again, you have to assume for the sake of argument

11   that what their expert says is true.

12           **MR. WILLIAMS:**  Sure.  Well, Your Honor, it's no

13   different than the <u>Reddit</u> case and the <u>Doe v Twitter</u> case.  So

14   in <u>Reddit</u> and I'm looking at the Ninth Circuit decision, the

15   plaintiff -- and Mr. Nath tried to distinguish it to say, oh,

16   there was no promotion of CSAM in that, it was the same claim,

17   same allegations.  It says in the Ninth Circuit decision at

18   1139, the plaintiffs allege that the presence of child

19   pornography on Reddit is blatant but Reddit has done little to

20   remove the unlawful content or prevent it from being posted

21   because it drives user traffic and revenue.

22           Reddit hosted many sub-Reddits that openly and

23   explicitly marketed themselves as fora for child pornography

24   with names like Our Best of Young, NSFW, Are Teens Dirty, Are

25   Teen Beauties and Are Young Girls Gone Wild.

58

1                   Users publicly trade and solicit child pornography on

2     these pages and advocacy groups and the press have repeatedly

3     reported this activity to Reddit.  They go on, plaintiffs

4     allege that Reddit earns substantial advertising revenue from

5     sub-Reddits that feature child pornography because they

6     generate controversy and attract viewers.

7                   **THE COURT:**  Well --

8                   **MR. WILLIAMS:**  The Ninth Circuit still said, I mean,

9     that wasn't sufficient.

10                  **THE COURT:**  Well but the users created the sub-

11    Reddits, right?

12                  **MR. WILLIAMS:**  But they're saying Reddit hosting

13    these sub-Reddits.

14                  **THE COURT:**  Well, I know, that's different.  So

15    Reddit allows users to make sub-Reddits, the sub-Reddits create

16    these sub-Reddits with bad titles.  I see that as fundamentally

17    different than MindGeek creates a category that they know is a

18    code word for CSAM.  Why doesn't that get them past summary

19    judgment?

20                  **MR. WILLIAMS:**  On which claim, Your Honor?  Because

21    that's the issue.  On the trafficking claim, even if -- let's

22    put aside Section 230, I mean, obviously we think it is fatal

23    here.  But even under the trafficking claim, they have to prove

24    a lot more than MindGeek created a category that some people

25    might interpret as code for CSAM.  So they have to show that

1    MindGeek actively participated, knowingly and actively

2    participated in a sex trafficking venture.

3          There's no evidence of that in this case.  I mean,

4    regardless of what definition the plaintiff admits it was a

5    consensual relationship with her boyfriend, she was not

6    provided anything of value, she did not give him anything of

7    value --

8          THE COURT:  Well, but on this score Mr. Nath -- I

9    think that my understanding is that Judge Carney already ruled

10   on this, that is law of the case that four years later

11   commercial transaction could render the video made four years

12   before into a commercial sex act.

13         MR. WILLIAMS:  It's not law of the case, Your Honor

14   and I would cite to you, Herrington v City of Sonoma, 12 F3d

15   901, which is Ninth Circuit decision, this takes me back to my

16   civil procedure days, but law of the case only applies when

17   there's an appellate decision in the case.  It doesn't apply to

18   Judge Carney's ruling on a motion to dismiss and it doesn't

19   apply at the summary judgment stage.  Moreover --

20         THE COURT:  Well, I wish I had known that when I got

21   all my cases transferred to me last year.  Okay.

22         MR. WILLIAMS:  But moreover, Your Honor, let's look

23   at even that ruling.  So what Judge Carney did is he relied on

24   the initial district court decision in Doe v Twitter as support

25   for this definition of commercial sex act.

60

1          In that case, Twitter conceded at oral argument that

2    the retweeting of CSAM would be a commercial sex act under the

3    statute.  And that was Twitter's concession.  We don't have a

4    concession here.  It goes up to the Ninth Circuit, the Ninth

5    Circuit vacates that decision.  And on remand, the judge looks

6    at it and says, you know what, I'm abandoning that position

7    that it's a commercial sex act, it's been vacated by the Ninth

8    Circuit and even the Court recognizes that the MindGeek case

9    was relying upon its prior decision which has now been reversed

10   by the Ninth Circuit.

11          So putting aside there's no law of the case, the

12   logic and rationale of it falls under its own weight.  The idea

13   that posting a video four years later constitutes a commercial

14   sex act would literally -- I mean, again we raise this

15   hypothetical but it would apply.  Someone could be engaging in

16   a commercial sex act by posting it after they're dead.  I mean,

17   because someone could post a video years later and then now

18   they've somehow induced them to engage a commercial sex act.

