# Pachman Exhibit B

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

DAVIDA BROOK (275370)
dbrook@susmangodfrey.com
KRYSTA KAUBLE PACHMAN (280951)
kpachman@susmangodfrey.com
HALLEY W. JOSEPHS (338391)
hjosephs@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Phone: (310) 789-3100; Fax: (310) 789-3150

(*See additional counsel on signature page)*

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**WESTERN DIVISION**

| | |
|---|---|
| JANE DOE on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>MINDGEEK USA INCORPORATED, MINDGEEK S.A.R.L., MG FREESITES, LTD (D/B/A PORNHUB), MG FREESITES II, LTD, MG CONTENT RT LIMITED, AND 9219-1568 QUEBEC, INC. (D/B/A MINDGEEK),<br><br>Defendants. | Case No. 8:21-cv-00338-WLH-ADS<br><br>*Hon. Wesley L. Hsu*<br><br>**<u>CLASS ACTION</u>**<br><br>**STIPULATION OF SETTLEMENT** |

# STIPULATION OF SETTLEMENT

This Stipulation of Settlement is made and entered into on this 17 day of July 2026 by and among Plaintiff Jane Doe in *Jane Doe v. MindGeek USA Inc., et al.*, Case No. 8:21-cv-00338-WLH-ADS (C.D. Cal.) and Plaintiff Jane Doe #1 in *Jane Doe #1 v. MG Freesites, Ltd, D/B/A "Pornhub," et al.*, Case No. 7:21-cv-00220-RDP (N.D. Ala.) (collectively, **"Plaintiffs"**), individually and on behalf of a Class, as defined below, and Defendants MindGeek USA Incorporated, MindGeek S.à r.l., MG Freesites Ltd, MG Freesites II Ltd, 9219-1568 Quebec Inc., MG Content RT Ltd, MG CY Holdings Ltd, and MG Billing Limited (**"Defendants"**) (together with Plaintiffs, the **"Parties"**).

WHEREAS, Plaintiffs are prosecuting the above-captioned class action cases against Defendants in *Jane Doe v. MindGeek USA Inc., et al.*, Case No. 8:21-cv-00338-WLH-ADS (C.D. Cal.) in the United States District Court for the Central District of California, and in *Jane Doe #1 v. MG Freesites, Ltd, D/B/A "Pornhub," et al.*, Case No. 7:21-cv-00220-RDP (N.D. Ala.) in the United States District Court for the Northern District of Alabama;

WHEREAS, on June 17, 2026, the Parties executed a binding Confidential Term Sheet memorializing the essential terms of the settlement agreed to by the Parties:

NOW, THEREFORE, in consideration of the covenants, agreements, and Releases set forth herein and for other good and valuable consideration, it is agreed by and among the undersigned that the Actions be settled, compromised, and dismissed on the merits with prejudice as to the Releasees, subject to the approval of the District Court, on the following terms and conditions:

## 1. DEFINITIONS

As used herein, in addition to any definitions set forth elsewhere in this Agreement, the following terms shall have the meanings set forth below:

1.1 **"Action"** means, individually the Alabama Action or the California Action, and **"Actions"** means collectively the Alabama Action and the California Action.

1.2 **"Agreement**" or "**Stipulation of Settlement**" means this Stipulation of Settlement, including all exhibits, appendices, schedules, and attachments hereto, as amended, modified, or supplemented in accordance with its terms.

1.3 **"Alabama Action"** means the civil action entitled *Jane Doe #1 v. MG Freesites, Ltd, d/b/a "Pornhub," et al.*, Case No. 7:21-cv-00220-RDP (N.D. Ala.).

1.4 **"Audit Scope"** means the auditor's scope of work, work plan, procedures, access protocols, and form of report, as described in Section 3.2.

1.5 **"Banning"** or **"Ban"** or **"Banned"** means permanently blocking Models or Content Partners who upload or attempt to upload CSAM or NCM, including all legal names and email addresses related to the Model or Content Partner.

1.6 **"Business Day"** means any day other than a Saturday, Sunday, or day on which commercial banks in New York, New York are authorized or required by law to close.

1.7 **"California Action"** means the civil action entitled *Jane Doe v. MindGeek USA Inc., et al.*, Case No. 8:21-cv-00338-WLH-ADS (C.D. Cal.).

1.8 **"Child Sexual Abuse Material or CSAM"** means a piece of Content that depicts anyone under 18 years of age engaging in Sexually Explicit Conduct.

1.9 **"Claim Form"** means the document Class Members submit to request payment pursuant to this Agreement in the form approved by the Court in the Preliminary Approval Order.

1.10 **"Claims Deadline"** means the deadline established by the District Court for Class Members to submit Claim Forms.

1.11 **"Class"** means (i) the class certified by the Order Granting Plaintiff's Motion for Class Certification at Dkt. 209 in the California Action, and (ii) the class certified by the Memorandum of Opinion and Order Granting Plaintiff's Motion for Class Certification at Dkt. 148 in the Alabama Action, which collectively includes all persons who were under the age of eighteen when they appeared in a video or image that has been made available for viewing on any website owned or operated by the Defendants anytime from February 12, 2011 through December 6, 2024. The Class does not include individuals who have already timely exercised their right to be excluded from the class(es) as certified in the Alabama Action or California Action.

1.12 **"Class Counsel"** means Plaintiffs' counsel of record in the Alabama Action and the California Action for the Settling Parties.

1.13 **"Class Member"** means any person who is included in the Class.

1.14 **"Class Member Minors"** means all Class Members who are under the age of eighteen (18) at the time of the Final Approval Hearing.

1.15 **"Class Notice"** or **"Notice"** means the notice of the Settlement approved by the Court to be sent by the Settlement Administrator, as described in Section 5. Class Counsel will prepare the Class Notice, to be mutually approved by the Parties, and submit it for the District Court's approval.

1.16 **"Class Representatives"** means Plaintiff Jane Doe in the California Action and Plaintiff Jane Doe #1 in the Alabama Action, individually and as representatives of the Class, and any of their assigns, successors-in-interest, representatives, or beneficiaries.

1.17 **"Class Website"** means the website(s) maintained by the Settlement Administrator concerning the Actions.

1.18 **"Communication"** means chats or messages on the Websites.

1.19 **"Content"** means any depiction of Sexually Explicit Conduct, including but not limited to a photograph, film, video, picture, audio recording, or

computer-generated image, including all metadata, but does not include advertising materials or platforms. With respect to live stream and webcam functionality, this definition applies only to the extent such functionality is made available on a Website and compliance is technically feasible using then-available systems and tools.

1.20 **"Content Partner"** means any third-party entity (including its agents, employees, and affiliates) that uploads Content to a Website and has certified, in writing or electronically, that the entity: 1) is duly organized, validly existing and in good standing as a corporation or other entity under the laws and regulations of the entity's jurisdiction of incorporation, organization, or chartering; 2) is subject to United States federal criminal recordkeeping requirements for visual depictions of actual and simulated Sexually Explicit Conduct; and 3) owns its own website or otherwise distributes Content off of the Websites.

1.21 **"Counsel"** means counsel of record in the Alabama Action and the California Action for the Settling Parties.

1.22 **"Defendants"** means all the defendants named in each of the complaints, as amended, filed in the Actions. Defendants means all of the Defendants, individually, collectively, or in any combination, and their successors and assigns.

1.23 **"Delete"** means to remove Content and Communication such that it is not maintained in retrievable form and cannot be retrieved through physical or technical means, except to the extent retention is required or reasonably necessary for legal holds, law-enforcement preservation requests, or regulatory or legal obligations.

1.24 **"Depicted Person"** means any individual depicted in Content.

1.25 **"District Court"** or **"Court"** means the United States District Court for the Central District of California.

1.26 **"Escrow Account"** means the interest-bearing escrow account where the Settlement Fund shall be held pending disbursement.

1.27 **"Existing Monitorships"** means Defendants' current monitoring obligations under (1) the Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief (United States District Court for the District of Utah, Case 2:25-cv-00752, Document 6) and (2) Deferred Prosecution Agreement (United States District Court for the Eastern District of New York).

1.28 **"Event of Default"** means Defendants' material breach of any payment obligation under this Agreement, as described in Section 7.8.

1.29 **"Final Approval Date"** means the date on which the District Court enters its Order and Judgment finally approving the Settlement and dismissing the California Action with prejudice.

1.30 **"Final Approval Hearing"** means the hearing held by the Court to consider evidence and argument for the purpose of determining whether to finally approve the Settlement.

1.31 **"Guardian Ad Litem"** means any attorney who may be appointed by the District Court to represent the interests of Class Member Minors pursuant to Section 2.10.

1.32 **"Initial Payment Amount"** means Defendants' initial payment to the Settlement Fund in the amount of US$25,000,000.00, as described in Section 2.2(a).

1.33 **"Installment Payment"** means each of the six (6) annual payments to the Settlement Fund in the amount of US$15,833,333.33, subject to any adjustment to the sixth such payment as described in Section 2.2(b).

1.34 **"Irish Proceeding"** means the civil claim instituted in the High Court of Ireland by Plaintiff Jane Doe #1 in the Alabama Action captioned *Jane Doe v. MG Freesites Limited, et al.*, Record No. H.P.2023.5880 (Ireland H. Ct.).

1.35 **"Law Enforcement Request"** means any request by state, federal, or local law enforcement agencies to remove, preserve, produce, or disclose Content available on a Website because it is actual or suspected CSAM and/or NCM,

including any subpoena, warrant, preservation request, emergency disclosure request, or other legal process.

1.36 **"Matching"** means using human comparison or facial recognition technology to compare images or video (e.g. selfie) of the Model and Depicted Person to the photo on the government issued identification.

1.37 **"Model"** means any third-party individual or entity that uploads Content to a Website that is not a Content Partner.

1.38 **"Monitoring Committee"** means a group of individuals or entities to oversee compliance with the injunctive relief dictated by the Agreement and oversee certain disputes related to decisions about Content Moderation, Verification and/or Validation, as set forth in greater detail in Section 3.3 below.

1.39 **"Non-Consensual Material"** or **"NCM"** means Content depicting an individual who did not (i) consent to the Sexually Explicit Conduct; (ii) consent to the Content being created; or (iii) consent to the Content being distributed or uploaded.

1.40 **"Notice List"** means: (1) the list of any individual Class Members, along with their physical mailing addresses and/or email addresses, who can be identified through Defendants' internal records; and (2) the list of non-Class Members, along with their physical mailing addresses and/or email addresses, who submitted a CSAM content removal request to Defendants or otherwise notified Defendants about CSAM on the Websites and whose contact information has been obtained from Defendants' internal documents. Class Counsel will provide the Class Notice to the National Center for Missing and Exploited Children ("**NCMEC**"), as well as the Canadian Centre for Child Protection ("**C3P**") to disseminate to NCMEC's direct service providers network, law enforcement victim advocates, NCMEC's survivor network, and any other networks or contacts NCMEC and/or C3P deem appropriate.