19          You have to look at the language of the statute.  It

20   says, you're causing, you're inducing, you're soliciting

21   someone to engage in a commercial sex act.  There's no

22   evidence, I mean, the evidence is undisputed that MindGeek did

23   not do that here.  MindGeek had no connection to the plaintiff

24   until she asked for her videos to be removed and they removed

25   them.

61

1              And then going back to the tagging issue that you

2   mentioned or the category issue, it's not relevant to the

3   receipt and distribution claim either, 2252(a).  Because again

4   that only deals with whether or not the content is CSAM.

5   There's no separate claim for promotion of CSAM here.

6              So it's really -- the example you gave, I mean the

7   hypothetical not only is it --

8         **THE COURT:**  They didn't rely on advertising?

9         **MR. WILLIAMS:**  I'm sorry?

10        **THE COURT:**  They didn't rely on advertising as a

11  predicate?

12        **MR. WILLIAMS:**  No.

13        **THE COURT:**  Plaintiff?

14        **MR. WILLIAMS:**  No, under the trafficking statute?

15        **THE COURT:**  Yeah.

16        **MR. WILLIAMS:**  No.

17        **THE COURT:**  Okay.  All right.  Thank you.

18        **MR. WILLIAMS:**  So again I guess to go back to the

19  distinction both Reddit and Twitter involved allegations of

20  promoting CSAM, they're still barred under Section 230.

21             Revenue sharing, as we explained in our brief, it's

22  irrelevant here.  The issue in Google was the claim under the

23  Anti-Terrorist Act provided for cause of action if you're

24  providing material support to a terrorist group.  And the Ninth

25  Circuit explains why that wasn't covered by Section 230.  It

62

 1   had nothing to do with the content.  And the Ninth Circuit

 2   said, Google could remedy it by keeping the content up but just

 3   not sharing the revenue with ISIS.  And that would destroy the

 4   claim.

 5        There's no -- that can't happen here.  You can't say

 6   you can keep the content up and also, again, for other reasons,

 7   the theory of revenue sharing that they're now arguing, which

 8   isn't pled, is backwards.  They're saying that MindGeek earned

 9   money off of these videos through advertising, but the idea

10   behind revenue sharing and the Google case was Google was

11   sharing advertising with the terrorists.

12        **THE COURT:**  Right.

13        **MR. WILLIAMS:**  It is undisputed that MindGeek never

14   paid the ex-boyfriend any money here.  So it just doesn't apply

15   for a number of reasons.

16        And finally, again, you know, we heard Mr. Nath try

17   to explain why to Your Honor's question about, aren't we doing

18   exactly what Section 230 says you can't do, which is judging

19   the sufficiency of their content moderation.  And that's

20   exactly it.  I read that quote from the Roommates' case which

21   is you can't go down that road or it defeats the whole point of

22   Section 230.  And I just reiterate that again, I mean, that's

23   exactly what plaintiffs are asking the Court to do.

24        So unless there's other further questions, I will let

25   my colleague -- if there's anything else to address.

1          **THE COURT:**  Okay.  Thank you.

2          **MR. WILLIAMS:**  Thank you, Your Honor.

3          **MS. CAFFERATA:**  Thank you, Your Honor.

4          Naturally there's a fair amount of overlap between

5    the two substantive motions, but now we're putting our hat on

6    as far as whether the facts are so clear that it compels the

7    result as a matter of law that MindGeek is liable for a

8    2252(a).  And so with that, I thought I would address that

9    claim specifically and look at the state of the record.

10         I won't go over the Section 230 discussion because I

11   -- on the whole, because I think it's already been covered.  I

12   would, however, note that the Reddit absolutely did involve

13   allegations that there was active, what's the word, inducement

14   or encouragement of CSAM and specifically on page *4 of the

15   Ninth Circuit Reddit case, it says, the plaintiffs had alleged

16   that Reddit was an information content provider because of its

17   refusing to enforce its policies, provision of, awards for sub-

18   Reddits, featuring CSAM, so that is clearly something where

19   they're saying they were trying to elevate it and promote it,

20   synonymous private messaging center that allows evasion of law

21   enforcement.

22         Number four, elevation of sub-Reddits involving CSAM.

23   So there was an allegation again that Reddit was participating

24   actively.  And then use of barely trained moderators who failed

25   to enforce its policies and promulgated the spread of CSAM.