1.41 **"Objection"** means a written objection to the Settlement submitted by a Class Member in accordance with Section 5.10.

1.42 **"Objection Deadline"** means a date established by the Court in the Preliminary Approval Order for Class Members to submit Objections to the Court.

1.43 **"Outstanding Balance"** means the unpaid portion of the scheduled payment(s) that triggered an Event of Default, plus any scheduled payments that have since become due, as described in Section 7.8.

1.44 "**Parties**" means Plaintiffs and Defendants, collectively, and "Party" means any one of them.

1.45 **"Plaintiffs"** means, collectively, (a) Jane Doe #1, on behalf of herself and the other members of the Class in the Alabama Action, and (b) Jane Doe, on behalf of herself and the other members of the Class in the California Action.

1.46 **"Preliminary Approval Date"** means the date on which the District Court enters the Preliminary Approval Order.

1.47 **"Preliminary Approval Order"** means an order granting preliminary approval of the proposed Settlement and directing that notice of that Settlement be provided to the Class.

1.48 **"QSF"** means the Qualified Settlement Fund described in Section 2.3 and Section 2.4.

1.49 **"Registered Users"** means a user who creates an account with a username and valid email address and can interact textually with the Websites, but is unable to upload Content.

1.50 **"Released Claims"** means the claims released by the Releasing Parties against the Releasees, as described in Section 4.1.

1.51 **"Releasees"** means the persons and entities released by the Releasing Parties, as described in Section 4.1.

1.52 **"Releasing Parties"** means Plaintiffs and the Class, as described in Section 4.1.

1.53 **"Service Award"** means the amount of any award approved by the Court to be paid from the Settlement Fund to the Class Representatives to compensate the Class Representatives for efforts undertaken by them on behalf of the Class and for risks undertaken in bringing the Actions. For the avoidance of doubt, the amount of any Service Award shall be in addition to any settlement relief the Class Representatives may be eligible to receive as Class Members.

1.54 **"Settlement"** means the settlement set forth in this Agreement.

1.55 **"Settlement Administration Expenses"** means all Class Notice and administrative fees, costs, or expenses incurred in administering the Settlement, including those fees incurred by the Settlement Administrator. Settlement Administration Expenses also means all fees, costs, and expenses incurred in issuing Class Notice as well as notice following class certification in each Action, including those amounts incurred by JND Legal Administration LLC (the notice administrator in the California Action), and Epiq Class Action and Claims Solutions, Inc. (the notice administrator in the Alabama Action). Settlement Administration Expenses shall be paid from the Settlement Fund.

1.56 **"Settlement Administrator"** means a settlement administration firm mutually approved by the Settling Parties, subject to District Court approval, that will be responsible for: (a) administration of the Settlement Fund through the QSF; (b) disseminating Class Notice and Class Action Fairness Act ("**CAFA**") notice pursuant to 28 U.S.C. § 1715, when and as ordered by the District Court or otherwise required by law; and (c) administration of the Notices and the claims process, as further detailed below. The Settlement Administrator and Class Counsel may engage a notice administration firm to assist with Class Notice, subject to District Court approval.

1.57 **"Settlement Effective Date"** means the first Business Day after both of the following have occurred: (a) entry of a final order of the District Court approving the Settlement substantially in the form proposed in the Stipulation of Settlement;

and (b) the expiration of all rights for reconsideration of or appeal from such final settlement approval order.

1.58 **"Settlement Fund"** means a cash fund consisting of the Settlement Fund Amount paid by or on behalf of Defendants into the Escrow Account pursuant to Section 2.

1.59 **"Settlement Fund Amount"** means aggregate cash payments in an amount totaling US$120,000,000.

1.60 **"Settling Parties"** means Plaintiffs and Defendants, collectively, and each of the Defendants or the Plaintiffs, individually.

1.61 **"Settlement Payment"** means payment from the Settlement Fund to each Class Member who timely submits a valid Claim Form and as determined by the Settlement Administrator pursuant to the terms of the plan of allocation.

1.62 **"Sexually Explicit Conduct"** means any actual or simulated sexual act, including but not limited to:

a. sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal contact;

b. bestiality;

c. masturbation or any other stimulation of genitals or anus;

d. sadistic or masochistic abuse; or

e. lascivious exhibition of the breast(s), anus, genitals, or pubic area of any person.

1.63 **"Suspend"** or **"Suspension"** means to remove Content such that it is no longer published or otherwise made available on a Website and to cease all monetization of the Content.

1.64 **"Term Sheet"** means the term sheet executed and entered by the Parties on June 17, 2026.

1.65 **"Term Sheet Effective Date"** means the date the Term Sheet became effective, which was June 17, 2026.

1.66 **"Validation"** or **"Valid"** or **"Validate"** means that every individual who appears in the Content is a Verified Depicted Person.

1.67 **"Verification"** or **"Verify"** or **"Verified"** means the process of (a) authentication of government issued identification and Matching the Model to that government issued identification upon account creation; and (b) authentication of government issued identification and Matching the Depicted Person to that government issued identification and the Content when a Depicted Person appears in Content.

1.68 **"Websites"** means any website, mobile application, or online service owned by Defendants or over which Defendants exercise editorial control that allows third parties to upload Content or that republishes the same Content.

1.69 The terms "he or she" and "his or her" include "it" or "its," where applicable. Defined terms expressed in the singular also include the plural form of such term, and vice versa, where applicable.

1.70 All references herein to sections and paragraphs refer to sections and paragraphs of this Agreement, unless otherwise expressly stated in the reference. Section and paragraph headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement. The terms "including," "include," and "includes" mean "including without limitation." Unless expressly stated as Business Days, all references to "days" mean calendar days. In the event of any conflict between the body of this Agreement and any exhibit, appendix, schedule, notice, form, or other attachment, the body of this Agreement shall control, except to the extent such exhibit, appendix, schedule, notice, form, or other attachment expressly imposes a more specific obligation and expressly states that it controls. No obligation, audit right, monitoring right, disclosure duty, access right, reporting requirement, or other right or duty shall be implied from this Agreement, any exhibit, appendix, schedule, notice, form, or other attachment, or any order approving the Settlement, except to the extent expressly set forth therein.

**2. <u>SETTLEMENT RELIEF: MONETARY RELIEF</u>**

In consideration of the Releases and relief provided herein, Defendants agree to make available the following monetary relief:

2.1 **Settlement Fund Amount**: US $<u>120,000,000.00</u>, which shall be paid by or on behalf of Defendants into the Escrow Account at such times and in such amounts as are specified below (amounts deposited into the Escrow Account to constitute the "**Settlement Fund**"). Except as otherwise set forth below, the Settlement Fund Amount shall constitute the entirety of the cash consideration to be paid by Defendants in settlement of the Actions (other than its internal costs to perform the injunctive relief set forth below).

2.2 **Settlement Fund Structure and Allocation:** Defendants shall fund the Settlement Fund in seven (7) installments, as follows:

a. Defendants shall make an initial payment to the Settlement Fund in the amount of US$25,000,000.00 (the "**Initial Payment Amount**") by July 31, 2026. A grace period of five (5) additional Business Days shall apply solely to address unforeseen banking issues or technical obstructions to timely transmission or receipt of payment, provided Defendants have used reasonable efforts to timely transmit the Initial Payment Amount.

b. Defendants will make six (6) further annual payments to the Settlement Fund, each in the amount of US$15,833,333.33 (each, an "**Installment Payment**") on each of the first six (6) anniversaries of June 17, 2026; provided that the sixth Installment Payment shall be adjusted as necessary to account for any rounding so that the Initial Payment Amount and all Installment Payments equal US$120,000,000 in the aggregate.

c. If any payment date under this Agreement falls on a day that is not a Business Day, such payment shall be due on the next Business Day, and such extension shall not constitute or contribute to an Event of Default or result in the accrual of default interest.

d. All costs of notice and settlement administration, and any amounts that the District Court awards for attorneys' fees, expenses, or Service Awards shall be payable from the Settlement Fund.

e. The Settlement Fund shall be used to pay: (i) all Settlement Administration Expenses; (ii) any Service Awards; (iii) any amounts the District Court awards for attorneys' fees and expenses; and (iv) all payments to Class Members to compensate the Class for past and present harm, in accordance with a plan of allocation that addresses the allocation of Settlement Funds to Class Members.

2.3 **Qualified Settlement Fund**: The Settling Parties agree that the Settlement Fund, plus any interest accrued thereon, shall be held in the Escrow Account, which is intended to be a Qualified Settlement Fund ("**QSF**") within the meaning of Treasury Regulation §1.468B-1. The Settlement Administrator shall take such actions as are necessary to ensure that the Settlement Fund satisfies this requirement.

2.4 The Escrow Account shall be established by Class Counsel at a depository institution insured by the Federal Deposit Insurance Corporation. The Settlement Administrator shall be the "administrator" of the QSF within the meaning of Treasury Regulation §1.468B-2(k)(3) and shall take such actions as are necessary to ensure that the Settlement Fund satisfies this requirement. The Settlement Administrator shall also be responsible for causing the filing of all tax returns required to be filed by or with respect to the QSF and complying with any applicable information reporting or tax withholding requirements with respect to the QSF. All taxes on income or interest generated by the Settlement Fund shall be paid out of the Settlement Fund. The funds deposited in the Settlement Fund Account shall be invested in instruments, accounts, or funds backed by the full faith and credit of the United States Government or fully insured by the United States Government or any agency thereof. Such permissible investments include investments in a United States

Treasury Fund or bank account that is either: (a) fully insured by the FDIC; or (b) secured by instruments backed by the full faith and credit of the United States Government. The costs of establishing and maintaining the Escrow Account shall be paid from the Settlement Fund.

2.5 **Not a Claims-Made Settlement**: The Parties agree that this is not a claims-made Settlement; if the Settlement becomes effective, there will be no reversion of Settlement Fund to Defendants or any other persons or entities who or which funded the Settlement Fund.

2.6 **Distribution of the Settlement Fund**: The Settlement Fund shall be distributed to the Class Members pursuant to a plan of allocation proposed by Plaintiffs and approved by the Court, or such other plan of allocation as approved by the Court. Plaintiffs will consider in good faith Defendants' input into the proposed plan of allocation.

2.7 **Method of Allocation**: To receive a Settlement Payment, each Class Member entitled to such a payment must file a Claim Form by the Claims Deadline. Each Class Member with an approved claim shall be entitled to a Settlement Payment allocated in accordance with the plan of allocation.