1          Now, there are other things in these cases, but I

2    don't really think there's a reasonable question that promotion

3    was absolutely at issue in Reddit, and for that matter in

4    Twitter.  And there was a clear result with respect to 230.

5    Also with respect to Reddit, the 230 -- the 2232 claim was

6    denied on the basis of summary judgment, but it didn't appear

7    in the Ninth Circuit case because it wasn't even appealed by

8    plaintiff's counsel here.

9          So turning to the theories of plaintiff.  We've heard

10   a lot about the active encouragement that MindGeek was

11   supposedly involved in and how the word teen was used to really

12   drive CSAM and, you know, this very cynical view that the word

13   teen is automatically code for underage people.  And it

14   couldn't be further from the truth.

15         An identifier that also identifies millions and

16   millions and millions of non-CSAM videos in addition to

17   whatever might have popped up if somebody added the word teen

18   to a CSAM video, doesn't mean it's code word for CSAM.  And

19   we'll have -- we would have at trial, Your Honor, a woman,

20   Sherry Kotachoni (phonetic) who is a human trafficking expert

21   who's used by governments and companies all over the world to

22   combat CSAM.  And she and also our FBI agent --

23         **THE COURT:**  I don't think you need to waste time on

24   this argument.  I agree with you that at best, at best for

25   them, at worst for you, this is a question of fact for the jury

1    as to whether or not teen is, in fact, a code word for CSAM.

2          **MS. CAFFERATA:**  Thank you, Your Honor.

3          Okay.  I just wanted to also give a little bit of

4    perspective in terms of the evidence that was presented on the

5    2232(a) motion.  The first allegation was about how there's

6    this, you know, the website is a wash with CSAM.  And the

7    record shows that if you do even a back of the envelope kind of

8    a look at the actual evidence that's in the record on this

9    motion that's simply not true.

10          In fact, the millions of dollars that have been spent

11   by Aylo to find and get rid of CSAM which is also in the

12   record, has been really, really effective.  And so the idea

13   that this phenomenon that occurs on pretty much every website

14   is somehow despite all of these tools just, you know, so

15   obvious and awash and everybody's putting their head in the

16   sand just really doesn't comport to reality.

17          So for example if you look at a three year period

18   ending on December 31st, 2019 there was almost 13.2 million

19   uploads just upon Hub.  Now, the class period is about 13 years

20   and the 38,000 possible CSAM apparent or suspected CSAM that

21   was reported to NCMEC, much of which didn't ever go up on the

22   website to be shown to the world, that when you divide it,

23   38,000 of the 13.2 million uploads and that was over time, many

24   years, right, when that was collected, that's less than 1

25   percent.  It's .3 percent about.

66

1          So this whole hyperbole about how the website is

2     awash with CSAM and despite all these tools, there's actually

3     this sort of underground effort to propagate CSAM just doesn't

4     comport with reality.

5          And specifically with respect to the willful

6     blindness test.  Now, the Supreme Court in Global Tech

7     discussed willful blindness as opposed to reckless defendants

8     and negligent defendants.  And said a willfully blind defendant

9     is one who takes deliberate actions to avoid confirming a high

10    probability of wrongdoing and can almost be said to have

11    actually known the critical facts.

12         By contrast, a reckless defendant is when he merely

13    knows there's a substantial and unjustified risk of such

14    wrongdoing and a negligent defendant is one who should have

15    known of a similar risk, but in fact, did not.

16         So all of the arguments about what MindGeek didn't do

17    well enough or didn't do fast enough, those clearly fall

18    within, at best, recklessness or negligence, which is simply

19    not the standard for willful blindness.

20         So plaintiff relied on certain statements of fact to

21    say that MindGeek had actively encouraged CSAM content,

22    claiming that it used these tags, titles and playlists for CSAM

23    coded language, like the Best Collection of Young Boys or Young

24    Teen.

25         And with respect to statement of fact 13, there is no

1   evidence that any MindGeek employee decided to tag or title for

2   any of the videos at issue.  No evidence that MindGeek employee

3   created any playlist.

4          And we've already talked about Exhibit Z, where in

5   fact, the record shows that it's highly unlikely, there's

6   actually no evidence that the tags were applied to the

7   plaintiff's videos because she would have been UGC, user

8   generated content and not model or partner, content partner

9   content.