2.8 **Disbursement of Cash Payments from Settlement Fund**: The Settlement Administrator shall distribute Settlement Payments from the Settlement Fund to Class Members in accordance with the terms of the plan of allocation.

2.9 **Method of Settlement Payments to Class Members**: Class Members will have the option of having their Settlement Payments transmitted to them through Zelle, ACH direct deposit, Venmo, or check via U.S. mail, first-class postage prepaid. Class Members who do not choose a payment method on the Claim Form will be sent checks via First Class mail by the Settlement Administrator.

2.10 **Guardian Ad Litem:** The Court may, in the exercise of its discretion under Fed. R. Civ. P. 17(c), appoint a Guardian Ad Litem to represent the interests of Class Member Minors in connection with evaluation of the fairness of the

Settlement. If so appointed, the Guardian Ad Litem shall be authorized to review the terms of the Settlement and make a recommendation to the Court on or before the Objection Deadline regarding the fairness and adequacy of the Settlement as it relates to a Class Member Minors. The Parties shall have no obligation to amend or modify the Settlement to address any objection or proposed modifications to the Settlement submitted by the Guardian Ad Litem. The Court also may, in its discretion under Rule 17(c), appoint or authorize any appointed Guardian Ad Litem to assist Class Member Minors with the completion and submission of their Claim Forms and evaluation of the fairness and adequacy of any allocation of Settlement Funds to those class members. The reasonable fees and costs of any Guardian Ad Litem appointed under this Section 2.10 shall be treated as Settlement Administration Expenses.

2.11 **Unclaimed Settlement Payments:**

a. Each cash payment issued to a Class Member by check will state on the face of the check that it will become null and void unless cashed within ninety (90) calendar days after the date of issuance. If a check is not cashed within ninety (90) calendar days after the date of issuance, the Settlement Administrator will follow up with other forms of notice and will also determine, with the assistance of Class Counsel as appropriate, if any other contact information is available to encourage the Class Member to cash the check, receive a new one, or receive their Settlement Payments through another payment method.

b. In the event that an electronic deposit to a Class Member is unable to be processed, the Settlement Administrator shall attempt to contact the Class Member within thirty (30) calendar days to correct the problem. The Settlement Administrator will follow up with other forms of notice and will also determine, with the assistance of Class Counsel as appropriate, if any other contact information is available to encourage the Class Member to receive their Settlement Payments through another payment method.

c. In each instance of an uncashed check or an unsuccessful electronic deposit attempt, the Settlement Administrator will send at least one additional check or attempt one additional electronic deposit approximately 120 days after the original date of issuance. The Settlement Administrator will continue to follow up to encourage the affected Class Member to cash the check or correct the electronic deposit problem.

d. In accordance with the plan of allocation, the Settlement Administrator and Class Counsel shall periodically consider the economic and administrative feasibility of re-distributing unclaimed Settlement Payments. In the event that further redistributions are no longer economically or administratively feasible, Class Counsel will apply to the Court for a *cy pres* award to be made to one or more nationally recognized non-profit organizations, reasonably acceptable to and independent from all Parties, that engage in or conduct efforts to remediate or prevent the creation and dissemination of CSAM. The Parties and their respective counsel shall not be responsible for any claims, damages, liabilities, losses, suits, or actions arising out of, or relating to the distributions made by the Settlement Administrator or decisions made by Settlement Administrator.

**3. <u>SETTLEMENT RELIEF: INJUNCTIVE RELIEF</u>**

In consideration of the Releases and relief provided herein, Defendants agree to make available the following injunctive relief:

3.1 **Content Moderation:** Defendants agree to establish and implement, and thereafter maintain beginning on the Settlement Effective Date, the comprehensive procedures set forth in Appendix A to this Agreement, that are designed to deter and reduce the risk of the uploading of CSAM to their Websites and the publication or dissemination of CSAM or NCM on their Websites; provided that any obligation under Appendix A that expressly provides for a later implementation deadline or phased implementation schedule shall be implemented in accordance with

such express deadline or schedule. Defendants shall act in good faith to comply with Appendix A and shall not seek to circumvent this Agreement.

3.2 **Audit:** Defendants agree to participate in external audits over a period of five years beginning on the Final Approval Date pertaining to whether they have satisfied the obligations described in Appendix A or otherwise required by this Agreement, subject to any express phased implementation deadline or schedule set forth in Appendix A. The sequence and timing of such audits shall be as follows:

a. An initial audit to be completed within one year of Final Approval Date; and

b. Two further audits, each to be completed within two years of the preceding audit.

The auditor shall be one or more qualified, objective, independent third-party professionals who use procedures and standards generally accepted in the profession. Defendants shall select the auditor(s) who shall be approved by Plaintiffs' Counsel, which approval shall not be unreasonably withheld, conditioned, or delayed. The auditor may be any person or entity appointed to fulfill Defendants' current monitoring obligations under (1) the Stipulated Order for Permanent Injunction, Monetary Judgment, and Other Relief (United States District Court for the District of Utah, Case 2:25-cv-00752, Document 6) and (2) Deferred Prosecution Agreement (United States District Court for the Eastern District of New York) (together, the **"Existing Monitorships"**). The auditor's scope of work, work plan, procedures, access protocols, and form of report (the **"Audit Scope"**) shall be limited to procedures sufficient to evaluate Defendants' compliance with Appendix A. The Audit Scope shall be subject to approval by Defendants and the Monitoring Committee, such approval not to be unreasonably withheld, conditioned, or delayed. To the extent that the Audit Scope is coextensive with the scope of the Existing Monitorships, the auditor may rely on data, documents, or interviews and other information provided by Defendants in connection with Existing Monitorships or, if

the auditor has performed the Existing Monitorships, its own work for the Existing Monitorships, and shall only perform such additional processes, procedures, and protocols as are necessary to ensure compliance with Appendix A. Any audit shall be subject to reasonable confidentiality, privilege, data-minimization, security, and trade secret protections.

3.3 **Monitoring**: Within thirty (30) days of entry of the Preliminary Approval Order (or as soon thereafter as the District Court is able to do so), the District Court shall appoint a three-person Monitoring Committee who will meet annually, for a period of five years beginning on the Settlement Effective Date, to assist in the enforcement of and compliance with Appendix A. Any member of the Monitoring Committee has the right to request an additional meeting each year if he or she feels circumstances warrant it. The Monitoring Committee members will be as follows: (1) Randi S. Ellis as Monitor, who will be compensated by Defendants at a reasonable rate/fee mutually agreeable to Monitor and Defendants; (2) one unpaid member nominated by Defendants, who may be an employee, officer, director, consultant, or representative of Defendants or any Defendant affiliate; and (3) one unpaid member nominated by Plaintiffs. The Monitoring Committee's role shall be limited to reviewing Defendants' good-faith implementation of the specific injunctive relief obligations set forth in Appendix A. Any information, documents, data, or materials provided to or obtained by the Monitoring Committee in the course of its duties shall be used solely for the purposes of (a) assessing Defendants' compliance with the specific obligations set forth in Appendix A, and (b) communicating with the District Court regarding any identified non-compliance with such obligations. The Monitoring Committee shall not review, supervise, approve, audit, or direct Defendants' business operations, product decisions, personnel matters, legal strategy, law-enforcement response decisions, trust-and-safety policies unrelated to Appendix A, or individual Content Moderation decisions, except to the extent reasonably necessary to assess compliance with an express obligation in Appendix A. The Monitoring Committee

shall not contact Defendants' employees, other than a Defendants-nominated member solely in his or her capacity as Defendants' designee on the Monitoring Committee, without Defendants' Counsel present or copied, and without Defendants' Counsel's prior consent. Any interviews, communications, reports, or information shall be subject to appropriate confidentiality, privilege, data-minimization, security, and trade secret protections. If any dispute arises concerning the Monitoring Committee's authority, access, requests, or recommendations, the Settling Parties shall meet and confer in good faith before seeking resolution from the District Court.

## 4. RELEASES AND WAIVERS

4.1 **The Release:** Upon the Settlement Effective Date, Plaintiffs and the Class (the **"Releasing Parties"**) shall release as against Defendants, and all their respective or individual, direct and indirect, past, present and future parents, holding companies, subsidiaries, corporate affiliates (any entity that directly or indirectly controls, is controlled by, or is under common control with another entity), divisions, joint ventures, predecessors, successors, reorganized successors, spin-offs, assigns, and each of their respective past, present and future principals, directors, officers, managers, shareholders, members, partners, employees, representatives, agents, attorneys, insurers, and reinsurers and all of their respective heirs, executors, administrators, predecessors, successors, assigns, and persons acting through, under or in concert with them, individually, jointly, and severally (the **"Releasees"**), any and all claims, whether past or present, mature or not yet mature, known or unknown, suspected or unsuspected, contingent or noncontingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, that Plaintiffs or any other member of the Class (a) asserted in the Actions, or (b) may ever have that arise out of or are based upon the acts, facts, statements, or omissions involved, set forth or referred to in the Actions (the **"Released Claims"**). For the avoidance of doubt, nothing in this Release shall be construed as a release, waiver, or discharge of any claims, rights, demands, or causes

of action arising out of or relating to any acts, omissions, events, or conduct occurring after the last opt out deadline in the Actions, which was December 6, 2024. This Release applies solely to claims arising from acts, omissions, events, or conduct that occurred on or prior to December 6, 2024, and the Parties expressly reserve all rights with respect to any matters involving post December 6, 2024 conduct. For clarity, all claims of any Class Member against third-party platforms, Models, Content Partners, advertisers, sponsors, advertising networks, and any other non-Defendant persons or entities are fully preserved unless such persons or entities are named Defendants or are wholly owned subsidiaries of a named Defendant. Upon the Settlement Effective Date, Defendants, their affiliates, officers, directors, and employees shall release Plaintiffs, all other members of the Class, and their Counsel from any claims related to the institution, prosecution, and settlement of these Actions. Each Class Member, regardless of whether that member submitted a timely claim or receives any payment from the Settlement Fund, shall be bound by this release. Any Class Members who are not United States citizens who receive any payment from the Settlement Fund pursuant to this Settlement shall also provide a separate signed release as against Defendants coextensive with the Class release set forth above.

4.2 **Waivers**: In addition, Class Members expressly waive, to the fullest extent permitted by law: (i) the provisions, rights, and benefits conferred by Section 1542 of the California Civil Code; and (ii) any law of any foreign state, state of the United States, federal law, or principle of common law which is similar, comparable, or equivalent to Section 1542 of the California Civil Code. Section 1542 of the California Civil Code provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

## 5. NOTICE TO CLASS MEMBERS

5.1 **Email and Mail Notice:** Subject to the requirements of any orders entered by the District Court, no later than 14 calendar days after the Preliminary Approval Date, the Settlement Administrator shall commence notice by mailing a Class Notice by first-class mail to the mailing addresses on the Notice List and/or emailing a Class Notice to the email addresses on the Notice List. The Parties agree and understand that if more time is needed to prepare the Notice List and mail Class Notice, they will agree on another date for delivering the Class Notice, unless otherwise ordered by the Court.