10         There was a laundry list in plaintiff's briefing

11  about the content moderators and formatters supposedly

12  approving content with, I'll just use, ugly titles.  This was

13  used to show that they must have been on notice of all the CSAM

14  and approved it.  Right?

15         **THE COURT:**  Uh-huh.

16         **MS. CAFFERATA:**  But the evidence that they submitted

17  does not establish that this content was approved by moderators

18  or formatters at Aylo.  For example, Middle School Hand Job

19  there's no evidence that that title was reviewed upon upload.

20  Users can change their titles later and so this speculation

21  that that actually was the title before, there's simply no

22  evidence in the record.  Further, what the record does show is

23  that all the videos were taken down and the phrase was banned.

24         The supposed 9-year old, there's an exclamation point

25  in front of it, this is the sleepy foot one, it's probably a

1    typo because it's unlikely than a 9-year old can be considered

2    post puberty and an exclamation point is if you hold the shift

3    key and you put the exclamation point instead of the 1 --

4              **THE COURT:**  It's a 1, right.

5              **MS. CAFFERATA:**  -- but in any event, there's no

6    evidence that that was a title that was reviewed upon upload.

7    So this idea of approval is just not in the facts.  It was also

8    taken down and reported to NCMEC.

9              First Time Hard -- forgive me, for Very Young Tiny

10   Teen, again, taken down, reported to NCMEC.  Added to the band

11   worse service including tiny teen added and very young and

12   there was no evidence that that title was reviewed and approved

13   by Aylo moderators or formatters.

14             The rest, Farm Scene bucket, there's no evidence that

15   the plaintiffs have brought forward to show that, in fact,

16   those were titles that were reviewed or approved by Aylo.

17             And some of the other things that I would just

18   highlight from the record, to the extent that the plaintiffs

19   are relying on this idea of willful blindness which is

20   deliberate attempts to shield information you basically already

21   know, right.

22             It's hard, I have to sort of take off my common sense

23   hat honestly to understand what is being alleged here.  Because

24   the very things that they're pointing to are specifically

25   things that the company has chosen to put in place, put

69

1    resources against, significant resources, worked with outside,

2    you know, entities, interest groups, governmental entities,

3    whatever, worked with the community to put these things in

4    place, specifically to find the CSAM that inevitably will

5    appear on a website's platforms and handle it correctly.

6         And so this idea, and we noticed this in discovery,

7    Your Honor, where every time we would -- they would complain

8    about something, we'd point out, the company already does it.

9    And now we're up in this little corner of like, but there's a

10   tag.

11        If you look overall at the facts, it's really

12   undeniable that this is a company that works really hard to get

13   the CSAM down.  And is it perfect?  No.  But it's doing exactly

14   what the statutes want it to do, which is, you know, not --

15   more than what the statutes encompass it doing, right.  It is

16   looking for it, it is trying to find it, and that comes across

17   throughout the whole record.

18        You can see from the kinds of examples that

19   plaintiffs pick out as their core examples, if you actually

20   look at the exhibit very often, you'll see that there's a whole

21   story about it.  For example, with Exhibit Z where we see that

22   it was actually about a different kind of content than what

23   we're talking about in this case.

24        So with that, I would just reiterate, you know,

25   nothing that I've said should take away from what we believe is

1    our 230 argument that, in fact, all the facts compel a result

2    in our favor, because we believe that this was exactly what 230

3    was meant to deal with.  But certainly if the plaintiffs think

4    that 232(a) (sic) is, you know, if MindGeek is liable for

5    2332(a) as a matter of law, there's a host of factual issues

6    that they would not be able to get -- they would not be able to

7    get that result on summary judgment.  I mean, it's very clear

8    that, you know, the willful blindness is, for a situation where

9    somebody has deliberately shielded themselves and the record is

10   amply in Aylo's favor that in fact it's done the very opposite.

11            **THE COURT:**  Thank you very much.

12            Mr. Nath, last word on your motion for summary

13   judgment.

14            **MR. NATH:**  Thank you, Your Honor, I'll be very brief.

15   So the first thing I'll address is Reddit.  There was most of

16   what Ms. Cafferata read was relating to basically Reddit's

17   passive actions.  Then there was a mention of something called

18   carmo awards (phonetic).  That -- in looking at the Ninth

19   Circuit opinion, I couldn't find it in the Ninth Circuit

20   opinion.  My understanding is the carmo awards were actually

21   user generated content and users pick who gets the carmo awards

22   in the

23   Reddit case, so there really is nothing in Reddit about Reddit

24   taking affirmative action to actually promote CSAM content.