5.2 The mailing or emailing of a Class Notice to any person or entity that is not in the Class shall not render such person or entity a part of the Class or otherwise entitle such person to participate in this Settlement.

5.3 Within 5 Business Days after the Preliminary Approval Date, Class Counsel will deliver the Notice List to the Settlement Administrator. The Parties agree and understand that if more time is needed to prepare the Notice List, they will agree on another date for delivering the Notice List to the Settlement Administrator, unless otherwise ordered by the Court. Defendants agree to provide all other data in Defendants' possession that is reasonably necessary for the Settlement Administrator to effectuate the distribution of Class Notice and payments to Class Members.

5.4 The Settlement Administrator will run an update of the last known mailing addresses through the National Change of Address database before initially mailing the Class Notice. If a Class Notice is returned to the Settlement Administrator as undeliverable, the Settlement Administrator will endeavor to: (i) re-mail any Class Notice so returned with a forwarding address; and (ii) make reasonable efforts to attempt to find an address for any returned Class Notice that does not include a forwarding address. The Settlement Administrator will endeavor to re-mail the Class Notice to every person in the Notice List for which it obtains an updated address.

5.5 **Class Website:** The Settlement Administrator will maintain and update a Class Website to provide relevant information regarding the Settlement to Class Members. The Settlement Administrator shall activate the Class Website no later than 14 calendar days after the Preliminary Approval Date .

5.6 **Digital Notice:** Subject to the requirements of any orders entered by the District Court, no later than 14 calendar days after the Preliminary Approval Date, the Settlement Administrator shall commence media outreach and digital efforts and publish a press release to selected newswires as described in the California Action at Dkt. 259 and the Alabama Action at Dkt. 179 (but only to the extent approved by the Court in the Alabama Action in Dkt. 199).

5.7 **Banner Notice on Defendants' Websites**: Subject to the requirements of any orders entered by the District Court, no later than 14 calendar days after the Preliminary Approval Date, Defendants will post the banner notice on Defendants' websites as described in the Alabama Action at Dkt. 208 and the exhibits thereto. Posting of banner notices under this Section 5.7 will terminate on the day after the Claim Deadline.

5.8 **NCMEC Notice:** Subject to the requirements of any orders entered by the District Court, no later than 5 Business Days after the Preliminary Approval Date, Class Counsel will provide the Class Notice to NCMEC as well as C3P to disseminate to NCMEC's direct service providers network, law enforcement victim advocates, NCMEC's survivor network, and any other networks or contacts NCMEC and/or C3P deem appropriate.

5.9 **CAFA Notice:** Pursuant to 28 U.S.C. § 1715, not later than ten (10) calendar days after this Agreement is filed with the Court, Defendants, through the Settlement Administrator, shall cause notice of the proposed Settlement and all materials required by 28 U.S.C. § 1715 to be served upon the appropriate Federal official and the appropriate State official of each State in which a Class Member resides, and any other government official required under Section 1715. The

Settlement Administrator shall provide all Counsel with confirmation of service promptly after service is completed and shall serve any supplemental CAFA notice reasonably required by law or order of the District Court.

5.10 **Right to Object:** Any Class Member can object to the Settlement. Any Class Member who intends to object to this Settlement must present the objection in writing, which must be personally signed by the objector and must include: (1) the Class Member's full name, telephone number, current address, and email address, if any; (2) a URL or video/image title, or some other form of documentation to indicate that the Class Member is a member of the Class (i.e., a copy of a content removal request relating to content depicting the Class Member, or any other communication to Defendants or a third-party regarding such content appearing on Defendants' Websites); (3) a written statement of all grounds for the objection accompanied by any legal support for the objection (if any); (4) copies of all documents or writings that the Class Member desires the Court to consider; (5) the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection; (6) a statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through counsel, who must file an appearance or seek pro hac vice admission in accordance with the Local Rules); and (7) the signature of the Class Member or his/her counsel (the preceding items described in this sentence are collectively the "**Objection**"). All written Objections must be filed with the District Court no later than the Objection Deadline with a complete copy sent to the Settlement Administrator by mail or email also by the Objection Deadline. To the extent that the objection contains or attaches confidential documents or personally identifying information, the objector may seek leave from the District Court to file those documents under seal and/or with any personal information redacted or using a pseudonym in the publicly filed version of the objection, subject to the District Court's discretion. Unless otherwise ordered by

the District Court, any Class Member who fails to timely file a written objection with the District Court in accordance with the terms of this Paragraph shall not be permitted to object to this Settlement at the Final Approval Hearing, shall be foreclosed from seeking any review of this Settlement or Final Judgment by appeal or other means, and shall be deemed to have waived his or her objections and be forever barred from making any such objections in the Actions or any other action or proceeding. The Class Notice shall advise Class Members of their right to object and the manner required to do so.

## 6. PRELIMINARY AND FINAL APPROVAL OF THIS AGREEMENT AND DISMISSAL OF CLAIMS

6.1 **Court Approval:** The Settling Parties, through their Counsel, agree to use their best efforts to pursue the completion, approval, and implementation of this Agreement by:

a. Completing and filing a motion to obtain an order granting preliminary approval of the Settlement and directing notice to the Class within ten (10) Business Days of the execution of the Stipulation of Settlement;

b. Working with the Settlement Administrator to promptly disseminate Class notice and CAFA notice pursuant to 28 U.S.C. § 1715, when and as ordered by the District Court or otherwise required by law, subject to the Settling Parties' mutual approval of the notice plan, notice forms, Notice List methodology, data-transfer protocols, Settlement Administrator budget, and any supplemental notice; and

c. Completing and submitting papers seeking final approval of the Settlement.

6.2 **Preliminary Approval:** Plaintiffs will file a motion seeking preliminary approval of the Settlement in the District Court no later than ten (10) Business Days of the execution of this Agreement.

6.3 To the extent the District Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement directly or with the assistance of the District Court or a mediator, as approved by the District Court, and endeavor to resolve the issue(s) to the satisfaction of the District Court.

6.4 Class Counsel agrees to file a motion for approval of Plaintiffs' Service Awards and Class Counsel's Fees and Expenses no later than 14 days before the Objection Deadline expires. Class Counsel intends to move for District Court approval of attorneys' fees of up to one-third (1/3) of the Settlement Fund, and reimbursement of all costs and expenses incurred by Class Counsel, and for Service Awards of up to US$150,000 for each Class Representative, up to US$5,000 for Jane Doe #2 who sought leave to join the California Action at Dkt. 89 and participated in initial discovery, and up to US$5,000 for Jane Doe #2 who appeared in the original Complaint and the First Amended Complaint in the Alabama Action at Dkt. 1 and Dkt. 22 and participated in initial discovery.

6.5 **Final Approval:** Class Counsel further agrees to file a Motion for Final Approval of the Settlement. The Motion for Final Approval of the Settlement will include a proposed Order and Judgment in a form agreed to by the Settling Parties. The Order and Judgment proposed by Class Counsel shall, among other things: (i) approve the Settlement as fair, reasonable, and adequate and in the best interest of the Class; (ii) deem the notice provided to the Class reasonable and consistent with the legal requirements; (iii) provide for the retention of the District Court's jurisdiction over the Parties to implement and enforce the terms of the Order and Judgment; and (iv) dismiss the California Action with prejudice and deem the Releasing Parties to have released all Released Claims against Releasees.

6.6 **Cooperation and Best Judgment:** The Parties agree to cooperate in preparing any and all papers necessary to define, pursue, and effectuate the Settlement. Within 5 Business Days of the District Court's Final Approval of the

Settlement in the California Action, the Settling Parties agree to use their best efforts to secure a final judgment and order of dismissal with prejudice in the Alabama Action and to effectuate the dismissal, discontinuance, release, or other final resolution of the Irish Proceeding in a manner consistent with the Agreement and the releases provided therein.

**7. OTHER PROVISIONS**

7.1 **Termination**: If the Settlement is not approved by the District Court, the Agreement shall be a nullity, and none of its terms shall be effective or enforceable, and the Settlement Fund, including any accrued interest, less any taxes, notice related expenses, and reasonable administrative costs paid and/or incurred, shall be returned to the persons or entities paying the same within thirty (30) Business Days of termination. Additionally, the Settling Parties shall revert to their litigation positions in both the California Action and the Alabama Action immediately prior to the execution of the Term Sheet on June 17, 2026, and the fact and terms of the Settlement shall not be admissible in any trial or other proceeding, shall not be deemed an admission of liability or wrongdoing by any party, and shall not be used against any party for any purpose.

7.2 **Rule 11 Compliance:** Undersigned Counsel hereby certify and represent that each has complied fully with the requirements of Rule 11 of the Federal Rules of Civil Procedure and that the proposed final judgment shall contain a statement reflecting such compliance. Nothing in this certification shall be construed as an admission of liability or wrongdoing by either Plaintiffs or Defendants.

7.3 **Execution of Agreement:** Counsel executing this Agreement represent, warrant, and irrevocably covenant that they have full power, authority, and express written consent from their respective clients to execute this Agreement and bind such clients to its terms. Counsel may sign on behalf of the respective Parties by affixing electronic signatures in the format specified for federal court ECF filings.

7.4 **Binding Agreement**: This Agreement constitutes a binding and enforceable agreement between the Settling Parties that sets forth all material terms and obligations of the Parties hereto, subject to the conditions set forth herein. The Settling Parties' obligations, including to cooperate in preparing and submitting final settlement documentation, seek stays and tolling of litigation deadlines, pursue preliminary and final District Court approval, maintain the confidentiality of this Agreement prior to the filing of this Agreement with Plaintiffs' motion for preliminary approval, and comply with the dispute-resolution, no-admission, governing-law, jurisdiction, and execution provisions of this Agreement shall be binding on June 17, 2026. All payment obligations, releases, dismissal obligations, audit obligations, monitoring obligations, injunctive relief obligations, and other settlement obligations that require District Court approval are expressly contingent upon final District Court approval and shall have no force or effect unless and until such approval is obtained.