25   This is a very different case.

1            Point two on the 2255 -- 2252(a) evidence.  There's a

2    lot of talk from MindGeek both in connection with the summary

3    judgment -- our summary judgment motion and their summary

4    judgment motions about the measures that they are taking,

5    requiring IDs, tools for locating CSAM, technological tools.

6    None of those were in place until things went totally haywire

7    after 2020.

8            They were profiting off of CSAM on their websites,

9    they were encouraging it and they were encouraging teen content

10   without requiring IDs, without tool -- without implementing any

11   tools for locating CSAM and they included tools that allowed

12   traffickers to upload content anonymously so that law

13   enforcement couldn't track them.  All of this was going on

14   during the overall majority of the class period.  It's only

15   recently after the Visa/MasterCard debacle, after we filed

16   these lawsuits that a lot of these measures have taken place.

17           So it's not like this is a company that has been

18   doing its best to locate as much child pornography on its

19   website as it can.  It's only that the rubber met the road in

20   2020.  They saw that their bottom line was threatened and

21   things changed.

22           And then lastly on the evidentiary question about

23   plaintiff's videos.  Ms. Cafferata made the argument that they

24   only tagged -- that MindGeek's content formatters only tagged

25   model content videos.  That's -- on Exhibit C that's not clear

72

1    at all.  Clearly at all the case, but I will note that

2    plaintiff's video was uploaded as part of the model program

3    that's AMF-49.  That's our additional material fact,

4    plaintiff's additional material fact 49 that shows that

5    plaintiff's video was uploaded as part of the model program in

6    one instance.

7            So with that, Your Honor, unless there are further

8    questions in connection with our summary judgment motion I'll

9    rest.

10           **THE COURT:**  All right.  Thank you very much.

11           **MR. NATH:**  Thank you.

12           **THE COURT:**  Yes, Ms. Cafferata?

13           **MS. CAFFERATA:**  May I just take a --

14           **THE COURT:**  Sure.

15           **MS. CAFFERATA:**  Okay.  Yeah, thank you.

16           Okay.  Just really quick, because I know you've heard

17   a lot, Your Honor.

18           So there's no evidence that the tag in question for

19   the plaintiff was put on by anybody at Aylo.  There's just is

20   no fact.  What I was trying to explain is that this idea which

21   had been trotted out by plaintiffs that tags were put on all

22   the time at Aylo and all the time the moderators were sitting

23   there and doing that, that's not what they actually do so they

24   might change it in a certain situation, but it's not like

25   something that they constantly do such that you could sort of

73

1    infer, right, that it must have been done on that video.  In

2    fact, there's no evidence that it was put on that video.

3            And then also just, you know, we can all read Reddit

4    for ourselves, but it says plaintiffs, and again, it's this

5    plaintiff with these lawyers now point to other allegations

6    that they alleged that Reddit quote, knowingly fostered a

7    business relationship with sex traffickers to support their

8    trafficking ventures.  But there's no indication that there was

9    a business relationship with such traffickers.

10           So the -- there definitely were allegations of active

11   participation by Aylo in that case and just like in this case,

12   Section 230 should govern.

13           **THE COURT:**  Thank you very much.  Do you want to

14   respond to that, Mr. Nath?

15           **MR. NATH:**  Your Honor, again, it's just the

16   conclusion of the Court on the record there is that Reddit took

17   a blind eye, that they weren't actually promoting particular

18   content.  I'd add that the Reddit decision is not a Section 230

19   and not a content creator case.  It's not particularly relevant

20   to the core Section 230 question here.

21           **THE COURT:**  All right.  Thank you very much.  The

22   motions for summary judgment are all taken under submission.

23   We'll issue an order as soon as I can.  I think that it makes

24   sense to me that we should reconvene after I issue the order

25   instead of me trying to pick dates right now that are just

1    magically out of a hat.

2            So what I'll do is when we issue the orders on the

3    summary judgment, presuming any of the case survives, I will

4    set a status conference at the same time.  All right?

5            **MR. NATH:**  Thank you, Your Honor.

6            **THE COURT:**  All right.  Thank you all.

7            **MS. CAFFERATA:**  Thank you, Your Honor.

8            **THE CLERK:**  All rise.  Court is adjourned.

9        **(Proceedings concluded at 2:33 p.m.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    July 26, 2024

            Signed                                        Dated


            TONI HUDSON, TRANSCRIBER