7.5 **Solvency Warranty:** Each Defendant will warrant and represent as to itself only, based on its knowledge after reasonable inquiry, that it is not "insolvent" within the meaning of 11 U.S.C. § 101(32), the Bankruptcy and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), the Companies Law, Cap. 113 (Cyprus), the Luxembourg Law of 7 August 2023 on Business Preservation and Modernisation of Bankruptcy Law, or any other applicable insolvency, bankruptcy, or similar law of any jurisdiction in which such Defendant is organized, domiciled, or conducts material operations, as of the time the Stipulation of Settlement is executed. In the event of a final order of a court of competent jurisdiction (whether in the United States, Canada, Cyprus, Luxembourg, or any other jurisdiction), not subject to any further proceedings, determining the transfer of the Settlement Fund, or any portion thereof, by or on behalf of any Defendant to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the United States Code (Bankruptcy), the Bankruptcy

and Insolvency Act (Canada), the Companies' Creditors Arrangement Act (Canada), or any other applicable federal, state, provincial, or foreign insolvency, bankruptcy, or fraudulent transfer law, and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by others, Plaintiffs may elect to accelerate the unsatisfied payment obligations set forth in Section 2 which shall then become immediately due and payable by Defendants.

7.6 **Bankruptcy**: If within 91 days of Settlement Effective Date or of any payment made thereunder, Defendants or a third party commences any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors, whether under the laws of the United States, Canada (including under the Bankruptcy and Insolvency Act or the Companies' Creditors Arrangement Act), Cyprus, Luxembourg, or any other jurisdiction in which any Defendant is organized, domiciled, or conducts material operations: (a) seeking to have any order for relief of any Defendant's debts, or seeking to adjudicate any Defendant as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, monitor, interim receiver, liquidator, examiner, or other similar official for any Defendant, or for all or any substantial part of any Defendant's assets, Defendants agree as follows: Defendants shall not argue or otherwise take the position in any such case, proceeding, or action (whether commenced in the United States or any foreign jurisdiction) that: (i) Defendants' obligations under the Stipulation of Settlement may be avoided under 11 U.S.C. § 547, Section 95 or 96 of the Bankruptcy and Insolvency Act (Canada), or any analogous provision of foreign law; (ii) Defendants were insolvent at the time the Stipulation of Settlement was entered into, or became insolvent as a result of the payment made to the Class; or (iii) the mutual promises, covenants, and obligations set forth in the Stipulation of Settlement do not constitute a contemporaneous exchange for new value given to Defendants or reasonably equivalent value under applicable law. If Defendants' obligations under the Stipulation of Settlement are avoided for any reason, including,

but not limited to, through the exercise of a trustee's, monitor's or liquidator's avoidance powers under the United States Bankruptcy Code, the Bankruptcy and Insolvency Act (Canada), or any other applicable insolvency law, Plaintiffs may elect to accelerate the unsatisfied payment obligations set forth in Section 2 which shall then become immediately due and payable by Defendants.

7.7 **Most Favored Creditor:** If, at any time from June 17, 2026 until the payment in full of the Settlement Fund, any Defendant sells equity, including debt convertible into equity, in cash to third party investors in an equity, including debt convertible into equity that contains terms and provisions that are more favorable than the terms and provisions contained in this Agreement, Defendants shall, at the request of Plaintiffs, enter into amendments to the Agreement with Plaintiffs to provide for the same more favorable terms and provisions.

7.8 **Event of Default**: In the event that Defendants have materially breached any payment obligation under this Agreement (**"Event of Default"**), Plaintiffs shall provide written notice to Defendants of the alleged default. Upon receipt of the notice, Defendants shall have five (5) Business Days to cure the alleged default. If the alleged default is cured within the five (5) Business Days, it shall be deemed resolved and no further action shall be taken. If Defendants fail to cure the alleged default within five (5) Business Days, the unpaid portion of the scheduled payment(s) that triggered the default, plus any scheduled payments that have since become due (the **"Outstanding Balance"**) shall become immediately due and payable by Defendants, plus default interest on the Outstanding Balance run at a rate of nine percent (9%) per annum from the date of the Event of Default, based upon an actual/365 counting convention, and Plaintiffs shall have the right, in accordance with applicable law, to take any other action to obtain remedies for the breach of this Agreement, including without limitation for declaratory relief, injunctive relief, preliminary relief, damages, costs, and/or specific performance.

7.9 **No Admission of Liability**: Each of the Settling Parties expressly denies having engaged in any wrongful conduct toward any other Party and acknowledges that no Party has made any concession or admission of liability regarding any claims in the Actions. The Settling Parties agree that, whether or not the Settlement Effective Date occurs, nothing in this Agreement or any related documents, communications, negotiations, proceedings, or any action taken to negotiate, seek approval of, implement, or carry out this Agreement is intended nor shall be construed as any such concession or admission of liability, wrongdoing, fault, violation of law, or actionable conduct, including but not limited to any concession or admission concerning Defendants' entitlement to the immunities set forth in 47 U.S.C. § 230 or whether Defendants' alleged conduct constitutes "participation in" sex trafficking or renders them "perpetrators of" a sex trafficking venture under 18 U.S.C. § 1595 as a matter of law. The Settling Parties further agree that the Term Sheet and this Agreement shall be inadmissible in any judicial, administrative, or other proceeding or action, whether civil, criminal, regulatory or otherwise, except as necessary to enforce its terms and that the Term Sheet and this Agreement have no precedential value and shall not be used for any purpose, including as evidence or admission, with respect to any other claims that are currently pending or may in the future be brought against Defendants or their affiliated entities.

7.10 **Confidentiality and Public Statements:** Except as necessary to seek preliminary or final approval of the Settlement, provide notice to the Class, comply with CAFA or other notice obligations, comply with legal process, court order, regulatory request, or applicable law, or satisfy tax, accounting, audit, financing, insurance, corporate governance, or securities-related reporting or disclosure obligations, the Settling Parties and their Counsel shall keep the existence, terms, negotiations, and communications concerning this Agreement and the Settlement confidential until the Settlement papers are filed with the District Court or otherwise disclosed with the Settling Parties' written agreement. Any permitted disclosure

shall be limited to the information reasonably necessary for the permitted purpose and, where practicable, shall be made subject to reasonable confidentiality protections.

7.11 **Governing Law**: This Agreement, and any disputes arising out of or relating to this Agreement, shall be governed by and construed in accordance with the laws of the State of California, without regard to its choice of law or conflict of law principles.

7.12 **Jurisdiction**: Any action or proceeding arising out of or relating to this Agreement shall be brought exclusively in the District Court, and the Settling Parties shall not challenge the jurisdiction of such court in any such action or proceeding. The District Court shall retain exclusive and continuing jurisdiction over this Action, the Parties, and all matters relating to the Settlement, including but not limited to the administration, interpretation, effectuation, and enforcement of this Agreement and the Final Order and Judgment. Without limiting the generality of the foregoing, the District Court shall retain jurisdiction to enforce the terms of this Agreement, including Defendants' obligation to make timely payments or to pay the full Settlement Fund Amount as set forth herein, and to enter such further orders as may be necessary or appropriate to effectuate and implement the terms and conditions of this Agreement. In the event of any dispute arising out of or relating to this Agreement, including any dispute regarding Defendants' payment obligations, the Parties shall submit such dispute exclusively to the District Court for resolution. The District Court shall have full authority to compel compliance with all terms of this Agreement, to impose sanctions or other remedies for noncompliance, and to enter such orders as may be necessary to protect the rights of the settlement Class Members and to ensure that the purposes of this Agreement are fully realized.

7.13 **Finality and Binding Effect**: This Agreement constitutes the final, complete, and binding agreement among the Settling Parties with respect to the subject matter hereof. This Agreement supersedes all prior and contemporaneous

negotiations, representations, warranties, commitments, offers, proposals, communications, and understandings, whether written or oral, among the Settling Parties or their Counsel relating to the Settlement, including, without limitation, the Term Sheet. If any provision of this Agreement conflicts with any provision of the Term Sheet, this Agreement shall control. For the avoidance of doubt, upon the Settlement Effective Date, the Term Sheet shall have no independent force or effect except to the extent expressly incorporated into or referenced in this Agreement. No amendment, modification, supplement, or waiver of any provision of this Agreement shall be valid or enforceable unless set forth in a written instrument signed by Counsel for all Settling Parties. The failure of any Settling Party to enforce any right or provision of this Agreement shall not constitute a waiver of such right or provision. Each of the Settling Parties acknowledges and agrees that (a) it has read and understands this Agreement in its entirety; (b) it has been represented by, and has had the opportunity to consult with, counsel of its own choosing in connection with the negotiation, execution, and delivery of this Agreement; (c) it has not relied upon any representation, warranty, or undertaking of any other Settling Party or any other person or entity that is not expressly set forth in this Agreement; and (d) it is executing this Agreement voluntarily, knowingly, and without duress or undue influence. This Agreement shall be binding upon, and shall inure to the benefit of, the Settling Parties and their respective successors, assigns, heirs, executors, administrators, and legal representatives.

7.14 **Stay of Proceedings**: If so advised or required by the court in either Action or the Irish Proceeding, the Settling Parties will agree to file any motion or submission necessary to stay all proceedings and toll all litigation deadlines in the Actions and the Irish Proceeding until the District Court rules on final approval of the Settlement. Nothing in this provision shall prevent any party from seeking emergency relief from a court presiding over any of the Actions or proceedings to be stayed pursuant to this Section 7.14 if it deems such relief necessary to protect its

rights and interests; provided that any non-moving party shall be entitled to oppose any such request for emergency relief.

7.15 **Resolution of Disputes**: Any disputes arising from this Agreement, including any unresolved disputes concerning language to be included in the settlement documentation, will be resolved by the District Court or, if unavailable, a mediator mutually agreed upon in writing by the Settling Parties, who shall have authority to make binding determinations consistent with the terms of this Agreement and applicable law, provided that such determinations do not materially alter the fundamental rights and obligations of the Parties as set forth in this Agreement.

7.16 **No Presumption Against Drafter**: This Agreement is deemed to have been prepared by counsel for all Parties, as a result of arm's-length negotiations among the Settling Parties. Whereas all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

7.17 **Further Assurances**: Each Settling Party shall take commercially reasonable steps reasonably necessary to effectuate, implement, and carry out the express terms of this Agreement and any order finally approving the Settlement, and shall not take any voluntary action intended to frustrate the implementation of the Settlement. Nothing in this Section shall expand any Settling Party's obligations beyond the express terms of this Agreement or any applicable order of the District Court, waive any right, defense, privilege, or protection, or require any Settling Party to agree to any modification of the Settlement.

7.18 **Severability**: If any provision of this Agreement is held to be invalid, illegal, or unenforceable, the remaining provisions shall remain in full force and effect to the maximum extent permitted by law; provided, however, that no provision shall be severed, modified, or enforced in a manner that materially impairs the release of claims, payment structure, no-admission protections, dismissal obligations, injunctive relief, or other material benefit of the bargain reflected in this Agreement.

7.19 **Notices**: Where this Settlement Agreement requires notice to the Parties, such notice shall be sent to the undersigned counsel. Notice may be sent by email and, absent notice to the sender that the email was not or could not be delivered to the addressed recipient, shall be deemed sent on the date and time sent from the sender's email account. In the event of an undeliverable Notice email the Parties shall make reasonable efforts to cooperate to effect delivery of Notice hereunder.

IT IS HEREBY AGREED by the undersigned, on behalf of their respective clients.

Counsel for Plaintiff Jane Doe #1, on behalf of herself and the other members of the Class in the Alabama Action,


Gregory M Zarzaur
Zarzaur Law LLC
2850 Cahaba Road
Ste 220
Birmingham, AL 35223
Email: gregory@zarzaur.com


Date: 7/17/2026


Joshua Patrick Hayes
PRINCE, GLOVER, HAYES
PO Box 20149
Tuscaloosa, AL 35402
Email: jhayes@princelaw.net


Date: 7- 17 2026


Gaetano Anthony D'Andrea
LAFFEY BUCCI D'ANDREA REICH & RYAN, LLP
1100 Ludlow Street, Suite 300
Philadelphia, PA 19107
Email: gdandrea@laffeybuccikent.com


Date: 7-17-2026


Danielle M Bianculli Pinter
NATIONAL CENTER ON SEXUAL EXPLOITATION
1201 F St. NW Suite 200
Washington, DC 20004
Email: bbull@ncose.com
Email: dpinter@ncoselaw.org


Date: 7-17-2026


Kimberly Lambert Adams
LEVIN PAPANTONIO RAFFERTY PROCTOR BUCHANAN OBRIEN BARR & MOUGEY, PA
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Email: kadams@levinlaw.com


Date: 7/17/26

Mark B Schoeller
**CLARK HILL, PLC**
2 Commerce Square, Ste. 2620
Philadelphia, PA 19103
Email: mschoeller@clarkhill.com

Date: 7/17/26

**Counsel for Plaintiff Jane Doe, on behalf of herself and the other members of the Class in the California Action,**

**Krysta Kauble Pachman**
Susman Godfrey LLP
1900 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
Email: kpachman@susmangodfrey.com

Date: 7/17/26

Date: ______________

**Steve M. Cohen**
Pollock Cohen LLP
1111 Broadway Street Suite 1804
New York, NY 10006
Email: scohen@pollockcohen.com

**Counsel for Plaintiff Jane Doe, on behalf of herself and the other members of the Class in the California Action,**

______________________ Date: ______________________

**Krysta Kauble Pachman**
Susman Godfrey LLP
1900 Avenue of the Stars Suite 1400
Los Angeles, CA 90067
Email: kpachman@susmangodfrey.com

______________________ Date: 17 July 2026

**Steve M. Cohen**
Pollock Cohen LLP
111 Broadway Street Suite 1804
New York, NY 10006
Email: scohen@pollockcohen.com

**Counsel for Defendants MG Freesites Ltd, MG Freesites II, Ltd, MindGeek S.à r.l., MindGeek USA Incorporated, MG CY Holdings Ltd, MG Content RT Limited, 9219-1568 Quebec Inc., and MG Billing Limited**

______________________________ Date: July 17, 2026

Seth R. Goldman
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.**
919 Third Avenue
New York, New York 10022
Email: SRGoldman@mintz.com

Kevin M. McGinty
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.**
One Financial Center
Boston, Massachusetts 02111
Email: KMMcginty@mintz.com

Arameh Zargham O'Boyle
Esteban Morales
**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY and POPEO, P.C.**
2049 Century Park East, Suite 300
Los Angeles, California 90067
Email: AZOboyle@mintz.com
Email: Emorales@mintz.com

Sara M. Turner
**BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.**
1901 Sixth Avenue North
Suite 2600
Birmingham, Alabama 35203
Email: smturner@bakerdonelson.com

# **EXHIBITS**

**Exhibit A:** Appendix A

## APPENDIX A

## I. UPLOADING.

A. Defendants must establish and implement, and thereafter maintain, comprehensive procedures ("**CSAM and NCM Prevention Program**") that are designed to deter and reduce the risk of the uploading of CSAM to their Websites and the publication or dissemination of CSAM or NCM on Defendants' Websites. Defendants must, at a minimum:

1. Document in writing the content, implementation, and maintenance of the CSAM and NCM Prevention Program;

2. Design, implement, maintain, and document safeguards based on the likelihood that CSAM or NCM could be published, disseminated, or otherwise made available by Defendants on their Websites. Such safeguards must include policies, practices, procedures, and technical measures designed to ensure Content uploaded by a Model or Content Partner may not be published or otherwise made available to third parties unless Defendants follow the processes laid out in Sections I(B) and I(C), below.

B. At a minimum, Defendants must include the following processes and procedures for Model Accounts:

1. **Model Verification:** Verify that the Model is eighteen (18) years of age or older.

2. **Multi-Factor Authentication:** Defendants must require each Model to register for multi-factor authentication when opening an account.

3. **Notice to Model:** For each piece of Content uploaded by a Model, provide a notice to the Model at the time of uploading. The notice will inform the Model that Defendants will review Content prior to its publication and that Defendants will report actual or suspected CSAM or NCM to the National Center for Missing and Exploited Children or to relevant law enforcement.

4. **Affirmation of No CSAM and NCM:** For each piece of Content uploaded by a Model, the Model will be required to affirm that the Content does not contain CSAM or NCM.

5. **Depicted Person Verification**: Prior to publication, Defendants will Verify:

   a. That every Depicted Person was eighteen (18) years of age or older at the time such Content was uploaded. If the Defendants determine that a Depicted Person was under eighteen (18) years of age when the Content was created, the Content will be rejected, Deleted, and fingerprinted, and will proceed through the Disposition Process identified below in Section VI; the Model shall be Banned and any other Content uploaded by the same

Model and depicting the same Depicted Person shall be audited for compliance;

b. That every Depicted Person consented to the (i) Sexually Explicit Conduct; (ii) Content being created; and (iii) Content being distributed, provided that this requirement is not required for a Depicted Person who has previously met this requirement for other Content uploaded by the same Model; and

c. That every Depicted Person is Validated upon each upload.

d. If the Depicted Person's face is not visible in the Content, Defendants will use additional means, which may include reviewing other Content or images featuring the face of the Depicted Person, or other records, to Validate the Depicted Person.

6. [redacted]

C. At a minimum, Defendants must include the following processes and procedures for Content Partners:

1. **Know your Customer ("KYC") Onboarding Process**:

a. Collection of account information:

i. Account holder's name and company details;

ii. Company principal's information; and

iii. Principal's contact email and government-issued ID.

b. Collect documentation based on application type:

i. Individual applicants: Government-issued photo ID and proof of domain ownership.

ii. Company applicants: Certificate of incorporation, company register extract, declaration of directors/UBOs, certificate of good standing, government ID from company's principal, and proof of domain ownership.

c. Content review:

i. Request access to and undertake reasonable review of Content Partner's available Content, whether free or paid;

ii. Review Verification documents for a random sample of Content of the Content Partner selected by the Defendants; and

iii. Subject all uploaded Content to moderation as described in Provision II.A.

d. If the Company discovers that principals of company applicants appear on sex offender lists or have been convicted of sexual crimes or serious violent crimes (such as murder or kidnapping), the Content Partner will be Banned and all Content uploaded by that Content Partner will be removed.

2. **Content Partner audits**: At least once every twelve (12) months, require that Content Partners produce the documents establishing consent, Verification, and Validation of each Depicted Person for a random sample of the Content Partner's Content. Defendants will Suspend all Content for which Content Partner fails to provide the requested documentation within thirty (30) days. Such Content may not be republished or otherwise made available to Websites by Defendants unless the Content Partner provides the requested documentation. If, as part of an audit, a Content Partner fails to provide requested documentation for any one piece of Content within forty-five (45) days, Defendants must initiate a subsequent audit for a new sample of previously unaudited Content. Failure to comply with subsequent audits will result in removal of Content Partner account, Suspension of all Content Partner Content, and Deletion of all Content Partner Content.

D. For any advertisements supplied by advertiser Websites, Defendants shall ensure that any photograph, film, video, picture, audio recording, or computer-generated image, including all metadata, depicting Sexually Explicit Conduct contained therein meets all Verification and Validation requirements and subject it to moderation as described in Provision II.A.

## II. <u>CONTENT MODERATION.</u>

A. **Automated Review of Content:** Utilizing available tools and technologies to review Content to determine whether it is actual or suspected CSAM or NCM prior to its publication or otherwise making it available to any Website, including, but not limited to:

1. Comparing Content, via internal or external tools, to Content previously identified and/or fingerprinted or otherwise marked by the tools as actual or suspected CSAM or NCM. Where such tool is a verified third party hash list (such lists to be determined in good-faith consultation with the Monitoring Committee, with Defendants retaining final decision-making authority subject to commercially reasonable and legally permissible implementation), if such a comparison indicates that a piece of Content matches previously identified or reported actual or suspected CSAM or NCM or is likely to be CSAM or NCM, Defendants shall not publish it or otherwise make it available on any Website. For all other tools, if Defendants'

review determines that the Content is not or is not likely to be actual or suspected CSAM or NCM, Defendants may publish the Content, provided that the Content meets all other moderation, Verification, and Validation requirements.

2. To the extent Defendants use Moderators to review Content:

   a. At least one Moderator must exclusively watch and listen to each piece of Content in its entirety, and where the Content is uploaded by a Model, Validate each Depicted Person;

   b. Moderators must review the language spoken or heard in all Content. The Moderator reviewing a particular piece of Content must be either fluent in the primary languages spoken in such Content or must review a transcription of the Content that has been translated into a language in which the Moderator is fluent;

   c. A Moderator's salary, bonus, or any other financial compensation may not be based solely or substantially on the amount or quantity of Content that the Moderator reviews during any given time period.

B. **Technology:**

1. Defendants agree to periodically assess and evaluate their use of technology tools to monitor for, detect, and remove CSAM and NCM from their Websites, including any such technology proposed or suggested by the Monitoring Committee.

C. **Training:**

1. Mandatory CSAM Prevention training for trust and safety employees that addresses the following:

   a. The current and emerging risks and harms associated with the publication and dissemination of CSAM and NCM;

   b. The safeguards implemented by Defendants related to CSAM and NCM prevention;

   c. How Content is flagged, fingerprinted, and removed;

   d. How users are Banned; and

   e. How and when Content is reported and who it should be reported to.

2. This training must be provided upon hire and on at least an annual basis thereafter to all moderators and employees with responsibilities related to Content and CSAM and NCM prevention.

D. **Moderation Policies:**

1. Policies, practices, procedures, and technical measures designed to ensure the consistent and thorough review of Content to determine whether it is actual or suspected CSAM or NCM, both before that Content is published on any Website and upon Defendants' receipt of any report or complaint that the Content may be CSAM or NCM.

## III. CONTENT REMOVAL REQUESTS.

A. Policies, practices, procedures, and technical measures regarding Content Removal Requests, including, but not limited to:

1. Implementing a process by which an individual, without requiring an account with a Website, can submit a Content Removal Request. The process will include:

a. A link or button on the home page for each Website as well as each webpage displaying Content for an individual to submit a Content Removal Request; and

b. An easy-to-use Content Removal Request form that includes a link to an explanation of Defendants' review process;

c. Upon receipt of a Content Removal Request with an email address for which the Defendants have Verified that the submitter has access to:

i. Immediate Suspension of all Content identified in the Content Removal Request that provides a valid URL for the Content;

ii. The Suspension, within seventy-two (72) hours of all Content identified in the Content Removal Request by title or other information that permits Defendants to identify Content through a search of Defendants' Websites and internal systems; and

iii. If after twenty-four (24) hours Defendants are unable to locate the Content, Defendants will use the contact information provided to contact the individual who submitted the Content Removal Request with the request to obtain additional information to assist Defendants in locating the Content;

d. Upon receipt of a Content Removal Request without an email address or without an email address that Defendants have Verified that the submitter has access to, the Suspension within five (5) days, of all Content identified in the Content Removal Request by URL, title, or other information that permits Defendants to identify Content through a search of Defendants' Websites and internal systems;

e. Processes and technical measures that readily inform the submitter of the status of each Content Removal Request; and

f. Content Removal Request Content may not be republished or otherwise made available to any individual by Defendants unless Defendants confirm that the Content meets the safeguards required under sub-Provision Section I.B.5 and that the Content is not suspected CSAM or NCM, and, where the Depicted Person submitting the claim has been Verified and Validated if the Depicted Person has withdrawn their removal request. For Content Removal Requests that include an email address Defendants have Verified that the submitter has access to, Defendants must notify the submitter when any Content associated with the submitter's Content Removal Request is republished or otherwise made available to any individual by Defendants.

## IV. WITHDRAWAL OF CONSENT.

A. Policies, practices, procedures, and technical measures regarding Withdrawal of Consent, including, but not limited to:

1. Implementing a process by which an individual, or an individual's representative that has provided sufficient proof of representation, without being required to have an account with a Website, can submit a request that Defendants remove one or more pieces of Content or all Model Content that has been Verified to include the individual, from Website(s) based on the Withdrawal of Consent (a "Withdrawal of Consent Request"). The process must include:

a. A link or button on the home page for each Website as well as each webpage displaying Content or as a standalone option in the Content Removal Request process pursuant to Provision III for an individual, or an individual's representative, to submit a Withdrawal of Consent Request, as well as a link to an explanation of the process by which Defendants review each Withdrawal of Consent Request;

b. Upon receipt of a Withdrawal of Consent Request with an email address that Defendants have Verified the submitter has access to:

i. The immediate Suspension of all Content identified in a Withdrawal of Consent Request by a valid URL;

ii. The Suspension, within seventy-two (72) hours of all other instances of the same Content uploaded by a Model requested in a Withdrawal of Consent Request by a valid URL from all Websites;

iii. If after twenty-four (24) hours Defendants are unable to locate the Content, Defendants will use the information available to contact the individual who submitted the Withdrawal of Consent Request with the request to obtain additional information to assist Defendants in locating the Content;

iv. The Suspension, if requested, within seven (7) days of all Content uploaded by a Model that has been Verified to include the individual (collectively, "Withdrawal of Consent") from all Websites; and

v. Processes and technical measures that readily inform the submitter of the status of each Withdrawal of Consent Request submitted pursuant to this sub-provision.

c. Upon receipt of a Withdrawal of Consent Request without an email address that Defendants have Verified the submitter has access to, the Suspension:

i. Within five (5) days, of all Content uploaded by a Model identified in the Withdrawal of Consent Request by URL, title, or other information that permits Defendants to identify Content through a search of Defendants' Websites and internal systems; and

ii. Within ten (10) days, all other instances of the same identified Content uploaded by a Model from all Websites.

d. Any Content Suspended pursuant to a Withdrawal of Consent Request may only be republished or otherwise made available by Defendants if the Depicted Person withdrawing Consent is Verified and Validated and has withdrawn the Withdrawal of Consent Request, or if:

i. The Withdrawal of Consent Request was submitted by an individual who lacked or is unable to provide sufficient proof of representation of an individual appearing in the Content uploaded by a Model:

1. Defendants confirm that the Content meets the safeguards required under its policies and procedures; and

2. The Content is not suspected CSAM or NCM.

e. For Withdrawal of Consent Requests that include an email address that Defendants have Verified the submitter has access to, Defendants must notify the submitter when any Content associated with the submitter's Withdrawal of Consent Request is republished or otherwise made available to any individual by Defendants.

2. Any Content uploaded by a Model and Suspended pursuant to Withdrawal of Consent Requests determined to have been submitted either by the individual appearing in the Content, or by a submitter with sufficient proof of representation of such individual ("Withdrawal of Consent Content"), will be subject to the following requirements:

a. Within twenty-four (24) hours of such determination, Defendants must Suspend from all Websites all other instances of the same Content, or portions of the same Content that Defendants are able to identify through

the content identification tools and technologies utilized by Defendants in the ordinary course of business; and

b. Within three (3) days of such determination, Defendants must:

i. Fingerprint or otherwise mark the Content, including all other instances of the same Content, or portions of the same Content that Defendants are able to identify through the content identification tools and technologies utilized by Defendants in the ordinary course of business, as Withdrawal of Consent Content to facilitate efforts to prevent it from being republished or otherwise made available to an individual;

ii. Delete any webpage where any instances of the same Content, or portions of the same Content that Defendants are able to identify through the content identification tools and technologies utilized by Defendants in the ordinary course of business, was hosted. However, any webpage, including all metadata, upon which the Content was hosted, that Defendants are otherwise required to Delete pursuant to this sub-provision may be retained or disclosed to the extent requested by a government agency in a formal preservation letter that identifies the specific data to be preserved or required by compulsory process, a request from law enforcement, a litigation hold, or otherwise required by law, regulation, or court order; and

iii. Request that Google, Bing, and Yahoo! de-index the Website webpage(s) upon which the Content was hosted. For search engines for which the Defendants must manually request such de-indexing, the deadline is seven (7) days after determination of the Content to be Withdrawal of Consent. To the extent that the Monitoring Committee identifies additional search engines that may need to be included in this process, the Defendants will confer in good faith to ascertain the feasibility and necessity of adding such sites to this provision, with Defendants retaining final decision-making authority unless this Appendix A expressly provides otherwise.

## V. <u>FLAGGING CONTENT.</u>

A. **Law Enforcement:** Policies, practices, procedures, and technical measures regarding requests by law enforcement agencies to remove Content.

1. Implementing a process by which any law enforcement agency can request that Defendants remove Content available on a Website suspected as CSAM or NCM ("Law Enforcement Request"). The process will include:

a. A link or button on the home page for each Website so that any law enforcement agency can request the removal of Content because it is suspected as CSAM or NCM;

b. Upon receipt of a Law Enforcement Request with a validated law enforcement email address:

i. Immediate Suspension of Content identified in the Law Enforcement Request that provides a valid URL for the Content;

ii. The Suspension, within seven (7) days, of all other instances of the same Content identified by a valid URL from all Websites;

iii. The Suspension:

1. Within seventy-two (72) hours, of all Content identified in the Law Enforcement Request by means other than a valid URL, such as a title or other information that permits Defendants to identify Content through a search of Defendants' Websites and internal systems;

2. Within seven (7) days, of all other instances of the same Content identified in the Law Enforcement Request by means other than a valid URL, such as a title or other information sufficient to identity the Content, from all Websites;

c. Processes and technical measures that readily inform a law enforcement agency of the status of each Law Enforcement Request it has submitted;

d. The Content subject to a Law Enforcement Request may not be republished or otherwise made available to any consumers by Defendants until:

i. Law enforcement that submitted the Law Enforcement Request informs Defendants that the Content is not CSAM or NCM; or

ii. Defendants confirm the Content meets the safeguards required under its policies and procedures, and Defendants' review determines that it is not suspected CSAM or NCM, and wait forty-eight (48) hours after notifying law enforcement that submitted the Law Enforcement Request that the Content will be republished or otherwise made available.

iii. If after twenty-four (24) hours Defendants are unable to locate the Content, Defendants will use reasonable efforts to contact the law enforcement agency who submitted the Law Enforcement Request with a request to obtain additional information to assist Defendants in locating the Content.

B. **Registered User Flags.**

1. Policies, practices, procedures, and technical measures so that a registered user of a Website can flag or otherwise report to Defendants for review Content, comments, or direct messages between a user, Content Partner and/or Model and users on a Website, to the extent available, because the Content, comment or direct

message (a) contains actual or suspected CSAM or NCM; (b) promotes, encourages, or solicits the creation, publication, or dissemination of CSAM or NCM; or (c) encourages, promotes, solicits, or engages in child abuse or non-consensual sexual activities. The process will include:

a. A link or button in proximity to each user comment and direct message between users so that a registered user may flag or otherwise report the comment or direct message for review by Defendants, as well as a link to an explanation of the process by which Defendants review each flag or report;

b. Defendants' review of any flagged or otherwise reported user comment or direct message within three (3) days of such flagging or reporting to determine whether it (i) promotes, encourages, or solicits the creation, publication, or dissemination of CSAM or NCM, or (ii) encourages, promotes, solicits, or engages in child abuse or non-consensual sexual activities;

c. The immediate removal of any user comment or direct message Defendants determine (i) promotes, encourages, or solicits the creation, publication, or dissemination of CSAM or NCM, or (ii) encourages, promotes, solicits, or engages in child abuse or non-consensual sexual activities; and

d. The Banning, within three (3) days, of any registered user that Defendants determine has posted a comment or sent a direct message (i) promoting, encouraging, or soliciting the creation, publication, or dissemination of CSAM or NCM, or (ii) encouraging, promoting, soliciting, or engaging in child abuse or non-consensual sexual activities. In Banning such a registered user, Defendants must Ban all accounts of that user on all Websites and implement measures to facilitate efforts to prevent the user from creating an account for uploading Content to any Website.

C. **Trusted Flaggers.**

1. Upon receipt of a Trusted Flagger Report ("TFR") with an email address that Defendants have confirmed that the submitter has access to, the:

a. Immediate Suspension of all Content identified in the TFR that provides a valid URL for the Content;

b. The Suspension, within twenty-four (24) hours, of all Content identified in the TFR;

c. If after twenty-four (24) hours Defendants have not identified the Content, Defendants must attempt to connect with the Trusted Flagger who submitted the TFR to obtain additional information to assist in locating the Content;

d. Processes and technical measures that readily inform the Trusted Flagger of the status of each TFR; and

e. Preventing Content identified by the TFR from being republished or otherwise made available to Websites unless Defendants confirm that the Content has been Verified and Validated.

## VI. DISPOSITION OF ACTUAL OR SUSPECTED CSAM OR NCM.

A. Policies, practices, procedures, and technical measures to address any instance in which Defendants have Suspended actual or suspected CSAM or NCM on the Websites, including, but not limited to:

1. For instances of such actual or suspected CSAM or NCM identified outside the processes pursuant to its policies and procedures Suspending such Content, as well as all other instances of the same Content, or portions of the same Content that Defendants are able to identify through the content identification tools and technologies utilized by Defendants in the ordinary course of business, from all Websites within twenty-four (24) hours of Defendants' review determining that it is actual or suspected CSAM or NCM;

2. Within three (3) days of determination of such Content to be actual or suspected CSAM or NCM:

a. Fingerprinting or otherwise marking the Content, including all other instances of the same Content, as actual or suspected CSAM or NCM to facilitate efforts to prevent it from being republished or otherwise made available to an individual;

b. Deleting any Website webpages on which any instances of the same Content, or portions of the same Content that Defendants are able to identify through the content identification tools and technologies utilized by Defendants in the ordinary course of business, was hosted. However, any Website webpage upon which the Content was hosted that Defendants are otherwise required to Delete pursuant to this sub-provision may be retained or disclosed to the extent requested by a government agency in a formal preservation letter that identifies the specific data to be preserved or required by compulsory process, a request from law enforcement, a litigation hold, or otherwise required by law, regulation, or court order; and

c. Request that Google, Bing, and Yahoo! de-index the Website webpage(s) upon which the Content was hosted. For search engines for which the Defendants must manually request such de-indexing, the deadline is seven (7) days after determination of the Content to be actual or suspected CSAM or NCM. To the extent that the Monitoring Committee identifies additional search engines that may need to be included in this process, the Defendants will confer in good faith to ascertain the feasibility and necessity of adding

such sites to this provision, with Defendants retaining final decision-making authority unless this Appendix A expressly provides otherwise;

3. For Content uploaded by a Model determined to be such actual or suspected CSAM or NCM within seven (7) days, Defendants must:

    a. Suspend all Content on all Websites uploaded by the Model who uploaded the CSAM or NCM Content; and

    b. Ban all accounts of that Model from all Websites, and implement measures to facilitate efforts to prevent the Model from creating an account for uploading Content to any Website.

4. Within seven (7) days of determination of actual or suspected CSAM or NCM Content, upon request of any non-consenting individuals featured in such Content, assigning a case manager responsible for responding to information requests or other inquiries from the individual relating to such Content;

5. For instances of such actual or suspected CSAM or NCM identified outside the processes, pursuant to its policies and procedures, Suspending such Content, as well as all other instances of the same Content, or portions of the same Content that Defendants are able to identify through the Content identification tools and technologies utilized by Defendants in the ordinary course of business, from all Websites within twenty-four (24) hours of Defendants' review determining that it is actual or suspected CSAM or NCM; and

6. Defendants and the Monitoring Committee will confer in good faith to ascertain the feasibility and necessity for rerunning specific automated tools against Content on a periodic basis, with Defendants retaining final decision-making authority unless this Appendix A expressly provides otherwise.

## VII. <u>RESTRICTIONS ON TERMS.</u>

A. Policies, practices, procedures, and technical measures to prevent searching for or tagging or titling Content with terms Defendants have determined suggest the Content is CSAM or NCM, including but not limited to:

1. Displaying a message whenever a person searches for Content using such terms:

    a. Stating that the person may be attempting to access Content that is CSAM or NCM, which may be illegal; and

    b. Where available, and provided to Defendants by relevant or applicable organizations, contact information for organizations that provide help to persons who have sought CSAM or NCM.

2. Preventing the use of restricted terms in metadata in freeform text fields on the Websites, such as comments, tags and titles, Communications, and searches to any Websites, subject to restrictions under applicable laws.

## VIII. REPORTING ACTUAL OR SUSPECTED CSAM.

A. Policies, practices, procedures, and technical measures designed to ensure Defendants report any actual or suspected CSAM uploaded to, or identified on, a Website to the National Center for Missing and Exploited Children within seventy-two (72) hours of Defendants' determination that the Content is actual or suspected CSAM.

## IX. PERIODIC ASSESSMENT AND MONITORING OF SAFEGUARDS.

A. **At least once every twelve (12) months:**

1. Assess the sufficiency of any safeguards in place to address the internal and external risks that could result in the publication of CSAM or NCM on a Website, and modify the CSAM and NCM Prevention Program based on the results; and

2. Monitor the effectiveness of the safeguards and modify the CSAM and NCM Prevention Program based on the results.

B. **Ongoing evaluation of adequacy of practices and procedures.**

1. Evaluate and adjust the CSAM and NCM Prevention Program in light of any material changes to:

a. Defendants' operations or business arrangements;

b. New or more efficient technological or operational methods to control for CSAM or NCM;

c. Any other circumstances that Defendants know or have reason to know may have a material impact on the effectiveness of the CSAM and NCM Prevention Program or any of its individual safeguards; and

d. At a minimum, Defendants must evaluate the CSAM and NCM Prevention Program at least once every twelve (12) months and modify the CSAM and NCM Prevention Program based on the results, as necessary.

C. **Semi-Annual Reporting:** Within ninety (90) days of June 30 and December 31 of each calendar year, publish a hyperlink on the home page of each Website to a report detailing Defendants' implementation and enforcement of policies, practices, procedures, and technical measures to prevent the publication and dissemination of CSAM and NCM ("CSAM and NCM Prevention Transparency Report"). Each CSAM and NCM Prevention Transparency Report must include the following information for the six (6) months preceding the end of the applicable reporting period (i.e., June 30, December 31):

1. A description of all business units or teams (e.g., compliance, Moderators) involved in Defendants' CSAM and NCM prevention efforts;

2. A description of each policy, practice, process, procedure, tool, and technical measure employed by Defendants designed to ensure that the Websites are not used for the publication or dissemination of CSAM or NCM, including but not limited to:

   a. A description of each policy, practice, process, procedure, tool, and technical measure employed by Defendants to Verify the identity, age, and consent of each person depicted participating in the Sexually Explicit Conduct in Content on the Websites;

   b. A description of what constitutes CSAM and NCM;

   c. A description of each policy, practice, procedure, tool, and technical measure employed by Defendants to detect, identify, remove, and/or report CSAM and NCM;

   d. A graphical representation of the process by which Defendants review Content for the presence of CSAM and NCM;

   e. A description of the review process where a Moderator does not speak the language spoken or presented in Content;

   f. A description of Defendants' processes for responding to CSAM and NCM on the Website, including but not limited to those concerning persons and entities attempting to upload CSAM or NCM to a Website or otherwise using a Website to disseminate CSAM or NCM;

   g. A description of each process by which individuals, organizations, and law enforcement agencies may report or flag actual or suspected CSAM and NCM on the Websites to Defendants, as well as the policies, practices, and procedures governing Defendants' response to any such report or flag;

   h. A description of all processes by which, and categories of circumstances under which, Defendants report CSAM and NCM to an external organization or agency;

   i. A description of Defendants' membership in any industry organizations, partnerships, or other collaborations related to the detection, identification, removal, and/or prevention of CSAM or NCM, or related to child safety; and

   j. An explanation of any material updates or changes to Defendants' policies, practices, procedures, or technical measures insofar as they relate to preventing the upload of, or to the detection, identification, and/or removal of CSAM or NCM.

3. Detailed metrics on the results of Defendants' efforts designed to ensure that the Websites are not used for the publication or dissemination of CSAM and/or NCM, including both narrative explanation and numerical data displayed in charts and/or graphs on the following metrics:

    a. The number of photos and videos uploaded to the Websites;

    b. The number of photos and videos published or otherwise made available to an individual on the Websites;

    c. The number of unique Withdrawal of Consent Requests received in connection with the Websites;

    d. The number of unique Content Removal Requests, flags, and Law Enforcement Requests received in connection with actual or suspected CSAM or NCM on the Websites;

    e. The number of actual or suspected CSAM and NCM photos and videos uploaded to, but not published or otherwise made available to individuals on the Websites, including a breakdown of how such Content was identified as actual or suspected CSAM or NCM (e.g., moderation, tool, technology);

    f. The number of actual or suspected CSAM and NCM photos and videos removed from the Websites, including a breakdown of how such Content was identified as actual or suspected CSAM or NCM (e.g., moderation, technology, Content Removal Request, flag, Law Enforcement Request), the average number of days such Content was available on the Websites, and the average number of views such Content received before it was removed;

    g. The number of accounts identified as attempting to upload, publish, or disseminate actual or suspected CSAM and/or NCM in connection with the Websites, as well as a breakdown of what actions were taken with respect to these accounts in response;

    h. The number of accounts Suspended, Banned, or otherwise actioned in connection with the attempted upload, publication, or dissemination of actual or suspected CSAM and/or NCM in connection with the Websites, as well as how many of these accounts were reinstated and the reasons for any such reinstatements;

    i. The number of reports of actual or suspected CSAM and NCM made to outside organizations that seek to prevent CSAM or NCM (e.g., the National Center for Missing and Exploited Children);

    j. The number of videos that were not initially published due to the inability to validate that any Depicted Person(s) were verified as the face(s) of the

Depicted Person(s) were not visible, and were only published after alternative procedures were performed to Validate the Depicted Person(s);

k. The number of videos that were not published due to the inability to Validate that all Depicted Person(s) were Verified, where reasonable additional means as identified in Section I.B.5.d above were unavailable; and

l. The number of Content Removal Requests that were closed without further action on the reported content, account, or information because they were determined to be unverifiable, inaccurate, abusive, or a false report.

## X. MISCELLANEOUS

A. Capitalized terms used in this Appendix A shall have the meaning set forth in the Term Sheet to which this Appendix is attached.

B. In the event that any provision of this Appendix A conflicts with any obligation imposed under any law, statute, regulation, judicial decision, or administrative determination applicable to or binding on any Defendant, whether now existing or subsequently enacted, adopted, or announced (collectively, a "Controlling Legal Requirement"), Defendants' conduct shall be governed by and conform to the applicable Controlling Legal Requirement. For clarity, nothing in this Appendix A prohibits any Defendant from preserving, retaining, reviewing, producing, or disclosing Content, account information, records, metadata, communications, or other information in response to a preservation request, subpoena, warrant, court order, regulatory request, law enforcement request, litigation hold, discovery obligation, or other compulsory process, or as otherwise required or permitted by applicable law. The invalidity of any provision of this Appendix A by reason of any Controlling Legal Requirement shall not limit the validity or enforceability of any other provision of Appendix A that is not governed by that Controlling Legal Requirement.

****